**COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC., et al., Plaintiffs,**

v.

**The COCA–COLA COMPANY, a Delaware Corporation, Defendant.**

**Civ. A. Nos. 81–48, 87–398–JJF.**

United States District Court, D. Delaware.

June 28, 1991.

**604**

Edmund N. Carpenter, II, Charles F. Richards and Jesse A. Finkelstein of Richards, Layton & Finger, Wilmington, Del. (Emmet J. Bondurant, Jane F. Vehko and Jeffrey D. Horst of Bondurant, Mixson & Elmore, Atlanta, Ga., of counsel), for plaintiffs.

Richard D. Allen of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Frank C. Jones, Chilton Davis Varner and Dwight J. Davis of King & Spalding, Atlanta, Ga., of counsel), for defendant.

## OPINION

FARNAN, District Judge.

### INTRODUCTION

This is one of three related actions involving the contracts which govern the relationship between The Coca-Cola Company (the "Company") and certain of its bottlers (the "bottlers"). This action, which for convenience will be referred to as the "*Elizabethtown*" case, arises out of contractual disputes between the Company and the bottlers involving the supply of syrup for the product bottled Coca-Cola. Two related actions, *Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*, C.A. No. 83–95, and *Alexandria Coca-Cola Bottling Co., Ltd. v. The Coca-Cola Co.*, C.A. No. 83–120 (collectively referred to as the "*diet Coke* cases"), 769 F.Supp. 671, arise from disputes involving introduction by the Company of its new diet product, diet Coke, in 1983.[1]

Litigation of these cases was conducted for eight years before Hon. Murray M. Schwartz, who became unable to see the litigation to its completion when he became ill in the Winter of 1989, after the end of trial on these matters. The cases were reassigned to me in the Spring of 1989. The parties elected to retry the cases rather than to allow decision on the then-existing record, and the *Elizabethtown* case was retried before me from September 1989–March 1990. This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a) in the *Elizabethtown* case.

The *Elizabethtown* litigation began in 1981 and stems from the Company's decision to substitute high-fructose corn syrup ("HFCS" or "HFCS–55") for granulated sugar in the syrup for the Coca-Cola beverage drink sold by the Company to the plain-

---

1. For ease of reference, citations to the previous published opinions in the *Elizabethtown* case will be as follows:

*Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 95 F.R.D. 168 (D.Del.1982) ("*Coke I* at ___").

*Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 98 F.R.D. 254 (D.Del.1983) ("*Coke II* at ___").

*Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 654 F.Supp. 1388 (D.Del.1986) ("*Coke III* at ___").

*Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 654 F.Supp. 1419 (D.Del.1987) ("*Coke IV* at ___").

*Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 668 F.Supp. 906 (D.Del.1987) ("*Coke V* at ___").

*Coca-Cola Bottling Co. of Elizabethtown v. Coca-Cola Co.*, 696 F.Supp. 57 (D.Del.1988) ("*Coke VI* at ___").

Judge Schwartz' six published opinions in the *diet Coke* litigation will hereinafter be cited as follows:

*Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 563 F.Supp. 1122 (D.Del.1983) ("*diet Coke I* at ___").

*Alexandria Coca-Cola Bottling Co. v. Coca-Cola Co.*, 637 F.Supp. 1220 (D.Del.1984) ("*diet Coke II* at ___").

*Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 107 F.R.D. 288 (D.Del.1985) ("*diet Coke III* at ___").

*Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 110 F.R.D. 363 (D.Del.1986) ("*diet Coke IV* at ___").

*Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 696 F.Supp. 97 (D.Del.1988) ("*diet Coke V* at ___").

*Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 123 F.R.D. 97 (D.Del.1988) ("*diet Coke VI* at ___").

tiff bottlers. The dispute centers primarily around the appropriate price of that syrup and evaluation of the Company's conduct in supplying the syrup and negotiating several issues with the bottlers. The *Elizabethtown* litigation also involves alleged historical overcharges by the Company to the bottlers in the sucrose component of the syrup.

Plaintiffs are profitable businesses which are presently or were formerly engaged in the bottling of Coca–Cola under contracts which conform to Consent Decrees issued by this Court in 1921. This action involves 30 plaintiffs and 30 bottling contracts.

During the course of the litigation, twelve plaintiffs either amended their bottling contracts or sold their rights to bottle Coca–Cola to bottlers who operate under amended bottling contracts. These twelve plaintiffs seek only past damages and make no claims under Count II, which seeks declaratory and injunctive relief. For convenience these twelve will be referred to as the "past damages plaintiffs." The remaining plaintiffs will be known as full plaintiffs. The full plaintiffs, their principal places of business, and the dates for the beginning of their alleged damage periods are as follows:

| PLAINTIFF | STATE OF INCORPORATION OR PRINCIPAL PLACE OF BUSINESS | BEGINNING OF DAMAGE PERIOD |
|---|---|---|
| Coca–Cola Bottling Co. of Magnolia | Magnolia, AK | February 2, 1976 |
| Sacramento Coca–Cola Bottling Co. | Sacramento, CA | February 2, 1977 |
| Coca–Cola Bottling Co. of Elizabethtown | Elizabethtown, KY | January 1, 1969 |
| Coca–Cola Bottling Co. of Shelbyville | Shelbyville, KY | January 1, 1969 |
| Trenton Coca–Cola Bottling Co. | Trenton, MO | February 4, 1976 |
| Kelford Coca–Cola Bottling Co. | Kelford, NC | February 4, 1971 |
| Plymouth Coca–Cola Bottling Co. | Plymouth, NC | February 4, 1971 |
| Wilmington Coca–Cola Bottling Works | Wilmington, NC | February 4, 1971 |
| Coca–Cola Bottling Co. of Dickinson | Dickinson, ND | February 4, 1975 |
| Coca–Cola Bottling Co. of Jamestown | Jamestown, ND | February 4, 1975 |
| Coca–Cola Bottling Co. of Williston | Williston, ND | February 4, 1975 |
| Cleveland Coca–Cola Bottling Co. | Cleveland, OH | January 1, 1969 |
| Coca–Cola Bottling Co. of LeHigh Valley | Bethlehem, PA | January 1, 1969 |
| Laredo Coca–Cola Bottling Co. | Laredo, TX | February 4, 1977 |
| Central Coca–Cola Bottling Co. | Richmond, VA | February 4, 1971 |
| Love Bottling Co. | Muskogee, OK | July 24, 1982 |
| Coca–Cola Bottling Co. of LaCrosse | LaCrosse, WI | July 24, 1981 |
| Arkansas–Georgia | Nashville, AK | July 24, 1982 |

Consolidated Pretrial Order 2–3 (Dkt. 848).

The past damages plaintiffs, their principal places of businesses, and their alleged damages periods are as follows:

| PLAINTIFF | STATE OF INCORPORATION OR PRINCIPAL PLACE OF BUSINESS | DAMAGES PERIOD |
|---|---|---|
| Coca–Cola Bottling Co. of Streator | Streator, IL | Feb. 2, 1971– April 30, 1987 |
| Natchez Coca–Cola Bottling Co. | Natchez, MS | Feb. 4, 1975– Dec. 31, 1986 |
| Coca–Cola Bottling Co. of Jefferson City | Jefferson City, MO | Feb. 4, 1976– April 30, 1987 |
| Coca–Cola Bottling Co. of Macon | Macon, MO | Feb. 4, 1976– April 30, 1987 |
| Coca–Cola Bottling Co. of Deming | Deming, NM | Feb. 4, 1975– April 30, 1987 |
| Coca–Cola Bottling Co. of Tulsa | Tulsa, OK | Feb. 4, 1976– Dec. 31, 1984 |
| Coca–Cola Bottling Co. of Brownsville | Brownsville, TX | Feb. 4, 1977– May 31, 1984 |
| Coca–Cola Bottling Co. of San Angelo | San Angelo, TX | Feb. 4, 1977– Dec. 30, 1985 |
| Las Cruces Coca– Cola Bottling Co. | Las Cruces, NM | Feb. 4, 1975– Dec. 30, 1985 |
| Coca–Cola Bottling Co. of Tucson | Tucson, AZ | Feb. 4, 1975– Dec. 30, 1985 |
| Coca–Cola Bottling Co. (Alexandria) | St. Cloud, MN | Feb. 4, 1975– July 31, 1984 |
| Coca–Cola Bottling Co. of Marshall | Marshall, TX | Feb. 4, 1975– Oct. 1, 1987 |

Consolidated Pretrial Order at 3–4 (Dkt. 848).

The Company is a corporation organized and existing under the laws of the State of Delaware, and having its principal office and place of business in the State of Georgia. Each of the plaintiffs is a corporation that is incorporated in and has its principal place of business in a state other than Delaware or Georgia. Therefore, there is complete diversity of citizenship. The amount in controversy exceeds the sum of $10,000, exclusive of interest and costs, and therefore, the Court has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1332(a)(1).

The factual background of this case has been recited repeatedly in Judge Schwartz' published opinions and should be familiar to all who have participated; however, for the sake of completeness in this Opinion, it will be repeated generally.

As indicated, the following narrative is intended to provide background only. Specific occurrences which have bearing on the issues pending before the Court will be discussed in greater detail in the Court's findings of fact under each Count. This narrative is drawn from numerous sources, including evidence presented in the record and Judge Schwartz' prior opinions.

## BACKGROUND

In 1886, Dr. John Smyth Pemberton, an Atlanta pharmacist, developed the formula for a syrup that could be mixed with carbonated water to produce a beverage. He named the beverage "Coca–Cola." The name "Coca–Cola" derives from two of the ingredients, coca leaves and cola (or kola) nuts, extracts of which were used to manufacture Merchandise No. 5, one of seven compounds or "merchandises" used by Dr. Pemberton in the original formula for

Coca–Cola. *United States v. Coca–Cola Co. of Atlanta*, 241 U.S. 265, 271 & 272, 36 S.Ct. 573, 574 & 575, 60 L.Ed. 995 (1916).

Dr. Pemberton registered the name "Coca–Cola" written in Spencerian script as a trademark "for soda water and other beverages" on June 6, 1887. The original trademark registration dated June 6, 1887, described Coca–Cola as follows:

> This "Intellectual Beverage" and Temperance Drink contains the valuable Tonic and Nerve Stimulant property of the Coca plant and Cola (or Kola) nuts and makes not only a delicious, exhilarating, refreshing and invigorating Beverage (dispensed from the soda water fountain or in other carbonated beverages), but a valuable Brain Tonic and cure for all nervous affections—Sick Headaches, Neuralgia, Hysteria, Melancholy, ...
>
> The peculiar flavor of COCA–COLA delights every pallet; it is dispensed from the soda fountain in same manner as any other fruit syrups.

PX87.

In 1888, Asa G. Candler, a pharmacist and owner of a wholesale drug company in Atlanta, acquired a partial interest in the Coca–Cola trademark and formula. He acquired complete ownership in 1891. In 1892, Asa Candler formed the Coca–Cola Company, a Georgia corporation (the "Georgia corporation"), to manufacture and market Coca–Cola syrup for use in the soda fountain business, whereby one ounce of the syrup was to be mixed with eight ounces of carbonated water at the point of sale.

The Georgia corporation did not attempt to bottle the syrup for Coca–Cola prior to 1899.[2] In 1899, B.F. Thomas and J.B. Whitehead, two lawyers from Chattanooga, Tennessee, approached Candler about obtaining the right to sell Coca–Cola in "bottles and other receptacles." On July 21, 1899, Candler executed on behalf of the Georgia corporation a contract granting to Whitehead and Thomas the exclusive right to bottle and sell Coca–Cola throughout the United States, with the exception of six New England states, Mississippi and Texas (the "1899 contract"). The 1899 contract also gave Whitehead and Thomas exclusive right to use the trademark "Coca–Cola" on bottles in the territories covered by the contract.

The 1899 contract contemplated that Whitehead and Thomas would form a corporation to be known as the "Coca–Cola Bottling Company" to which their rights under the 1899 contract would be assigned. Whitehead and Thomas formed the Coca–Cola Bottling Company as a Tennessee corporation in December, 1899. It became the first "parent bottler" of Coca–Cola and built plants in Atlanta and Chattanooga.

The 1899 contract required Whitehead and Thomas to meet consumer demand for bottled Coca–Cola, to purchase all syrup for the production of bottled Coca–Cola from the Coca–Cola Company, to refrain from using substitutes for the syrup, to refrain from using the syrup in any way other than that specified, and to sell unbottled syrup only with the written consent of the Company. At the same time, the Company was obligated to sell Whitehead and Thomas their requirements of Coca–Cola syrup at a fixed price as shown on the wholesale price list of fountain syrup in effect at the time, which was attached as an exhibit to the 1899 contract. By an undated amendment, the Whitehead–Thomas contract was amended to fix the syrup price at $1.00 per gallon, less a 10¢ per gallon rebate to pay for "labels and advertising matter" to be provided by the Company at its actual cost. The syrup was to be bottled under pressure of one atmosphere in proportions of not less than one ounce of syrup to eight ounces of water.

The 1899 contract also contemplated that Whitehead and Thomas would, at their own expense, construct a bottling plant in Atlanta and as many additional bottling plants as were needed to meet demand in the territories. Demand grew rapidly, and the two bottling plants built in Atlanta and

---

**2.** However, certain bottlers in isolated instances apparently placed Coca–Cola in bottles prior to 1899.

Chattanooga were soon unable to meet demand outside their respective cities. Other than the Atlanta and Chattanooga plants, the Coca–Cola Bottling Company did not actually bottle the beverage itself. Rather, beginning in 1900, the Coca–Cola Bottling Company entered into contracts wherein Thomas and Whitehead assigned certain of their rights under the 1899 Contract to individuals, partnerships, and corporations (referred to hereinafter as "actual" bottlers), who built bottling plants and promoted and sold bottled Coca–Cola in exclusive territories assigned to them by Coca–Cola Bottling Company.

A dispute arose between Whitehead and Thomas over the desirable contract period with the actual bottlers. While Thomas favored a two-year term, Whitehead favored perpetual contracts. With the Georgia corporation's permission, Whitehead and Thomas divided the rights granted to them under the 1899 contract. Thomas retained ownership of Coca–Cola Bottling Company (referred to hereinafter as the "Thomas Company"). The Thomas Company conveyed to Whitehead and his new business associate, J.T. Lupton, its rights under the 1899 contract for all territories except the District of Columbia and the states of New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia, West Virginia, North Carolina, Tennessee, Kentucky, Indiana, Ohio, Washington, Oregon, California, and small portions of Georgia and Alabama. Whitehead and Lupton then formed a Tennessee corporation called Dixie Coca–Cola Bottling Company, the name of which was thereafter changed to *The* Coca–Cola Bottling Company (referred to hereinafter as "Whitehead–Lupton Company"). The Georgia corporation, Thomas Company, and Whitehead–Lupton Company joined in amending the 1899 agreement to reflect the division. The Thomas Company and the Whitehead–Lupton Company were known as "parent bottlers."

The Whitehead–Lupton Company and the Thomas Company further divided their territories among other parent and "subparent" bottlers. Subparent bottlers of the Whitehead–Lupton Company included Western Coca–Cola Bottling Company and The Coca–Cola Bottling Company (1903). Subparent bottlers of the Thomas Company were Coca–Cola Bottling Works, Coca–Cola Bottling Works the 3d, and Pacific Coca–Cola Bottling. The bottling plants built by Whitehead and Thomas in Atlanta and Chattanooga were sold to the actual bottlers to whom the rights for those territories were assigned. Thereafter the parent bottlers did not own any Coca–Cola bottling plants, nor were they engaged in the actual bottling or sale of Coca–Cola beverage, which was left entirely to the actual bottlers. The actual bottlers were also primarily responsible for developing a market for bottled Coca–Cola in their respective territories, although the Georgia corporation apparently contributed funds to help develop a market.

In 1919, the property, good will, and business of the Georgia corporation founded by Candler was acquired by a Delaware corporation also called "The Coca–Cola Company," which assumed the Georgia corporation's outstanding contracts and liabilities. Thereafter, the Georgia corporation surrendered its charter.[3]

Between 1899 and 1920 there were several changes in the formula for Coca–Cola syrup. Most notable of these was the elimination of saccharin as a sweetening ingredient in the syrup produced after 1907. Prior to 1906, the syrup was sweetened with a combination of sugar and saccharin. Following the passage of the Pure Food and Drug Act, the Company began using granulated sugar in place of saccharin. Refined granulated sugar became the most expensive ingredient in the manufacture of the syrup. The parties agreed to an increase in the fixed price of the syrup to reflect the higher sweetener cost.

The onset of World War I brought with it sugar rationing and rigid price controls which held the price of sugar at nine cents per pound. At the end of the War, a severe sugar shortage combined with re-

---

3. For ease of reference the Georgia corporation and the successor Delaware corporation will hereinafter be referred to interchangeably as "the Company."

moval of the price controls caused the price of sugar to skyrocket from nine cents per pound in September 1919 to over twenty-seven cents per pound by June 1920. This extreme rise in the price of sugar caused the parent bottlers in late 1919 to agree to a temporary amendment to their contracts allowing the Company to pass sugar price increases in excess of nine cents per pound to the actual bottlers. This was the first time the parties agreed to a fluctuating price based upon the actual cost of an ingredient.

The Company in January 1920 sought relief from the fixed price contract and proposed a fluctuating price tied to the cost of manufacture of the syrup. The parent bottlers advised that they would not enter into negotiations to amend their contracts with the Company until the Company provided itemized information concerning the cost of manufacturing the syrup. Except for providing cost statements prepared by its accountants, the Company refused to disclose the cost information, informing the bottlers they should rely on "the integrity and good faith of The Coca–Cola Company." The parent bottlers' rejection of the flexible pricing proposal precipitated a confrontation between themselves and the Company concerning the nature of the bottling contracts. The Company took the position that the contracts were terminable at will. The parent bottlers, on the other hand, insisted their contracts were perpetual. The Company informed the parent bottlers that their contracts would be terminated as of May 1, 1920. On April 9, 1920, the Company notified all actual bottlers that its negotiations with the parent bottlers had ceased, that the parent bottlers' contracts would be terminated on May 1, 1920, and that the Company would contract directly with the actual bottlers as soon as circumstances permitted.

On April 13, 1920, the two principal parent bottlers filed suit in Fulton County, Georgia Superior Court to enjoin the Company from terminating their contracts. A temporary restraining order was entered which prohibited the Company from selling Coca–Cola syrup to anyone other than the parent bottlers. The actual bottlers employed J.B. Sizer, a Chattanooga lawyer, to represent their interests in the litigation. Sizer reported to a special committee appointed by the Coca–Cola Bottlers' Association, the trade organization to which the actual bottlers belonged. Sizer's fees were paid by the Association and by assessments of the actual bottlers in the Whitehead–Lupton and Thomas territories based upon the gallonage of syrup used by each bottler. Six actual bottlers intervened in the litigation in support of the parent bottlers. The Georgia suit was voluntarily dismissed by the parent bottlers on May 20, 1920 and refiled on June 1, 1920 in the United States District Court for the District of Delaware.

The parties agreed to the entry of an order on June 10, 1920 (the "June 10 order") requiring the Company to supply the parent and actual bottlers' requirements of Coca–Cola syrup during the pendency of the litigation. The order set the price of syrup paid by the actual bottlers at $1.72 per gallon until November 1, 1920, by which time final decision in the litigation was expected. The June 10 order further provided that if the court had not rendered final decision by November 1, 1920, the syrup price would be increased or decreased based upon the Company's actual costs of manufacturing the syrup.

In May 1920 the Company purchased a year's supply of refined cane sugar at a cost of about twenty cents per pound. During negotiations leading to the entry of the June 10 order, the Company failed to disclose that it had entered into this long-term sugar contract at a price near the top of the market. Beginning in June 1920, the market price of sugar began to decrease steadily. It fell to eleven cents per pound by November 1920 and continued to decline to five and one-half cents per pound by July 1921. From June to November 1920, however, the bottlers' syrup price remained fixed under the June 10 order. Thus, while the prices of competing soft drinks fell, the retail price of Coca–Cola remained high, causing a sharp decline in sales volume. Although the bottlers expected price relief on November 1, the Company announced a price increase in or-

## 610

der to recoup the cost of its inventories of high-priced sugar. The bottlers learned that by agreeing to the June 10 order basing the price of syrup on the Company's actual costs, they had unwittingly exposed themselves to and insulated the Company from the hazards of the marketplace and the Company's apparent poor judgment in making long-term sugar purchases near the top of the market.

On November 8, 1920 the Delaware District Court granted the parent bottlers' motions for a preliminary injunction preventing the Company from terminating the contracts. The court held that the contracts were perpetual and that the parent bottlers had received from the Company property rights in the business of bottling Coca–Cola beverage. *The Coca–Cola Bottling Co. v. The Coca–Cola Co.*, 269 F. 796 (D.Del.1920) (cited hereinafter as "*Coke 1920* at ___"). The parties resumed settlement negotiations. After the exchange of numerous proposals between the two litigants, as well as from the actual bottlers, settlement negotiations reached an impasse on March 8, 1921.

The Company appealed the District Court's preliminary injunction ruling to the United States Court of Appeals for the Third Circuit. The Company's appeal was argued on May 3, 1921, at which time the presiding judge recommended that the parties consider settlement. New negotiators were appointed. While the appeal was pending, the parties entered into two settlement agreements, one between the Company and the Thomas Company, and the other between the Company and the Whitehead–Lupton Company. The Delaware District Court formally incorporated those agreements as final judgments on October 4, 1921. The decrees incorporating the settlement agreements (the "Consent Decrees") are identical with the exception of two paragraphs in the Whitehead–Lupton agreement not relevant here. The Consent Decrees read in pertinent part as follows:

It appearing to the Court that the above stated cause is now ripe for final decree; that the parties thereto, including all of the Intervenors actually intervening in said cause, have entered into

an agreement settling and compromising said case and all questions of difference thereon arising, an original signed copy of which contract has been exhibited to the Court and a true and correct copy of which is hereto attached as Exhibit 1, and Counsel representing the several parties to said cause moving the Court to make said agreement of compromise and settlement the decree of the Court in said cause, and all parties in open court consenting thereto,

IT IS ORDERED, ADJUDGED AND DECREED: That said agreement or settlement and compromise, as the same appears attached hereto as Exhibit 1, be and the same is made the decree of this Court; and that it is so accordingly adjudged and decreed by the Court.

The settlement agreement incorporated in the Thomas Company case is reproduced in pertinent part below:

THIS AGREEMENT, made and entered into on this the 6th day of July, A.D. 1921, by and between COCA–COLA BOTTLING COMPANY, a corporation under the laws of the State of Tennessee, party of the first part, and THE COCA–COLA COMPANY, a corporation under the laws of the State of Delaware, party of the second part:

### WITNESSETH:

1: It being recognized that the primary obligation of all parties hereto, as well as all other individuals and Bottling Companies who employ the name Coca–Cola, in their corporate or trade name, is to promote the sale of Coca–Cola, and in consideration of the benefits to be derived by the parties to this instrument from the settlement of all matters of controversy between them in the above stated case, said case is hereby compromised and settled and this agreement is to be presented to the Circuit Court of Appeals and be made the judgment and decree of the proper Court.

2: The present contract between the said parties described in the pleadings in the above entitled cause, as hereby ex-

pressly modified and changed, shall remain of full force and effect, and is hereby agreed to be perpetual, and the same shall apply to the parties hereto and their respective successors and assigns; but no assignment shall be made by the party of the first part without the consent of the party of the second part, as provided in the original contract.

3: The said contract, as hereby modified shall operate perpetually, but if abnormal or burdensome conditions or occurrence prevail and the said parties fail to agree on a modification of prices and terms to meet such abnormal or burdensome conditions or occurrence *and* to continue during the same, then either party shall have the right to demand arbitration as to the price and terms; and if they disagree as to whether or not abnormal or burdensome conditions or occurrence exist, then that question shall also be arbitrated.

4: No forfeiture of any kind shall ever take place under the said contract as hereby amended until after the party of the first part shall have ninety (90) days written notice and opportunity to correct the conditions complained of, and if not corrected within said time and grounds of forfeiture exist, such forfeiture shall then occur; and if any forfeiture should ever arise as to any territory by reason of the act of any actual or sub-bottler, said forfeiture shall only apply to and embrace the territory supplied by the bottling plant of said offending actual or sub-bottler, and shall not extend to, nor cover, territory covered by the territory of any other bottler, even though said territory was obtained from or through the offending bottler.

5: The parties hereto raise the contract price of Coca–Cola Bottlers Syrup as fixed by said existing contract to one dollar and seventeen and one-half cents ($1.17) per gallon delivered as heretofore, including five cents (5¢) per gallon for advertising matter to be delivered at actual cost and freight expenses, and said party of the first part is hereby relieved and discharged from any and all obligations to spend anything for advertis-

ing; but it shall be bound to sell and deliver, at such actual cost, the same amount of advertising matter delivered to it by the party of the second part, to the actual Bottlers, as herein provided for. The party of the first part furthermore agrees to pay an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; same to include all possible increases in the cost of producing such syrup by the party of the second part other than may arise under, and as provided for by the arbitration clauses herein.

6: In order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages, the party of the first part hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; the party of the first part hereby further agrees that any increase in price or change in terms growing out of any agreement or arbitration as provided under paragraph three hereof shall not be exceeded or increased by it in any sales it may make of said syrup to the bottlers purchasing the same from it.

7: It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

· · · ·

· · · ·

10: The party of the second part contracts that the syrup sold and furnished by it to the party of the first part is to be *high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.*

. . . .

IN WITNESS WHEREOF, the said parties hereto, through their proper officers, and pursuant to resolutions of their respective Boards of Directors authorizing them so to do, have hereunto signed their names and affixed their corporate seals, on the day and date first herein written. In duplicate.

(emphasis added).

The Whitehead–Lupton decree contains the following paragraphs not found in the Thomas decree:

15: This settlement is conditioned upon the consent of the actual bottlers to the modification of their contracts with the party of the first part in accordance with the terms of this agreement.

16: The parties hereto will request the Court of Appeals to postpone a decision until it can be determined whether such actual bottlers will consent. If such consent cannot be secured by September 1st, 1921, the parties to this agreement will agree upon the plan of procedure, and if they fail so to agree, shall submit the matter to arbitration as to what shall be done in regard thereto.

Except for these paragraphs, the two decrees are identical.

The Consent Decrees amended and clarified the contracts between the Company and the parent bottlers. The settlement agreement between the Company and the Whitehead–Lupton Company was contingent upon the agreement of the actual bottlers in the Whitehead–Lupton territory because the bottle contracts between the Whitehead–Lupton Company and its bottlers were perpetual. The contracts between the Thomas Company and its bottlers were two-year contracts, most of which had expired during the pendency of the 1920 litigation. Therefore, the settlement agreement between the Company and the Thomas Company was not required to be contingent upon the consent of the bottlers in the Thomas territories. In 1921, the actual bottlers' contracts in the Whitehead–Lupton and Thomas territories were amended to conform to the Consent Decrees. At the same time, the Thomas Company entered into perpetual contracts with its bottlers. It is these contracts which are at issue in the *Elizabethtown* litigation presently before the Court.

Between 1921 and 1975 the Company gradually acquired all of the parent and subparent bottlers and assumed their obligations to the actual bottlers. In 1978, the Company proposed amendments to the actual bottlers' contracts ("1978 Amendment") to substitute a new syrup pricing formula using a "sugar element," a "base element," and the Consumer Price Index. The proposed amendments also provided that the savings resulting from any substitution of another sweetener for sugar in the syrup would be passed through to the actual bottlers. From 1978 until 1987, when the Company withdrew the proposed amendment, a great majority of the actual bottlers, constituting 97% of the volume of the Coca–Cola bottling business, signed the 1978 Amendment. The remaining bottlers, who continue to purchase syrup under the original bottle contracts which comply with the 1921 Consent Decrees, are the plaintiffs in this litigation.

In January 1980, the Company started using high-fructose corn syrup in place of granulated sugar made from cane or beets to sweeten Coca–Cola syrup. Originally HFCS constituted fifty percent of the sweetener used in the syrup. Eventually, the Company stopped using sugar altogether and HFCS constituted 100% of the sweetener. From 1980–1987 the Company supplied HFCS-sweetened syrup both to the "amenders" (that is, those bottlers that signed the 1978 Amendment) and the "unamenders" (those bottlers that continued to operate under the original contracts). The amenders received a "pass-through" of the Company's savings from using the cheaper HFCS sweetener. The Company continued

to charge the unamenders the sugar-based price described in the pricing provisions of their unamended contracts. The unamenders brought this suit alleging that the Company's continued use of a sugar-based price overcharged them and seeking a pass-through of the Company's HFCS savings. This contention is the substance of Count I of this action.

In 1986, Judge Schwartz conducted a bench trial on two issues, one of which was the definition of sugar as it is used in the 1921 Consent Decrees upon which plaintiffs' bottle contracts are based. The plaintiffs argued in 1986 that the term "sugar" as used in the Consent Decrees meant refined granulated sugar, i.e., sucrose. They asserted that HFCS–55 was not "sugar" for purposes of their contracts and the Consent Decrees. The Company argued that "sugar" was a generic term for a family of complex carbohydrates, including sucrose, fructose, and glucose. The Company's definition of "sugar" would have included HFCS. Judge Schwartz concluded that " 'sugar' for purposes of paragraph 10 [of the Consent Decrees] means refined granulated sugar from cane or beet, and therefore HFCS–55 is not sugar as that term is used in paragraph 10 of the 1921 Consent Decrees...." *Coke III* at 1391. After Judge Schwartz declined to reconsider his ruling or to certify it for appeal, the Company informed plaintiffs that it would begin to supply them with syrup sweetened only with refined granulated sugar from cane or beet. The Company intended to continue supplying the amended bottlers with HFCS-sweetened syrup. The Company's action prompted plaintiffs to file a supplemental complaint in this action seeking an injunction to prevent the Company from supplying to them syrup sweetened only with sugar. In the supplemental complaint, plaintiffs also allege that the Company's actions in connection with its decision to provide plaintiffs with syrup sweetened only with granulated sugar from cane or beet breached an alleged covenant of good faith and fair dealing implied in their bottle contracts. Judge Schwartz denied plaintiffs' motion for a preliminary injunction, and the Company has supplied sugar-sweetened syrup to plaintiffs since late in 1987. Plaintiffs' efforts to obtain syrup sweetened with HFCS form the basis of Count II of their complaint.

Count III centers around whether the Company has breached its obligation under the bottle contracts to charge plaintiffs a syrup price based upon the "market price" of sugar. The Consent Decrees set the price of the syrup according to a formula based upon the "market price" of sugar "as quoted at the refineries by the ten refineries operating in the United States ... at the time, having the largest capacity of output." Consent Decrees, ¶ 7. In a bench trial conducted in 1986, Judge Schwartz decided the meaning of the term "market price." Plaintiffs contended that "market price" was an average of actual selling prices, while the Company asserted that the list price, i.e., the price published in trade journals and official price lists, was the market price. Judge Schwartz held that the term "market price" meant:

> an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances, or rebates.

*Coke III* at 1391. Count III involves whether the Company's reliance on the list prices published in trade publications and on refiners' price lists as the prices upon which it bases its calculation of "market price" violates the definition set out above.

Thus concludes a narrative of the events leading to this litigation. Before embarking upon more detailed findings of fact and conclusions of law on each of the three Counts, however, it is necessary to set

forth the general legal principles which must govern the Court's consideration of the issues.

## GENERAL PRINCIPLES OF LAW

### A. Law of the Case

1. Various issues in this lengthy litigation have been explored by my predecessor, Hon. Murray M. Schwartz, in six published opinions and numerous orders and unpublished opinions.

2. Except for those portions entered into the 1989–1990 trial record, the record of the trial before Judge Schwartz in 1988–1989 is not part of the record of this case.

█ 3. The Court's conclusions of law are limited by the law of the case doctrine, which in this context provides generally that "judges of coordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other." *TCF Film Corp. v. Gourley*, 240 F.2d 711, 713 (3d Cir.1957); *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking*, 576 F.Supp. 107, 125 (D.Del.1983), *aff'd without opinion*, 740 F.2d 956, 957 & 958 (3d Cir.1984). Therefore, the Court is bound by Judge Schwartz' definitions of sugar and market price as enunciated in *Coke III*. The general rule is a rule of judicial comity intended to preserve the orderly functioning of judicial process. *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 168 (3d Cir.1982); *TCF Film Corp.*, 240 F.2d at 714; *Rose Hall, Ltd.*, 576 F.Supp. at 125–26. The Court recognizes that the general rule is not absolute, however. There are exceptional circumstances under which a successor judge is empowered to reconsider the rulings of his predecessor. Such an "exceptional circumstance" may arise when the original judge is by death, resignation or disability not available to reconsider his decisions. *Hayman Cash Register Co.*, 669 F.2d at 169; *TCF Film Corp.*, 240 F.2d at 714; *Rose Hall, Ltd.*, 576 F.Supp. at 126. The retrial before me of the case at bar upon Judge Schwartz' illness could be considered such an "exceptional circumstance" because some of the issues in this case could not be presented for reconsideration to Judge Schwartz before he became ill. *See United*

*States v. Wheeler*, 256 F.2d 745, 747 (3d Cir.), *cert. denied*, 358 U.S. 873, 79 S.Ct. 111, 3 L.Ed.2d 103 (1958). Therefore, the Court will reconsider a ruling if appropriate as an "exceptional circumstance," i.e., a ruling which was not and could not have been reconsidered by Judge Schwartz.

█ 4. Any legal rulings or opinions stated by Judge Schwartz during the course of denying the motions for summary judgment in *Coke VI* and the various summary judgment motions in the *diet Coke* litigation are understood not to be binding as the law of the case:

> The denial of a motion for summary judgment is an interlocutory ruling which establishes no more than that on the summary judgment record there are fact issues which should be submitted to the trier of fact. Since the record at a trial may be different, such a preliminary ruling does not determine what issues should be submitted to the jury.

*Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614, 619 (3d Cir.1989). Thus, any opinions offered by Judge Schwartz should be understood as offered for the limited purpose of determining whether summary judgment was appropriate and not for the purpose of finding facts or making legal conclusions on the full record in the context of disposition on the merits. The task of dispositive findings and conclusions is the work of this Opinion.

5. Although not a part of the law of this case, the Court may find Judge Schwartz' rulings in the related *diet Coke* litigation persuasive.

### B. Governing Principles of Law

█ 6. Delaware applies the principle stated in the *Restatement (Second) Conflicts of Law* § 188 (1971) that the law of the state with the most significant relationship to the transaction governs. *Coke V* at 918.

7. The state with the most significant relationship to the subject of each transaction is the state in which the principal place of business of each plaintiff is located. *See Coke V* at 918.

8. Interpretation of each plaintiff's contract will be governed by the law of the state in which that plaintiff's principal place of business is located.

9. The actual bottlers are not the intended beneficiaries of the Consent Decrees, and none of the bottlers remaining in the litigation have standing to enforce them. *Coke VI* at 90–91. The only rights assigned to the plaintiffs by the parents include (a) use of the trademark, (b) an exclusive license to bottle Coca–Cola, and (c) the right to use the Root bottle. *Id.* at 90–91; *Coke IV* at 1441.

10. Although none of the bottlers remaining in the litigation have standing to enforce the Consent Decrees entered by this Court in 1921 to resolve the 1920 litigation, *Coke VI* at 91, the Consent Decrees bear a close nexus to the plaintiffs' bottle contracts. *Coke V* at 915. The Consent Decrees' delineation of the agreements between the Company and the parent bottlers informs the interpretation of the plaintiffs' bottling contracts. *Id.* at 916. For example, the syrup received by the actual bottlers cannot be different from that which the Company was bound by the Consent Decrees to deliver to the parent bottlers. *Id.*

11. Further, it is clear that the interests of the actual bottlers were considered by the parties to the Consent Decrees. The negotiators for the Company and the parent bottlers considered the ultimate effect of the pricing mechanism on the actual bottlers. *See* PX569 ("[I]n arriving at a settlement we must never forget that there are other parties concerned, besides the Parent Bottling Companies and this Company.... [T]here must be an agreement in advance which determines the price that the Actual Bottlers are to pay for COCA–COLA. This is necessary from the Actual Bottlers' point of view, and from the point of view of the success of the business"); PX576 ("It is for the protection of the actual bottlers that [the parent bottlers] have been so insistent that in arranging a sliding scale the actual cost of Coca–Cola should be correctly and fairly ascertained.").

12. In *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971), the United States Supreme Court set forth the "four corners" test for interpreting a consent decree:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.... [T]he instrument must be construed as it is written, and not as it might have been written....

*Id.* at 681–82, 91 S.Ct. at 1757. Thus, when construing the Consent Decrees, the Court's first resort is to the "four corners" of the Decrees, or in other words, to the language of the Decrees. *See Halderman v. Pennhurst State School and Hosp.*, 901 F.2d 311, 319 (3d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990).

13. The parties argue various circumstances extrinsic to the four corners of the Consent Decrees in support of their respective interpretations. Since reliance upon aids of construction, such as the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree, does not depart from the "four corners" rule of *United States v.*

Armour & Co., see United States v. ITT Continental Baking Co., 420 U.S. 223, 236–37 n. 10, 95 S.Ct. 926, 934–35 n. 10, 43 L.Ed.2d 148 (1975); Allen–Myland, Inc. v. International Business Machines Corp, 746 F.Supp. 520, 542 (E.D.Pa.1990); Coke III at 1397, the Court may consider the parties' arguments.

### C. General Principles of Contract Interpretation

■ 14. When interpreting a contract, the primary function of the Court is to ascertain the intention of the parties. 4 Williston on Contracts § 601 at 303–05.

■ 15. The Court should give effect to the mutual intention of the parties at the time the contract is executed. The Court should put itself in the position of the parties, looking forward from the time they entered into the contract. The Court should not view the contract from a position of hindsight. Generally, 4 Williston on Contracts § 607. "Judicial construction of a contract requires a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties." Id. § 600A at 287 (quoting Hunt v. Triplex Safety Glass Co. of North America, 60 F.2d 92, 94 (6th Cir.1932)).

■ 16. The Court should give the greatest weight to the express language of the contract itself, Restatement (Second) of Contracts § 203(b) at 93 ("[E]xpress terms are given greater weight than course of performance, course of dealing, usage of trade....") (emphasis added); see also United States v. Armour & Co., 402 U.S. 673, 678, 91 S.Ct. 1752, 1755–56, 29 L.Ed.2d 256 (1971), as the words themselves are the best and most important evidence of the intention of the parties. 4 Williston on Contracts § 610A at 514. The meaning of words is dependent upon their context, and the contract should be interpreted as a whole. 4 Williston on Contracts § 618 at 710–11; 2 E.A. Farnsworth, Farnsworth on Contracts § 7.13 at 292–93 (1990). An interpretation wherein the whole can be read so as to give significance to each part is preferred. Restate-

ment (Second) of Contracts § 202(2) & comment d. Where possible, the meaning of a term should be consistent throughout the contract.

■ 17. When the words of the contract are ambiguous, the Court may look to other indicia of the parties' intent, including the circumstances surrounding the making of the contract and course of performance. These indicia are secondary, however, to the actual contractual language. Generally, Restatement (Second) of Contracts §§ 202 & 203(b). A contract term is ambiguous if it is subject to reasonable alternative interpretations. Taylor v. The Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227 (3d Cir.1991) (citing Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980)). "In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings." International Union, U.A.W. v. Mack Trucks, Inc., 917 F.2d 107, 111 (3d Cir.1990) (quoting Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 101 (3d Cir.1986)).

18. The Court should not rewrite the contract for the parties. It is not the Court's function to change the obligations of the parties under a contract that they saw fit to make. 4 Williston on Contracts § 610A at 513. In applying the principles of contract interpretation, the Court "must guard against inadvertently reforming a contract 'under the guise of construction' by 'looking too intently for means of bringing about some ultimate good, thwarting an apparent wrong, or preventing hardship....'" Coke III at 1397; Coke 1920 at 805.

19. Courts do not rewrite contracts to include terms not assented to by the parties. E.g., Levy v. Levy, 130 Wis.2d 523, 388 N.W.2d 170, 174–75 (1986) ("In the guise of construing a contract, courts cannot insert what has been omitted or rewrite a contract made by the parties"); E.E.E., Inc. v. Hanson, 318 N.W.2d 101, 104

(N.D.1982) ("Normally, parties to a contract are allowed to write the terms of the contract themselves. A court may be called upon to interpret a contract written by the parties thereto but the court's authority to interpret a contract does not give a court the authority to modify it") (citation omitted); *Glantz Contracting Co. v. General Electric Co.*, 379 So.2d 912, 916 (Miss. 1980) ("Courts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence") (quoting *Citizens National Bank of Meridian v. Glascock, Inc.*, 243 So.2d 67, 70 (Miss.1971)); *Stull v. Hicks*, 59 Ill.App.3d 665, 16 Ill.Dec. 874, 876, 375 N.E.2d 981, 983 (1978) ("We are mindful of the fundamental principle that a court may not make a new contract for the parties or rewrite their contract under the guise of construction").

20. Absent illegality, mistake, fraud, duress or unconscionability, it is not within the Court's power to revise, modify, alter, extend, or remake the parties' contract to include terms not agreed upon by the parties. *Glantz Contracting Co. v. General Elec. Co.*, 379 So.2d 912 (Miss. 1980); *St. Joseph Data Service, Inc. v. Thomas Jefferson Life Ins. Co. of America*, 73 Ill.App.3d 935, 30 Ill.Dec. 575, 393 N.E.2d 611 (1979); *Stull v. Hicks*, 59 Ill. App.3d 665, 16 Ill.Dec. 874, 375 N.E.2d 981 (1978); *Low v. Davidson Manufacturing Co.*, 113 F.2d 364 (7th Cir.1940); *Texas Co. v. Todd*, 19 Cal.App.2d 174, 64 P.2d 1180 (1937).

21. The Court may reform a contract only when there is a mutual mistake of integration, *Restatement (Second) of Contracts* § 155 & comment a, unilateral mistake induced by fraudulent misrepresentation, *id.* § 166, or impossibility of performance, H. Hunter, *Modern Law of Contracts: Breach and Remedies* ¶ 12.03 & 12.04[2], [3] (1986). "If, however, the parties make a written agreement that they would not otherwise have made because of a mistake other than one as to expression, the court will not reform a writing to reflect the agreement that it thinks they would have made." *Restatement (Second) of Contracts* § 155 comment b.

22. Thus it is the task of the parties, not of this Court, to refashion the agreement to reflect new developments. *See Coke VI* at 49–50. If there is a reasonable way to uphold the contracts despite changes in the business, the Court must give consideration to it. *Id.* at 59.

## COUNT I

### FINDINGS OF FACT

*A. Plaintiffs' Contentions*

1. In Count I, plaintiffs contend the Company breached the unamended contracts by supplying them with syrup sweetened with HFCS–55 from 1980–1987 and by charging them a syrup price based upon more costly sugar. Plaintiffs seek a declaratory judgment that the Company's unilateral change in the sweeteners violated their unamended contracts. They also seek monetary damages for the amount of the alleged overcharge, prejudgment interest, and attorneys' fees.[4]

2. Plaintiffs seek damages equal to 100% of the difference between the sugar-based syrup price they were charged and a syrup price based upon what they contend was the "effective selling price" of HFCS–55.

3. Plaintiffs and the Company agree that in the event the Court awards monetary damages, the price of HFCS which should be used by the Court to calculate plaintiffs' damages should be the "market price" as that term is used in paragraph 7 of the Consent Decrees and paragraph FOURTH(d) of the bottle contracts. In *Coke III*, Judge Schwartz defined "market price" for sugar as:

---

4. Plaintiffs also seek a declaratory judgment that their unamended contracts entitle them to receive concentrate in lieu of syrup, and they assert that the Court should fashion a remedy to the current impasse between the parties by "interpreting" the unamended contracts to provide for the use of sweeteners other than sugar in the syrup and for the pass through of any resultant savings to the unamended bottlers. The Court will address these contentions in its analysis of Count II. *See infra* Count II at ¶¶ 97–105; 120–124; 145–146.

an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances or rebates.

*Coke III* at 1418.

4. Plaintiffs contend that there exists an "effective selling price" of HFCS which meets Judge Schwartz' definition of market price. They assert that the Court should use monthly averages of actual sales prices of HFCS–55 as a proxy for "effective selling price" or "market price" when it calculates their damages.

### B. The Company's Position

5. The Company contends that plaintiffs are not entitled to the difference between a syrup price based upon the price of HFCS–55 and the sugar-based syrup price they were charged because pass-through of sweetener savings was a benefit conferred by the 1978 Amendment not signed by these plaintiffs.

6. In the alternative, the Company asserts that even if it breached plaintiffs' unamended contracts, plaintiffs are not entitled to damages because they have not been harmed. The Company contends plaintiffs received the benefit of their economic bargain because they received a syrup of like quality at the price for which they contracted.

7. In the event the Court finds a breach and determines that damages should be awarded, the Company asserts the Court should use the list price of HFCS, i.e., the

prices published by the corn wet millers in trade publications, pricing letters and announcements, to calculate damages.

### C. Introduction

8. The allegations in Count I are derived from the Company's decision, announced January 25, 1980, to begin using high-fructose corn syrup (HFCS–55 or HFCS) in place of granulated sugar as the sweetener for Coca–Cola Bottlers' Syrup.

9. HFCS–55 is a liquid sweetener composed of 55% fructose, 42% glucose and approximately 3% oligasaccharides. Admitted Facts III.C. ¶ 161 at 81.[5]

10. HFCS–55 was unknown and did not exist in 1921. Admitted Facts III.C. ¶ 162 at 81. HFCS–55 is made by hydrolysis, which converts corn starch into a liquid through the use of chemical enzymes. Admitted Facts III.C. ¶ 161 at 81. This process did not exist until the 1960's and did not become commercially feasible until the 1970's. Admitted Facts, III.C. ¶ 163 at 81.

11. The substitution of HFCS for sugar does not adversely affect the quality of the Coca–Cola product. Admitted Facts III. D(i) ¶ 262 at 148 ("There is no organoleptic difference, *i.e.*, no difference in taste, feel, smell, or color, between Coca–Cola produced from syrup which contains 100% sucrose and Coca–Cola which is produced from syrup containing either 100% HFCS–55 or an authorized blend of HFCS and sucrose"); *see also* Tr. 1169 (W. Schmidt); Tr. 1425–26 (C. Schmidt); Tr. 3766 (Trombley); Tr. 4366 (Hanlon).

12. Since 1980, HFCS–55 has been less expensive than a comparable amount of sucrose with the same sweetening power. Admitted Facts, III.C., ¶ 168 at 83; III.C. ¶ 174 at 84.

13. On January 25, 1980, the Company, unilaterally and over the objection of the plaintiffs, announced that it would begin using a mixture of 50% HFCS–55 and 50% sugar to sweeten the syrup. On February 7, 1984, the Company announced an in-

---

**5.** Citations to "Admitted Facts" refer to the facts which the parties agree need no proof or which the parties agree were established in the prior

summary judgment decision. These appear in the Consolidated Pretrial Order (Dkt. 848) at pages 17–202.

crease in the proportion of HFCS to sugar from 50%–50% to 75% (HFCS)–25% (sugar). On November 6, 1984, the Company announced an increase in the amount of HFCS–55 in Coca–Cola syrup to 100% of the sweetener.

14. From 1980 until December 1, 1987, the Company supplied all bottlers—amended and unamended—with syrup sweetened wholly or partially with HFCS. On December 1, 1987, in response to Judge Schwartz' decisions in *Coke III, Coke IV,* and *Coke V,*[6] the Company began to supply plaintiffs, that is, the unamended bottlers, with syrup sweetened with 100% granulated sugar from cane or beets.

15. During the time the Company supplied plaintiffs with HFCS-sweetened syrup, it continued to charge them a syrup price based upon the market price of sugar and calculated under the sliding scale pricing mechanism described in paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended bottle contract.

### D. The Unamended Contracts Require the Use of Sugar to Sweeten the Syrup

16. Paragraph 10 of the Consent Decrees states: "The [Company] contracts that the syrup sold and furnished by it to [the Parent Bottlers] is to be high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup." Paragraph FIRST of the unamended contracts required the parent bottler "to obtain and furnish to [the unamended actual bottler] ... sufficient syrup for bottling purposes to meet the requirements of [the actual bottler] ... from The Coca–Cola Company

under the contract existing between [the parent bottler] and The Coca–Cola Company [the Consent Decrees]." Thus, it may be said that under paragraph FIRST of the unamended contracts, the parent bottler was required to supply the unamended actual bottler with the same syrup it received pursuant to paragraph 10 of the Consent Decrees. In this way, it may be said that paragraph FIRST of the unamended contracts incorporates the description of the syrup in paragraph 10 of the Consent Decrees as the syrup to be supplied to the unamended actual bottlers. In other words, the unamended contracts entitle the actual bottlers to receive the same "Bottlers Coca–Cola Syrup" described in paragraph 10 of the Consent Decrees. As previously indicated, Judge Schwartz ruled in *Coke III* that "[t]he effective present meaning of the term 'sugar' in paragraph 10 [of the Consent Decrees] is refined granulated sucrose from cane or beet, a definition that excludes HFCS–55." *Coke III* at 1406. Neither party contested this ruling.[7]

17. The Court finds that use of a sweetener other than sugar was not contemplated by the parties in 1921, who bargained for the requirement that the syrup be sweetened with not less than 5.32 pounds of sugar per gallon. Both the Company and the parent bottlers were familiar with the use of cheaper substitute sweeteners and variations in the sweetener strength. Consequently, they could have provided for the use of sweeteners other than sugar in the Consent Decrees and bottle contracts. The fact that they did not do so indicates that the parties bargained for the use of sugar as the only sweetener in the syrup and that they considered substitute sweeteners undesirable. These findings are evidenced by the numerous

---

**6.** In *Coke III,* Judge Schwartz decided that "sugar" as that term is used in paragraph 10 of the Consent Decrees meant granulated sugar from cane or beets and did not include HFCS. In *Coke IV,* Judge Schwartz declined to reconsider the *Coke III* ruling or to certify it for immediate appeal. In *Coke V,* Judge Schwartz granted leave for plaintiffs to amend their complaint to assert Count II, demanding that they be supplied with syrup sweetened with HFCS. In the same opinion and order, Judge Schwartz denied

plaintiffs' application for a preliminary injunction preventing the Company from supplying them exclusively with syrup sweetened 100% with granulated sugar from cane or beets.

**7.** In a conference conducted October 31, 1989, the Court offered to reconsider the *Coke III* rulings or to certify them for immediate appeal. Both parties declined the Court's offer. Dkt. 882.

changes in the sweetener which occurred prior to 1921.

18. At the time it entered into the 1899 contract with Whitehead and Thomas, the Company manufactured only one version of Coca–Cola syrup and sold the same syrup for use in both the soda fountain and bottling businesses. R. 1244, 1714; Admitted Facts III.A. ¶ 30 at 26.

19. Whitehead and Thomas, as well as some of the actual bottlers, soon discovered that the bottled product was not as sweet as the fountain product. Admitted Facts III.C. ¶ 116 at 67; III.D. ¶ 281 at 152; IV.A. ¶ 12 at 163–64.

20. To eliminate the difference in taste, the bottlers experimented with different syrup to water ratios. Thomas was permitted to add "a simple syrup" to the product sold by the actual bottlers. Admitted Facts IV.A. ¶ 13 at 164. This simple syrup contained the artificial sweetener saccharin, as well as "Coca–Cola coloring" and "Coca–Cola acid." Admitted Facts III.C. ¶ 117 at 67; III.D. ¶ 282 at 152; IV.A. ¶ 14 at 164.

21. Thus, prior to the passage of the Pure Food and Drug Act, the syrup used in bottling contained some saccharin. PX1 (R.1814).

22. The Pure Food and Drug Act, which was adopted in 1906, was interpreted by the USDA to prohibit the use of saccharin in soft drinks. Admitted Facts III.A. ¶ 34 at 27; III.D. ¶ 284 at 152; IV.A. ¶ 68 at 172. Passage of the Pure Food and Drug Act forced the Company to change the formula for the syrup supplied to the bottlers, and the Company in conjunction with the parent bottlers developed a new syrup, which did not exist in 1899, for sale exclusively to the bottlers under the 1899 contract. Admitted Facts, III.A. ¶¶ 35, 37, 38 at 28–29; III.D. ¶ 285 at 152. The new formula altered slightly the taste of bottled Coca–Cola. *See* PX102.

23. Prior to 1906, the syrup also contained a soft sugar known as "Confectioner's A." PX711 at AR2303; Admitted Facts III.A. ¶ 31 at 27. This was eventually found unsatisfactory, and the Company switched to granulated sugar. PX711 at AR2303.

24. Between 1907 and 1921, the Company reduced the quantity of sugar in a gallon of Coca–Cola Bottler's Syrup from 6.36 pounds per gallon before World War I, PX766 at AZ0609, to 5.97 pounds per gallon during 1916–1918, PX220, and to 5.32 pounds per gallon by the time of the 1920 litigation.

25. Prior to the imposition of sugar quotas and price controls in 1917, cane sugar was the primary sweetener used in soft drinks. Admitted Facts III.C. ¶ 122 at 68. Sucrose, especially sucrose from cane, was the preferred sweetener in the soft drink bottling industry. Admitted Facts ¶ 123 at 68. During 1918, the Company used a number of cheaper sweeteners as substitutes for cane sugar in Coca–Cola bottlers' syrup. The Company used corn syrup, glucose, beet sugar, and invert sugar as substitutes for cane sugar in Coca–Cola Bottler's Syrup. Admitted Facts III.A. ¶ 52 at 32–33. Substitute sweeteners used by the Company during the World War I period proved unsatisfactory. PX189; PX287; PX708.

26. The parties' familiarity with substitute sweeteners at the time of the 1920 litigation is further evidenced by the distribution by the USDA of a pamphlet entitled "Formulas for Sugar Saving Sirups." PX152. Copies of this pamphlet as published by USDA were widely publicized and reprinted by the Georgia Department of Agriculture (PX144; PX232), in trade journals directed at bottlers, including the *National Bottlers' Gazette* (PX172; PX208), and *The American Bottler* (PX147), and by suppliers to the soft drink industry (PX190). Discussion of the use of substitute sweeteners in newspapers was apparently noted by at least one bottler. PX226.

27. Many of the actual bottlers purchased concentrates from other manufacturers to bottle beverages other than Coca–Cola, such as ginger ale or various fruit-flavored drinks. Admitted Facts, III.C. ¶ 125 at 69. These bottlers would add sweetener to the concentrate. Many actual Coca–Cola bottlers who were faced with a

curtailment of the bottling of ginger ale and fruit-flavored drinks from concentrates as a result of sugar shortages due to World War I, Admitted Facts, III.A. ¶ 48 at 31, requested copies of "Formulas for Sugar Saving Sirups" directly from the USDA. *E.g.*, PX179; PX182–184; PX186; PX188; PX195; PX197–200; PX207; PX210; PX213–218; PX220; PX223–224; PX226; PX234; PX243; PX247–248; PX254; PX256; PX265. These bottlers included the Birmingham Coca–Cola Bottling Company, whose president, Crawford Johnson, was Chairman of the Special Committee of the Coca–Cola Bottlers' Association and an intervenor in the 1920 litigation. PX185; PX198.

28. In 1922, one Coca–Cola bottler wrote that he was familiar with the USDA's "Formula for Sugar Saving Sirups" and that, in his opinion, substitute sweeteners were inadequate replacements for sugar. PX708; Admitted Facts III.A. ¶ 131 at 70–71.

29. Clearly, the parties to the 1920 litigation and 1921 Consent Decrees were aware of the availability of substitute sweeteners. Although use of a sweetener other than sugar was a possibility of which the parties were aware in 1920 and 1921, sugar was the only sweetener mentioned in paragraph 10's description of Coca–Cola Bottlers' Syrup. The history of the bottlers prior to the entry of the Decrees suggests that the last thing to which they would have agreed was the use by the Company of a sweetener made from corn syrup. The fact that these substitute sweeteners had proved unsatisfactory supports the finding that the bottlers bargained for the use of 5.32 pounds of sugar per gallon as the exclusive sweetening agent.

### D. Syrup Pricing Under the Unamended Contracts

30. Paragraph 6 of the Consent Decrees describes a "sliding scale" pricing formula for the syrup described in paragraph 10 and sold by the Company to the parent bottlers as follows:

6. In order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages, the [Company] hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, ... and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound....

31. Paragraph FOURTH(d) of the unamended contracts describes the same base price and sliding scale pricing formula for the syrup sold by the parent bottlers to the actual bottlers:

[The actual bottler] agrees:

(d) To buy of or through [the parent bottler] all the Coca–Cola syrup required or used by [the actual bottler] in the preparation for market of its bottled goods aforesaid, and to pay for said Coca–Cola syrup on the following scale of prices:

One Dollar and Thirty ($1.30) cents per gallon delivered to any point in the above described territory where a plant may be established by the [first line bottler]; and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound,....

32. Paragraph 7 of the Consent Decrees and paragraph FOURTH (d) of the unamended contracts describe the mechanism for determining the market price of sugar upon which the sliding scale is based:

[T]he price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

Consent Decrees ¶ 7; see also Bottle Contract ¶ FOURTH(d).

33. The sliding scale pricing formula was the product of negotiations among the Company, the parent bottlers, and the actu-

al bottlers which led to the entry of the Consent Decrees in 1921.

34. During the 1920 litigation, the bottlers paid a price for the syrup tied to the Company's actual cost of manufacture.

35. Prior to the 1920 litigation, the parent bottlers paid the Company a fixed price per gallon which was not based upon the cost of any ingredient. The 1899 contract between the Company and Whitehead and Thomas obligated the Company to sell to the bottlers their requirements of Coca–Cola syrup at a fixed price and required that the syrup be bottled under pressure of one atmosphere in proportions of not less than one ounce of syrup to eight ounces of water. The price of the Coca–Cola syrup supplied to Whitehead and Thomas was as shown on the wholesale price list of fountain syrup in effect at the time, which was attached as an exhibit to the 1899 contract. Admitted Facts III.A., ¶ 12 at 19–20.

36. By an undated amendment, the 1899 contract was amended to fix the syrup price at $1.00 per gallon, less a ten cent per gallon rebate to pay for labels and advertising matter to be provided by the Company at its actual cost. Admitted Facts, III.A. ¶ 13, at 20.

37. Prior to the passage of the Pure Food and Drug Act in 1906, the syrup used in bottling contained some saccharin. PX1 (R. 1814). The Pure Food and Drug Act was interpreted by the USDA to prohibit the use of saccharin in soft drinks. Admitted Facts III.A., ¶ 34 at 27; III.D. ¶ 284 at 152; and IV.A., ¶ 68 at 172. In response to passage of the Pure Food and Drug Act, the Company in conjunction with the parent bottlers developed a new saccharine-free syrup that did not exist in 1899 for sale exclusively to Coca–Cola bottlers under the 1899 contract. Admitted Facts III.A., ¶¶ 35, 37, 38 at 28–29; III.D., ¶ 285 at 152; IV.A. ¶ 68 at 172. The parent bottlers agreed to pay an additional two cents per gallon as the new syrup price, which two cents was offset by a reduction in the amount of advertising materials for which they were required to pay pursuant to the 1899 contract from ten cents to eight cents.

Admitted Facts, III.A., ¶ 35 at 28; IV.A. ¶ 70 at 173.

38. In 1915, the Company and the parent bottlers modified their 1899 contract as a result of passage of the 1914 Clayton Act. Admitted Facts III.A. ¶¶ 41–42 at 29–30. The 1915 Amendment formally incorporated the increase in the price of the syrup from the ninety cents stipulated in the 1899 contract to ninety-two cents per gallon and the reduction from ten cents to eight cents of the advertising material the parent bottlers were obligated to purchase for the syrup. Admitted Facts III.A. ¶ 42 at 30. The 1915 Amendment was the first instance in which the phrase "Bottler's Syrup" was used in the contracts. Admitted Facts, IV.A. ¶ 21 at 165.

39. The 1915 Amendment necessitated corresponding amendments in the contracts between the parent and actual bottlers. The actual bottlers' contracts were amended in 1916 to require the actual bottlers to pay $1.20 per gallon for the syrup (a twenty-eight cent profit for the parent bottlers) and to use the new Root bottle as the standard Coca–Cola bottle "using one ounce of Bottlers' Coca–Cola Syrup in a standard Coca–Cola bottle." *E.g.*, PX38 (Star/Shreveport); Admitted Facts III.A. ¶ 46 at 31. The actual bottlers' contracts as amended refer to syrup in the same manner as did the 1915 Amendments to the parent bottlers' contracts.

40. Refined granulated sugar was the principal and most expensive ingredient used in the manufacture of the syrup. PX766 (AZ0605, AZ0609, AZ0610, AZ0611). The price per pound of sugar had ranged between roughly 4.9 cents when the 1899 contract was executed and 4.65 cents when the fixed price of syrup was last amended in 1907. PX312.

41. World War I severely affected the price and supply of sugar. Only the imposition of rigid price controls held the price of refined sugar at nine cents per pound. In 1917 the parent bottlers voluntarily agreed to a temporary price increase whereby they would pay the Company an additional five cents per gallon for Coca–Cola syrup because of the increased cost of

sugar and the corresponding increased cost of manufacturing the syrup caused by the War. The temporary price increase was to be limited to the duration of the circumstances occasioned by the War. It was also conditioned on the parent bottlers being relieved from the obligation of purchasing eight cents of advertising matter with each gallon of syrup. The parent bottlers paid ninety-seven cents per gallon for the duration of the agreement. Admitted Facts III.A. ¶ 51 at 32.

42. After termination of federal price controls of sugar in September 1919, sugar prices rose rapidly until they exceeded twenty-three cents per pound in May–June 1920. Admitted Facts III.A. ¶ 54 at 33.

43. At the request of the Company the parent and actual bottlers agreed to "temporary amendments" which would expire in February 1, 1920. The temporary amendments allowed the Company to pass on to the parent bottlers the full cost of sugar above nine cents per pound, the price that had existed under the federal price controls and upon which the previous temporary price increase had been predicated. It was understood that the parent bottlers would not be required to purchase advertising materials, and that the actual bottlers would allow the parent bottlers to pass on the added cost of syrup to a ceiling of $1.50 per gallon. Admitted Facts III.A. ¶¶ 55–56 at 33–35. At the Company's request, the arrangement was extended until March 1, 1920.

44. This agreement represented the first time the parties established a fluctuating price for the syrup based upon the actual cost of any ingredient. Admitted Facts III.A. ¶ 55 at 34.

45. At about the same time, the Company sought permanent relief from the fixed price contract. The Company proposed an amendment to the 1899 contract which would eliminate the limitations on the Company's power to raise syrup prices that existed by virtue of the ninety-two cent fixed price specified in the 1915 Amendment, grant the Company the right to pass on to the actual bottlers all increases in its total manufacturing costs, and guarantee

the Company two-thirds of the profits and the parent bottlers one-third of the profits from the sale of Coca–Cola syrup to the actual bottlers. Admitted Facts III.A. ¶ 57 at 35.

46. The parent bottlers advised Harold Hirsch, counsel for the Company, that they would not enter into negotiations to amend their contracts with the Company unless the Company provided itemized information concerning the cost of manufacturing the syrup so they could verify the Company's manufacturing costs. Admitted Facts III.A. ¶ 58 at 35–36.

47. Beyond offering cost statements prepared by its accountants, which were rejected by the parent bottlers as insufficient, PX323; Admitted Facts III.A. ¶ 60 at 36, the Company refused to disclose the cost information, offering only "the integrity and good faith of The Coca–Cola Company." PX1 at 1580. The parents then rejected the Company's flexible pricing proposal.

48. The Company responded by announcing that it considered its contracts with the parent bottlers to be contracts at will which could be terminated by the Company on reasonable notice. Admitted Facts III.A. ¶ 59 at 36.

49. On February 27, 1920, after the exchange of a series of proposals and counterproposals, the parent bottlers notified the Company that all negotiations were terminated, and that all temporary pricing arrangements were cancelled as of March 1, 1920. The parent bottlers demanded that the Company comply with all aspects of the 1899 contract and 1915 Amendment as of March 1. Admitted Facts III.A. ¶ 65 at 39.

50. On March 2, 1920, the Company notified the parent bottlers that their contracts would be terminated on May 1, 1920. PX343; PX344. The Company then submitted a final settlement proposal on April 1, 1920, offering to appoint the parents as agents and distributors entitled to a royalty on each gallon of syrup distributed. The proposal also included a cost-plus pricing arrangement with the price to be adjusted semi-annually based upon a sworn state-

ment from the Treasurer of the Company itemizing specific elements of the Company's costs. PX364; Admitted Facts, III.A. ¶ 68 at 40.

51. The Whitehead–Lupton Company rejected the proposal. PX368; PX369; Admitted Facts III.A. ¶ 69 at 40.

52. On April 13, 1920, the two principal parent bottlers filed suit in the Fulton County, Georgia Superior Court to enjoin the Company from terminating their contracts. Admitted Facts III.A. ¶ 71 at 41.

53. A temporary restraining order was entered which prohibited the Company from selling Coca–Cola syrup to anyone other than the parent bottlers. PX6; Admitted Facts III.A. ¶ 71 at 41.

54. The Bottlers' Association employed J.B. Sizer, a Chattanooga lawyer, to represent the interests of the actual bottlers in the litigation. Admitted Facts III.A. ¶ 72 at 41. Sizer reported to a special committee appointed by the Bottlers' Association, and his fees were paid by the Association, PX385; PX391, and by assessments of bottlers in the Whitehead–Lupton and Thomas territories based on the gallonage of Bottlers' Coca–Cola Syrup used by each bottler. PX689–95; PX697–98; PX701; PX704–706; Admitted Facts III.A. ¶ 72 at 41.

55. Six actual bottlers intervened in support of the parent bottlers. Admitted Facts V.A. ¶ 184 at 190.

56. The Fulton County suit was voluntarily dismissed by the parent bottlers on May 30, 1920, and it was refiled on June 1, 1920 in the United States District Court for the District of Delaware.

57. On June 10, 1920, the parties agreed to the entry of an order which required the Company to supply the bottlers' requirements of Coca–Cola syrup during the pendency of the litigation. The order fixed the price paid by the actual bottlers to the parent bottlers at $1.72 per gallon until November 1, 1920. In the event the court had not reached a decision on the application for interlocutory injunctions by November 1, the order provided that after that date the syrup price would be in-creased or decreased from the fixed $1.72 price based upon increases or decreases in the Company's actual costs of manufacture of the syrup.

58. Prior to the entry of this order, the Company had purchased a year's supply of refined cane sugar at about twenty cents per pound, a price near the top of the market. Admitted Facts III.A. ¶ 77 at 43. During negotiations leading to the June 10 order, the Company failed to disclose fully that it had entered into long-term sugar contracts at prices near the top of the market. The bottlers were led to understand that the Company had in fact entered into favorable long-term sugar contracts at a price lower than the current market price. PX1 (R. 1608); PX474 (letter from parent bottlers to Company dated October 30, 1920) ("[W]hen the working agreement was entered into the methods employed by The Coca–Cola Company in purchasing sugar were discussed with you [Charles Candler, President of the Company], you represented to us that The Coca–Cola Company had a contract with one of the largest refiners in the Country for a sufficient quantity of sugar to meet your requirements for the year 1920, the price to be determined by the market price every Monday morning.").

59. Beginning in June 1920, the market price of sugar began declining. By November 1920 it had fallen to eleven cents per pound. PX311; PX492. The price to the actual bottlers remained fixed at $1.72, however, causing them to suffer a substantial loss in sales volume. The Chairman of the Coca–Cola Company reported the Company's total sales volume of syrup (including both bottle and fountain syrup) declined 53% in September 1920 and 50% in October 1920 because of the high price of the syrup. *Coke III* at 1394.

60. The bottlers expected price relief on November 1, based upon their understanding of the Company's sugar contracts. Instead, the Company, in order to recoup the cost of its inventories of high priced sugar, announced syrup price increases in November 1920, December 1920 and January 1921.

61. The Company represented that its costs of manufacture had increased because of long term sugar purchases at high prices. The parent bottlers, in disbelief, demanded verification of the Company's figures. The bottlers' audit showed discrepancies, and the parties were unable to reconcile their figures or even agree on items to be included in the cost calculation. *Coke III* at 1394.

62. In November 1920, Crawford Johnson, the Birmingham bottler, President of the Bottlers' Association, and an intervenor in the lawsuit, met with W.C. Bradley, Chairman of the Board of the Company. Admitted Facts III.A. ¶ 80 at 44. Bradley told Johnson that in March 1920 the Company had purchased a year's supply of sugar at twenty cents per pound. Because of the decrease in volume, the Company would be unable to get rid of its inventories of this high priced sugar until April 1, 1921. He also informed Johnson that the Company could not afford to absorb the loss from the sugar without destroying its credit and going into bankruptcy. PX485; Admitted Facts III.A. ¶ 80 at 44.

63. Thus the bottlers discovered that by tying the price they paid for syrup to the Company's actual cost, they exposed themselves and insulated the Company from the hazards of the marketplace and the Company's own poor judgment in sugar purchases.

64. The parties eventually agreed to the sliding scale pricing mechanism set forth in paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts. The sliding scale pricing mechanism was designed to prevent the type of situation which occurred under the June 10 order. By tying the price of syrup to the market price of sugar, rather than the Company's actual cost, the bottlers were protected from future bad judgment on the part of the Company in its long-term sugar purchasing. In addition, tying the price of the syrup to the market price of sugar created a pricing mechanism based upon an objective factor and gave the bottlers a way to independently verify the price charged by the Company.

65. From the Company's point of view, the sliding scale pricing mechanism was preferable to the fixed price in the 1899 contract because it provided a way for the Company to recoup its increased costs when the price of the most expensive ingredient in the syrup—sugar—increased.

66. The pricing scheme and the events leading to its creation show that the term "sugar" as it is used in paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts has the same meaning as the term as it used in paragraph 10 of the Consent Decrees.

67. Paragraph 10 of the Consent Decrees is both a quality-control and a price-protecting provision. The requirement of "high grade standard Bottlers Coca–Cola Syrup" and the requirement of at least 5.32 pounds of sugar per gallon address the quality of the syrup. The requirement that the syrup contain not less than 5.32 pounds of sugar per gallon addresses price as well as quality by ensuring the Company cannot reduce the amount of sugar in the syrup or use a cheaper sweetener to evade the pricing provisions of paragraphs 5, 6 and 7 of the Consent Decrees. *See Coke III* at 1402.

68. Moreover, the great majority of settlement proposals from the bottlers in 1920–1921 were predicated upon the use of sugar to sweeten the syrup. *E.g.*, PX557 ("The basic cost of syrup per gallon ... based on ten cent sugar is $1.04 per gallon and that the future price shall be on a sliding scale of the price of sugar ... figured on the basis of 5.32 pounds of standard granulated sugar to the gallon of syrup"); *see also* PX504; PX583; PX607. These show that the parties assumed that the Company would continue to use at least 5.32 pounds of sugar as the sweetener indefinitely. The base price of $1.175 per gallon paid by the parents under paragraph 5 of the Consent Decrees was calculated on the cost of 5.32 pounds of sugar per gallon. PX1 (R. 1605–06).

69. Because both the base price and the escalator provisions were premised on the market price of the amount of sweetener

then in use, the Court finds it highly unlikely that the parties could have intended the application of a sugar-based pricing formula to a syrup that did not contain sugar. The Court now turns to the question of which party was intended to benefit from a decrease in the price of the sweetener.

70. Settlement negotiations between the parties resumed on November 30, 1920, slightly more than three weeks after the Court's ruling in favor of the parent bottlers. PX503; PX504.

71. The interests of the actual bottlers were initially represented by C.V. Rainwater, the Secretary–Treasurer of the Whitehead–Lupton Company. J.B. Sizer, the attorney employed by the Bottlers' Association and the intervening bottlers, was kept apprised by Rainwater and the parent bottlers' counsel of the negotiations. Admitted Facts, III.A. ¶ 83 at 45. The Company was represented by W.C. Bradley. *See* PX504; PX534. Between November 1920 and April 1921, Rainwater and Bradley exchanged a series of proposals for the settlement of the litigation, none of which were successful. Admitted Facts, III.A. ¶ 82 at 44–45.

72. In a letter from Sizer to Horace Ward (an attorney for the parents), dated December 17, 1920, Sizer recommended that the parties focus on two issues: (1) the perpetuity of the contracts; and (2) a sliding scale which would provide the Company with a "reasonable profit." PX523. The term "reasonable profit" indicates that Sizer expected the Company to derive some profit from use of the sliding scale price mechanism. At the same time, it indicates that Sizer and his clients did not contemplate that the Company would receive 100% of the profits from a decrease in the cost of sugar.

73. Under the pricing provisions of the Consent Decrees and unamended contracts, the unamended bottlers pay a base price of $1.30 per gallon of sugar-sweetened syrup so long as the price of sugar remains at 7¢ per pound or less. The bottlers pay an additional 6¢ per gallon for every 1¢ increase in the price of sugar over 7¢ per pound.

74. When the price of sugar is less than 7¢ per pound, the Company derives any benefits from a decrease in the price of sugar, assuming the Company purchases sugar at market price. Suppose, for instance, that the price of sugar is 7¢ per pound. The bottlers would pay $1.30 per gallon of syrup. If the price of sugar were to decrease to 6¢ per pound, the bottlers would continue to pay the base price of $1.30 per gallon of syrup. One-hundred percent of the benefits in terms of lower cost of manufacturing the syrup due to the decrease in the price of sugar would accrue to the Company.

75. Conversely, when the price of sugar is greater than 7¢ per pound, one-hundred percent of the benefits from a decrease in the price of sugar accrue to the bottlers. For example, if the price of sugar was 17¢ per pound, the bottlers would pay $1.90 per gallon of syrup ($1.30 base price per gallon + $.60 (6¢ per gallon for every 1¢ increase in the price of sugar over 7¢ per pound)). If the price of sugar fell to 12¢ per pound, the bottlers would then pay only $1.60 per gallon of syrup ($1.30 base price + $.30 (6¢ per gallon for every 1¢ increase in the price of sugar over 7¢ per pound)).

76. Thus, for a sugar-sweetened product, the pricing provisions of the Consent Decrees and the unamended contracts provide that when the price of sugar is less than 7¢ per pound or when the bottlers are paying the base price of $1.30 per gallon for syrup, one-hundred percent of any savings due to a decrease in the price of sugar accrues to the Company. Conversely, when the price of sugar is greater than 7¢ per pound or when the bottlers are paying a syrup price greater than the base price of $1.30 per gallon, one-hundred percent of the savings resulting from a decrease in the price of sugar accrues to the bottlers.

77. Further, when the price of sugar is greater than 7¢ per pound, the Company receives an additional .68¢ per gallon for each cent by which the price of sugar exceeds 7¢ per pound. This .68¢ represents the difference between the actual cost to

the Company of sweetening the syrup with 5.32 pounds of sugar purchased at market price and the additional 6¢ the bottlers pay for each gallon of syrup for every 1¢ increase in the price of sugar over 7¢ per pound.

78. At all times relevant to this litigation, the prices of both sugar and HFCS as alleged by both plaintiffs and defendants have exceeded 7¢ per pound.

79. At all times relevant to this litigation, the price of bottle syrup, whether calculated based upon the price of sugar or the price of HFCS as alleged by either party would exceed $1.30 per gallon. The Court now turns to the issue of what is the "market price" of HFCS.

80. While plaintiffs have proven that the wet millers sell a substantial amount of HFCS at prices below their list prices, Tr. at 6322 (Nelson); PX2824 at 78 (deposition of J. Nichols of Staley Manufacturing Co.); PX2828 at 88 (deposition of James Holsinger of Hubinger Company), this fact alone does not prove that there exists an "effective selling price" of HFCS less than list price which meets Judge Schwartz' definition, nor does it prove that the monthly sales averages compiled by plaintiffs would reflect such an "effective selling price" if such a price does exist.

81. The monthly sales averages do not satisfy Judge Schwartz' definition of market price because they include sales prices of HFCS not of the same grade which would be sold to certain industrial users, including soda manufacturers. PX2823 at 34 (deposition of Richard Wetherhall of Archer–Daniels Midland Co.); PX2824 at 115–16 (deposition of J. Nichols of Staley Manufacturing Co.); PX2825 at 107 (deposition of Fred Ash of American Maize Products, Inc.); PX2827 at 21 (deposition of Dennis Cosgrove of Cargill, Inc.); PX2829 at 113–114 (deposition of J.P. Nolan of C.P.C. International).

82. Further, some of the sales prices included in the monthly averages are net prices from which the 2% cash discount excluded by Judge Schwartz has been deducted. PX2823 at 28 (deposition of Richard Wetherhall of Archer–Daniels Midland

Co.); PX2824 at 29 (deposition of J. Nichols of Staley Manufacturing Corp.); PX2825 at 66 (deposition of Fred Ash of American Maize Products, Inc.).

83. The monthly averages include sales prices on dates other than the first seven days of the calendar quarter, as required by Judge Schwartz' definition. In addition, the prices at which actual sales are made shed very little light on the prices that the wet millers would actually quote upon inquiry prior to sale, especially since the wet millers consider the information regarding their actual sales to be confidential. PX2823 at 34–35 (deposition of Richard Wetherhall of Archer–Daniels Midland Co.); PX2823 at 140 (deposition of Lawrence Bohr of Archer–Daniels Midland Co.); PX2824 at 112–13 (deposition of J. Nichols of Staley Manufacturing Co.); PX2825 at 107–08 (deposition of Fred Ash of American Maize Products, Inc.); PX2826 at 58–59 (deposition of Michael Urbanic of Cargill, Inc.); PX2828 at 137–38 (deposition of James Holsinger of Hubinger Co.); PX2829 at 130 (deposition of J.P. Nolan of C.P.C. International). Moreover, no publication publishes actual sales prices other than list prices. PX2828 at 139, 145 (deposition of James Holsinger of Hubinger Co.); PX2829 at 130 (deposition of J.P. Nolan of C.P.C. International).

84. In fact, several wet millers stated that in response to Judge Schwartz' definition, they would give their list prices. PX2825 at 110–111 (deposition of Fred Ash of American Maize Products, Inc.); PX2826 at 60–61 (deposition of Michael Urbanic of Cargill Inc.); PX2829 at 147–49 (deposition of J.P. Nolan of C.P.C. International).

85. The wet millers also testified that they do offer and sell at least some HFCS at list price. *E.g.*, PX2826 at 55 (deposition of Michael Urbanic of Cargill, Inc.); PX2829 (deposition of J.P. Nolan of C.P.C. International).

86. Some of the wet millers considered all sales made below list price to be "individually negotiated," *e.g.*, PX2825 at 95 (deposition of Fred Ash of American Maize Products, Inc.), while others indicated that salespersons were required to obtain ap-

proval before consummating a sale at a price below list. PX2829 at 133 (deposition of J.P. Nolan of C.P.C. International); PX2823 at 114, 138–39 (deposition of Lawrence Bohr of Archer–Daniels Midland Co.).

CONCLUSIONS OF LAW

87. When interpreting a contract, the primary function of the Court is to ascertain the intention of the parties. 4 *Williston on Contracts* § 601 at 303–05.

88. In so doing, the Court should give the greatest weight to the express language of the contract itself, *Restatement (Second) of Contracts* § 203(b) at 93; *see also United States v. Armour & Co.*, 402 U.S. 673, 678, 91 S.Ct. 1752, 1755–56, 29 L.Ed.2d 256 (1971), as the words themselves are the best and most important evidence of the intention of the parties. 4 *Williston on Contracts* § 610A at 514. The Court should place even greater emphasis on the words of the Consent Decrees, since the decrees represent a compromise between the parties and consequently do not reflect 100% of the intentions of either party. *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971). When the words of the contracts or the Consent Decrees are ambiguous, the Court may look to other indicia of the parties' intent, including the circumstances surrounding the making of the contract and course of performance. *Halderman v. Pennhurst State School and Hosp.*, 901 F.2d 311, 319 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990); *Allen–Myland, Inc. v. International Business Machines Corp.*, 746 F.Supp. 520, 542 (E.D.Pa.1990); *Restatement (Second) of Contracts* §§ 202 & 203(b). These indicia are secondary, however, to the actual contractual language.

■ 89. A plain reading of the Consent Decrees and unamended contracts compels the conclusion that the syrup sold to the unamended bottlers pursuant to the unamended contracts must be sweetened with 5.32 pounds of granulated sugar from cane or beet per gallon. This conclusion is derived from the description in paragraph 10 of the Consent Decrees that the syrup shall contain 5.32 pounds of sugar per gallon. It is further supported by the fact that use of 5.32 pounds of sugar per gallon forms the basis of the pricing provisions of both the Consent Decrees and unamended contracts.

90. The plain language of the Consent Decrees and unamended contracts is supported by the evidence of the parties' course of dealing prior to 1921, which demonstrates that the parties were aware of the availability of substitute sweeteners and chose not to provide for their use in the syrup.

91. The Court should give effect to the intention of the parties at the time the unamended contracts were executed. The Court should put itself in the position of the parties looking forward from the time they entered into the contracts and Consent Decrees. The Court should not view the contracts and Consent Decrees from a position of hindsight. *Generally,* 4 *Williston on Contracts* § 607. The parties in 1921 contemplated only one product—Coca-Cola syrup sweetened with 5.32 pounds of granulated sugar per gallon.

92. As the contractual arrangements stood in 1921, the Company would be required to seek the consent of the parent bottlers to amend paragraph 10 of the Consent Decrees in order to substitute another sweetener for 5.32 pounds of granulated sugar per gallon of syrup. Consequently, the Court adopts Judge Schwartz' previous finding that paragraph 10 of the Consent Decrees required the Company to obtain the consent of the parent bottlers prior to changing the sweetener in the syrup. *Coke III* at 1403.

93. As of 1975, the Company had acquired all of the parent and subparent bottlers and assumed their obligations toward the actual bottlers. Admitted Facts III.A. ¶ 110 at 55. The Company's acquisition of the parent bottlers in the years since 1921 does not, however, leave it free to deviate unilaterally from paragraph 10 of the Consent Decrees. Under paragraph FIRST of the unamended contracts, the unamended bottlers are entitled to receive the same syrup received by the parent bottlers pursuant to paragraph 10 of the Consent De-

crees, i.e., high grade standard Coca–Cola Bottlers Syrup which shall contain 5.32 pounds of sugar per gallon of syrup. *Coke V* at 916. Consequently, upon dissolution of the parent and subparent bottlers, the Company was required to obtain the consent of the unamended bottlers prior to supplying them with syrup which did not contain 5.32 pounds of sugar per gallon.

94. The Company's unilateral substitution of HFCS for sugar in the syrup may be construed as an offer to amend paragraph 10 and the unamended contracts to provide for use of HFCS as the sweetener in the syrup. In order for the terms of a contract to be amended, both parties must manifest assent to the changed terms. If one party alters its performance, such alteration may be considered as an offer to amend the contract, and assent by the other party will be treated as an acceptance of the offer to substitute the altered terms. *Restatement (Second) of Contracts* § 287 & comment a. Plaintiffs clearly have not manifested assent to amendment of their unamended contracts as they incorporate paragraph 10 of the Consent Decrees to include HFCS in the absence of a corresponding amendment to the pricing provisions.

95. The Company has not obtained plaintiffs' consent to substitute HFCS for granulated sugar from cane or beet as the sweetener in Coca–Cola beverage syrup, and consequently, the unamended contracts have not been amended to provide for the use of HFCS in place of sugar.

96. The Court concludes the Company's unilateral substitution of HFCS for granulated sugar from cane or beet in the syrup supplied to plaintiffs from 1980–1987 without plaintiffs' consent was a breach of their right under the unamended contracts to receive the same syrup which the Company was obligated to provide the parent bottlers pursuant to paragraph 10 of the Consent Decrees.

97. The Court concludes that the Company also breached the unamended contracts by charging plaintiffs a syrup price based upon the price of sugar for a syrup which did not contain 5.32 pounds of sugar

per gallon. A plain reading of the Consent Decrees and unamended contracts reveals an inextricable linkage between the syrup pricing provisions and the use of 5.32 pounds of sugar per gallon to sweeten the syrup.

98. The Court agrees with and hereby adopts Judge Schwartz' finding that paragraph 10 of the Consent Decrees serves both a quality control function and a price-protecting function. *Coke III* at 1402. By linking the syrup price to the use of 5.32 pounds of sugar per gallon, the parties in 1921 ensured the Company could not evade the pricing provisions by decreasing the amount of sugar used and thus diluting the strength of the syrup or by using a cheaper sweetener. *Id.*

99. The Court concludes that the linkage between the quality statement in paragraph 10 of the Consent Decrees as incorporated into the unamended contracts and the syrup pricing provisions is a fundamental assumption of the unamended contracts and Consent Decrees which may be contravened only by an amendment to the contracts or Decrees. As previously stated, plaintiffs have not manifested assent to the Company's offer to unlink the use of 5.32 pounds of sugar per gallon and the pricing provisions by supplying HFCS-sweetened syrup to plaintiffs at a sugar-based price. At the same time, the Company has not manifested assent to amending both paragraph 10 and the pricing provisions to allow for provision of HFCS-sweetened syrup at an HFCS-based syrup price. Consequently, the unamended contracts and the Consent Decrees remain unamended and require that the syrup be sweetened with 5.32 pounds of granulated sugar from cane or beet at a syrup price based upon the price of sugar.

100. The Court concludes that, by providing plaintiffs with an HFCS-sweetened syrup at a sugar-based price, the Company breached the linkage between the use of 5.32 pounds of sugar per gallon of syrup as required paragraph 10 of the Consent Decrees as incorporated into the unamended contracts and the pricing provisions and violated a fundamental assumption of both

the Consent Decrees and unamended contracts.

■ 101. As compensation for the Company's breach, plaintiffs are entitled to "expectation damages," or damages which would restore the fundamental assumption of their contracts. *See Restatement (Second) of Contracts* § 347; *B.F. Hirsch v. Enright Refining Co.*, 751 F.2d 628, 634 (3d Cir.1984). Because the price of sugar has at all times relevant to this suit been greater than 7¢ per pound so that the bottlers have at all relevant times paid a syrup price greater than the base price of $1.30 per gallon, the inextricable linkage between the use of 5.32 pounds of sugar per gallon and the pricing provisions can be restored only by awarding plaintiffs one-hundred percent of the savings resulting from the use of the cheaper HFCS in place of sugar.

102. In light of the evidence in the record regarding the pricing of HFCS, the Court concludes that the list price of HFCS most closely approximates the "market price" as that term was defined by Judge Schwartz for purposes of the Consent Decrees and unamended bottle contracts.

103. Consequently, plaintiffs' damages should be calculated by subtracting the list price of HFCS–55 from the list price of sugar in each relevant quarter and multiplying by the number of gallons of syrup purchased by each plaintiff, adjusting for the actual percentage of HFCS–55 (25%, 50%, 75% or 100%) used in the syrup each quarter.

■ 104. In addition to these actual damages, plaintiffs are entitled to prejudgment interest. Although the Court denied plaintiffs' motion to amend the pretrial order to assert specifically a right to prejudgment interest, plaintiffs preserved their claim for prejudgment interest in the pretrial order under the heading "Statement of What Plaintiffs Expect to Prove: Count One:"

> Plaintiffs will prove that they are entitled to recover past damages for the period April 1980 through August 31, 1987 in an amount per gallon that reflects the difference between the sugar price used by The Coca–Cola Company in its syrup price notices and the market price of HFCS–55, *plus interest.*

Consolidated Pretrial Order at 440–41 (Dkt. 848) (emphasis added).

■ 105. In a diversity case, when the contract fails to provide for prejudgment interest, the Court must look to the law of Delaware, the forum state, for determining the availability of prejudgment interest. *American Original Corp. v. Legend, Inc.,* 689 F.Supp. 372, 383 (D.Del.1988).

■ 106. When a contract does not include a choice of law provision regarding the availability of prejudgment interest, the Delaware courts have concluded that the subject of prejudgment interest is governed by the substantive law of the state wherein the contract was to be performed. *Cooper v. Ross & Roberts, Inc.,* 505 A.2d 1305, 1306 (Del.Super.1986).

107. Of the seventeen jurisdictions involved in this litigation, the majority—twelve—make prejudgment interest available in contract claims when the amount claimed is liquidated or is capable of being made certain by calculation: Arkansas, Ark. Const., art. 19, § 13(d)(i); *Wooten v. McClendon,* 272 Ark. 61, 612 S.W.2d 105 (1981) (test for availability of prejudgment interest is whether the claim is capable of exact determination); Arizona, Ariz.Rev. Stat.Ann. § 44–1201(A); *Homes & Son Constr. Co. v. Bolo Corp.,* 22 Ariz.App. 303, 526 P.2d 1258 (1974) (prejudgment interest available for claims wherein the evidence furnishes data which, if believed, makes it possible to compute claim with exactness); Illinois, Ill.Rev.Stat.1983, ch. 17, para. 6402; *Alguire v. Walker,* 154 Ill.App.3d 438, 107 Ill.Dec. 279, 506 N.E.2d 1334 (1987) (prejudgment interest available where damages are liquidated or subject to exact computation); Minnesota, Minn.Rev. Stat.Ann. § 549.09 (prejudgment interest available from commencement of action or date of first written settlement demand regardless of whether damages are readily ascertainable); *Solid Gold Realty, Inc. v. Mondry,* 399 N.W.2d 681 (Minn.App.1987) (prejudgment interest available from date claim accrued to date action commences on

liquidated claims and when damages are readily ascertainable by computation or reference to generally recognized standards such as market value); Missouri, Ann.Mo. Stat. § 408.040(2); *Ohlendorf v. Feinstein*, 670 S.W.2d 930 (Mo.App.1984) (prejudgment interest allowed on liquidated claims and where amount due is readily ascertainable by computation according to recognized standards); North Carolina, Gen.Stat. N.C. § 24–5; *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521 (1973) (pre-judgment interest available if amount due is ascertainable from the contract itself or from the relevant evidence); *Bond v. Pickett Cotton Mills*, 166 N.C. 20, 81 S.E. 936 (1914) (same); North Dakota, N.D.C.C. § 32–03–04; *Metcalf v. Security Internat'l Ins. Co.*, 261 N.W.2d 795 (N.D.1977) (prejudgment interest available if the amount due is ascertainable by calculations in accordance with the proper construction of the contract); Ohio, Ohio R.C. § 1343.03(A); *Shaker Savings Ass'n v. Greenwood Village, Inc.*, 7 Ohio App.3d 141, 454 N.E.2d 984 (1982) (prejudgment interest available where amount due is capable of ascertainment by mere computation or subject to reasonably certain calculations by reference to existing well-established values); Oklahoma, 23 O.S.1981 § 6; *Withrow v. Red Eagle Oil Co.*, 755 P.2d 622 (Okla. 1988) (prejudgment interest available when amount due is capable of ascertainment by calculation or resort to well-established market values); *Sandpiper North Apts., Ltd. v. American Nat'l Bank & Trust Co.*, 680 P.2d 983, 993 (Okla.1984) (same); Pennsylvania, 41 P.S. § 202 (Purdon's Supp. 1990); *Fiat Motors of North Am. v. Mellon Bank, N.A.*, 827 F.2d 924 (3d Cir.1987) (Pennsylvania has adopted *Restatement (Second) of Contracts* § 354, which allows for prejudgment interest when the amount due is a definite sum in money or where performance due is fixed or has an ascertainable monetary value); *Fernandez v. Levin*, 519 Pa. 375, 548 A.2d 1191 (1988) (same); Texas, Tex.Civil Statutes art. 5069–1.03 (prejudgment interest due on contracts ascertaining a sum payable); *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929 (Tex. 1988) (prejudgment interest statute has been construed liberally); *Federal Life Ins. Co. of Chicago v. Kriton*, 112 Tex. 532, 249 S.W. 193 (1923) (same); Wisconsin, *Johnson v. Pearson Agri–Systems, Inc.*, 119 Wis.2d 766, 350 N.W.2d 127 (1984) (prejudgment interest available as a matter of common law when the amount claimed is "liquidable" because there is a reasonably certain standard of measurement by the correct application of which one can ascertain the amount owed).

108. The remaining five jurisdictions allow prejudgment interest in the discretion of the factfinder: California, Cal.Civ.Code § 3287 (allowing prejudgment interest of right for damages certain or capable of being made certain by calculation and in the discretion of the court where the contract claim is unliquidated); Kentucky, *General Accident Fire & Life Assurance Corp. v. Judd*, 400 S.W.2d 685 (Ky.1966) (quoting *Congoleum–Nairn v. M. Livingston & Co.*, 257 Ky. 573, 78 S.W.2d 781, 785 (1935)) (prejudgment interest a matter of right in liquidated claims and a matter of discretion in unliquidated claims); Mississippi, Miss.Code § 75–17–7 (1990 Supp.) (allowing prejudgment interest dating from no earlier than the filing of the complaint); *Merchants & Marine Bank v. Douglas–Guardian Warehouse Corp.*, 801 F.2d 742 (5th Cir.1986); *Glantz Contracting Co. v. General Electric Co.*, 379 So.2d 912 (Miss. 1980); New Mexico, N.M.S.A. § 56–8–4; Virginia, Va.Code § 8.01–382; *J.W. Creech, Inc. v. Norfolk Air Conditioning Corp.*, 237 Va. 320, 377 S.E.2d 605 (1989).

109. Defendant argues that the twelve jurisdictions which allow prejudgment interest only in cases where the sum claimed is liquidated or capable of ascertainment by calculation would not award prejudgment interest in this case because the amount of damages has been subject to heated dispute. In light of its view that prejudgment interest would be unavailable in these twelve jurisdictions, the Company urges the Court to use its discretion to deny prejudgment interest to plaintiffs from the remaining five jurisdictions.

110. The fact that the amount of damages is disputed, however, does not

necessarily render plaintiffs' claim under Count I unliquidated or incapable of ascertainment by calculation in the twelve jurisdictions that base the award of prejudgment interest on that particular characteristic of the damages claim. *Homes & Son Constr. Co. v. Bolo Corp.*, 22 Ariz.App. 303, 526 P.2d 1258 (1974) (mere difference of opinion as to amount due does not preclude award of prejudgment interest); *Solid Gold Realty, Inc. v. Mondry*, 399 N.W.2d 681 (Minn.App.1987) (same); *Laycock v. Parker*, 103 Wis. 161, 79 N.W. 327 (1899) (same); *see also United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 103 N.M. 480, 709 P.2d 649 (1985) (same).

111. Moreover, the fact that the Court has determined that the contract language indicates that the list price of HFCS, rather than the so-called "market price" urged by plaintiffs, should be used to calculate plaintiffs' damages does not necessarily preclude recovery of prejudgment interest. *Wilson v. Lester Hurst Nursery, Inc.*, 269 Ark. 19, 598 S.W.2d 407 (1980) (prejudgment interest is available even though plaintiff did not recover the full amount sued for, so long as the court was able to calculate the amount owed); *Koyer v. Detroit Fire & Marine Ins. Co.*, 9 Cal.2d 336, 70 P.2d 927 (1937) (decided under Civil Code § 3287(a)) (prejudgment interest available where amount awarded by jury conformed closely to plaintiff's claimed loss in the proof of claim).

112. The Court must therefore determine whether plaintiffs' damages under Count I are sufficiently determinable to make prejudgment interest available to plaintiffs in the twelve jurisdictions which require that claims be liquidated or ascertainable by calculation.

113. A claim may be sufficiently determinable if it can be ascertained by resort to well-established market values, *Sandpiper North Apts., Ltd. v. American Nat'l Bank & Trust Co.*, 680 P.2d 983 (Okla.1984); *Solid Gold Realty, Inc. v. Mondry*, 399 N.W.2d 681 (Minn.App.1987), or by computation according to a recognized standard, *Ohlendorf v. Feinstein*, 670 S.W.2d 930 (Mo.App.1984); *Shaker Sav. Ass'n v. Greenwood Village, Inc.*, 7 Ohio App.3d 141, 454 N.E.2d 984 (1982); *Johnson v. Pearson Agri–Systems, Inc.*, 119 Wis.2d 766, 350 N.W.2d 127 (1984).

114. Further, some courts have made prejudgment interest available when the amount of the claim may be readily calculated from evidence adduced at trial, *Robertson Companies, Inc. v. Kenner*, 311 N.W.2d 194 (N.D.1981); *Levy–Zentner Co. v. Southern Pacific Transp. Co.*, 74 Cal. App.3d 762, 142 Cal.Rptr. 1 (1977) (decided under Civil Code § 3287(a)); *Homes & Son Constr. Co. v. Bolo Corp.*, 22 Ariz.App. 303, 526 P.2d 1258 (1974); *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 194 S.E.2d 521 (1973); *Bond v. Pickett Cotton Mills*, 166 N.C. 20, 81 S.E. 936 (1914), or from the face of the contract itself, *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558 (Tex.1984); *Metcalf v. Security Internat'l Ins. Co.*, 261 N.W.2d 795 (N.D.1977); *Bond v. Pickett Cotton Mills*, 166 N.C. 20, 81 S.E. 936 (1914); *Restatement (Second) of Contracts* § 354 comment c (Section 354 has been adopted by the Pennsylvania courts) ("The sum due is sufficiently definite if it is ascertainable from the terms of the contract, as where the contract fixes a price per unit of performance....").

115. An award of prejudgment interest may be seen as a way to compensate a plaintiff who has been deprived of the use of his money over a period of time. *Johnson v. Pearson Agri–Systems, Inc.*, 119 Wis.2d 766, 350 N.W.2d 127 (1984) (citing *Laycock v. Parker*, 103 Wis. 161, 79 N.W. 327 (1899)). Many jurisdictions require that prejudgment interest be awarded only upon liquidated or determinable claims because defendant could avoid accrual of interest simply by tendering the calculated amount. *Id.; see also Parker v. Hartzell Propeller, Inc.* 291 Minn. 513, 189 N.W.2d 499 (1971) ("The question is not whether the parties argued on the amount of damages but whether defendant could have determined the amount of his potential liability...."); *Fed. Life Ins. Co. v. Kriton*, 112 Tex. 532, 249 S.W. 193 (1923) ("[T]he words 'ascertaining the sum payable' have reference to the sum or amount

the party executing the obligation may be reasonably expected or required to pay, in view of all the circumstances incident to the matter or business he is contracting about, if by reason of the provision of the contract he becomes at any time liable to pay thereunder...").

116. Prejudgment interest should not be awarded when defendant has no means available to determine that amount which he had to tender in order to prevent interest from accruing.

117. Under Count I, plaintiffs' damages are ascertainable from the face of the contract and resort to the well-established list prices of sugar and HFCS-55. Although plaintiffs urged the Court to use an alleged "market price" of HFCS to determine damages, defendant has always maintained that, if the Company is liable for damages under Count I, such damages should be calculated by subtracting the list price of HFCS from the list price of sugar.

118. The list price of sugar is well-established as the price upon which defendant has based the syrup price charged plaintiffs. Defendant has contended in this litigation, and the Court has found, that the list price of HFCS is a recognized, well-established market price. *See* Defendant's Proposed Findings of Fact and Conclusions of Law ¶¶ 271–289 at 57–60 (Dkt. 896); *see supra.*

119. The fact that the Company contested liability does not preclude an award of prejudgment interest. *E.g., United Nuclear Corp. v. Allendale Mut. Ins. Co.,* 103 N.M. 480,709 P.2d 649 (1985) (quoting *State Trust & Sav. Bank. v. Hermosa Land & Cattle Co.,* 30 N.M. 566, 597, 240 P. 469, 481 (1925) (quoting *Laycock v. Parker,* 103 Wis. 161, 79 N.W. 327 (1899))) ("[Mere] difference of opinion as to amount is ... no more reason to excuse [defendant] from interest than difference of opinion whether he legally ought to pay at all....").

120. The Court finds plaintiffs have been deprived the use of the money used to pay the Company's overcharge.

121. The Court therefore concludes that defendants are liable for prejudgment interest on the damages owed under Count I to plaintiffs from the twelve jurisdictions which require that claims be liquidated or determinable before prejudgment interest may be awarded. The Court also concludes that the plaintiffs from California and Kentucky are entitled to prejudgment interest because their claims were sufficiently determinable under California Civil Code § 3287(a) and *General Accident Fire & Life Assurance Corp. v. Judd,* 400 S.W.2d 685 (Ky.1966) (prejudgment interest awarded on liquidated claims as a matter of right). In the alternative, the Court exercises its discretion and awards prejudgment interest to the plaintiffs from California and Kentucky under California Civil Code § 3287(b) and *General Accident Fire & Life Assurance Corp. v. Judd,* 400 S.W.2d 685 (Ky.1966) (prejudgment interest awarded on unliquidated claims as a matter of discretion). The Court also exercises its discretion and awards prejudgment interest to the plaintiffs from Mississippi, New Mexico, and Virginia.

122. Plaintiffs in their post-trial briefing request that the Court award attorneys' fees. Plaintiffs did not preserve in the Consolidated Pretrial Order a claim for attorneys' fees under Count I.

123. Further, pursuant to the "American Rule," attorneys' fees are not recoverable by a prevailing party in federal court absent a governing statute or enforceable contract so providing or unless the opposing party acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *In re Perry,* 882 F.2d 534, 538 (1st Cir.1989); *Sea–Land Service, Inc. v. Murrey & Son's Co., Inc.,* 824 F.2d 740, 744 (9th Cir.1987); *Ford v. Temple Hospital,* 790 F.2d 342, 346 (3d Cir.1986); *Mobil Oil Corp. v. Independent Oil Workers Union,* 679 F.2d 299, 305 (3d Cir.1982); *Rollison v. Biggs,* 567 F.Supp. 964, 967–68 (D.Del. 1983), *aff'd* 749 F.2d 27 (3d Cir.1984).

124. There is no governing statute or enforceable contract providing for the recovery of attorneys' fees in this case. In addition, the Court finds that, while defendant engaged in hard-nosed litigation and business decisions, the Company has not

acted in bad faith, vexatiously, wantonly, or with oppressive purpose.

125. Consequently, the Court concludes plaintiffs are not entitled to attorneys' fees under Count I.

126. The parties will be ordered to resubmit their damage figures calculated in accordance with this Opinion.

## COUNT II

### FINDINGS OF FACT

*A. Introduction.*

1. Count II finds its genesis in the Company's response to the rulings of Judge Schwartz in this litigation. Judge Schwartz' various holdings are second nature to the litigants and others familiar with this case; however, the Court will briefly review the events which led plaintiffs to file a supplemental complaint containing the allegations in Count II.

2. In *Coke II*, Judge Schwartz certified for class action treatment two issues in the litigation—the meaning of "sugar" as that term is used in paragraph 10 of the Consent Decrees and the meaning of "market price" of sugar as that term is used in paragraph 7 of the Consent Decrees—and severed those issues for separate trial pursuant to Fed.R.Civ.P. 42(b). *See* Dkt. 155 & 157. The two issues were tried to Judge Schwartz between May 19—June 13, 1986, and resulted in Judge Schwartz' opinion in *Coke III*, decided August 8, 1986.

3. As previously stated, in *Coke III* Judge Schwartz defined "sugar" for purposes of paragraph 10 as "granulated sugar from cane or beet." *Coke III* at 1391. Judge Schwartz also decided that HFCS–55 is not sugar as that term is used in paragraph 10. *Id.*

4. In *Coke IV*, decided February 18, 1987, Judge Schwartz denied the Company's motion to amend the decision in *Coke III*. He also denied plaintiffs' motion that the decision in *Coke III* be certified as a final judgment which could be appealed immediately.

5. Prior to the denial of the motion to amend the *Coke III* rulings, the Company informed the unamended bottlers that as of May 1, 1987 the opportunity to sign the 1978 and 1983 Bottlers' Contract Amendments would be withdrawn.

6. On March 16, 1987, in reaction to Judge Schwartz' decisions in *Coke III* and *Coke IV*, the Company sent the following letter, which for purposes of this litigation is known as the "Sucrose Letter," to plaintiffs:

On August 8, 1986, Judge Murray M. Schwartz issued an opinion and order in the case of *Coca–Cola Bottling Company of Elizabethtown, Inc., et al. v. The Coca–Cola Company*, 654 F.Supp. 1388 (1986), Civil Action No. 81–48–MMS, United States District Court for the District of Delaware.

Judge Schwartz's opinion and order dealt with two issues. One of these was the meaning of the word "sugar," as used in paragraph 10 of the 1921 Consent Decrees entered into between the Company and the parent bottlers. Judge Schwartz held that for the purposes of paragraph 10 of the Consent Decrees, sugar meant refined granulated sugar from cane or beet, i.e., sucrose, and accordingly that HFCS–55 was not sugar within the meaning of paragraph 10 of the Decrees.

The Company thereafter filed a motion to alter or amend the Court's opinion in certain respects. This motion was decided by Judge Schwartz on February 18, 1987. He adhered to his ruling that "sugar" as used in paragraph 10 of the Consent Decrees did not include HFCS–55.

The Company respectfully disagrees with Judge Schwartz' interpretation of the word "sugar" in the Consent Decrees and, if necessary, will appeal the ruling at an appropriate time. Nonetheless, the Company will begin to furnish to you Coca–Cola Bottle Syrup that is sweetened with sucrose.

Accordingly, I am writing to inform you that effective as of September 1, 1987, the Company will supply to your and your authorized processor Coca–Cola Bottle Syrup that is sweetened 100%

with sucrose. Thereafter, only Bottle Syrup sweetened with sucrose should be used in the production and sale of Coca–Cola in bottles and cans in your territory, unless you agree with the Company in writing on or before July 1, 1987 that you will accept HFCS–55 as "sugar" under the terms of your bottle contract and the Consent Decrees and that Bottle Syrup sweetened with HFCS–55 may be priced by the Company on the same terms as Bottle Syrup sweetened with sucrose.

Similarly, effective as of September 1, 1987, the syrups supplied to you or your authorized processor by the Company for the production of Coca–Cola classic, caffeine-free Coca–Cola, and cherry Coke, will be sweetened 100% with sucrose unless you agree with the Company in writing on or before July 1, 1987 that you will accept HFCS–55 as "sugar" and that syrups sweetened with HFCS–55 may be priced by the Company on the same terms as syrups sweetened with sucrose.

7. Plaintiffs responded to the Sucrose Letter by filing a Motion for Preliminary Injunction (Dkt. 563) to prevent the Company from carrying out its intentions. The Company agreed to postpone implementing the Sucrose Letter policy, and plaintiffs agreed to waive damages pending disposition of the motion.

8. In *Coke V*, decided September 1, 1987, Judge Schwartz denied plaintiffs' preliminary injunction motion.

9. On December 1, 1987, the Company began to supply all unamended bottlers and their authorized processors with sucrose-sweetened syrups for Coca–Cola, Coca–Cola classic, caffeine-free Coke, and cherry Coke.

10. In *Coke V*, Judge Schwartz allowed plaintiffs to supplement their complaint to include allegations concerning the Company's implementation of the Sucrose Letter policy. These allegations form the substance of Count II of this litigation, which seeks an injunction prohibiting the Company from supplying plaintiffs with sugar-sweetened syrup while providing HFCS-sweetened syrup to the amended bottlers

and damages for breach of the duty of good faith and fair dealing implied in the unamended bottle contracts. The Court in the following sections will also address plaintiffs' request under Count I that the Court rewrite their unamended contracts to provide for use of and pass through of savings from sweeteners other than granulated sugar from cane or beet in the syrup supplied by the Company and their assertion that the unamended contracts entitle them to receive concentrate in lieu of syrup.

### B. Contentions of the Parties

11. Plaintiffs assert that, by supplying them with syrup sweetened with 5.32 pounds of sugar per gallon and no HFCS–55, the Company has breached paragraph FIRST of the unamended contracts as it incorporates paragraph 10 of the Consent Decrees because the Company is not supplying them with "high grade standard Bottlers Coca–Cola Syrup [which] ... contain[s] not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

12. Plaintiffs contend that the modifier "standard" as used in paragraph 10 of the Consent Decrees requires the Company to provide a "uniform" syrup to all bottlers—both amenders and unamenders. Because the bottlers who signed the 1978 Amendment receive syrup sweetened with HFCS–55, plaintiffs argue that HFCS-sweetened syrup has become the "standard" syrup for bottled Coca–Cola to be received by plaintiffs pursuant to the unamended contracts. In other words, plaintiffs contend that the sucrose sweetened syrup which they currently receive, even though it is sweetened with 5.32 pounds of sugar per gallon, does not conform to paragraph FIRST of their unamended contracts as it incorporates paragraph 10 of the Consent Decrees because it is not "high grade *standard* Bottlers Coca–Cola Syrup."

13. In addition, plaintiffs assert the Company breached its duty of good faith and fair dealing implied in the unamended contracts when it began supplying them with sucrose-sweetened syrup and when it

instituted certain quality control procedures at bottling facilities which handle both sucrose-sweetened and HFCS-sweetened syrups.

14. Plaintiffs allege that the Company's actions have harmed them in a number of ways, including:

a. Those plaintiffs who package product for other bottlers incurred increased operating expenses in connection with implementing the quality control procedures and maintaining dual inventories. Tr. 888–90, 894–95, 962–84 (W. Schmidt); Tr. 2075–79 (Wilson); Tr. 3746–54 (Trombley); Tr. 4300–06 (Hanlon).

b. Some plaintiffs who receive packaged product from amended processors or co-ops were forced to find alternative processors when the amended processor or co-op refused to package sucrose sweetened syrup. Tr. 1365 (C. Schmidt); Tr. 1902–03, 1908 (Williams); Tr. 2046, 2052–53, 2062–69 (Wilson); Tr. 2899–902, 2905–08 (Mayo); Tr. 3385–95, 3377–83, 3392–93 (Herauf); Tr. 3441–43 (Christian); Tr. 3717–18, 3721–23, 3727–29, 3741–46 (Trombley); Tr. 3083–85 (Bernabucci).

c. Other plaintiffs who receive packaged product from amenders or co-ops were forced to pay a substantial upcharge per case of product, Tr. 3091–92, 3987–88 (Bernabucci); Tr. 4211–12, 4217, 4265–77 (Payne); Tr. 4284–85, 4287–95 (Hanlon); Tr. 2864–65 (Tyndall) Tr. 2905 (Mayo), or to invest in packaging equipment to process the syrup themselves. Tr. 3437, 3446–49 (Christian); 3641–42, 3655–79, 3681–87, 3694–98 (Manke); Tr. 3727–28 (Trombley).

d. The Company declined to continue its voluntary participation in cooperative advertising and merchandising programs with the unamended bottlers while continuing to provide amended bottlers with supplemental marketing funds.

e. The Company withdrew the 1978 and 1983 Amendments and introduced an allegedly more onerous Master Bottle Contract.

15. Plaintiffs contend the Company instituted the dual syrup system only after assuring itself that the amended bottlers would suffer no substantial disruption in their operations as a result. They allege the Company breached its duty of good faith and fair dealing implied in the unamended bottle contracts by instituting the dual syrup system in bad faith and with the sole intent of "punishing" plaintiffs for failing to sign the 1978 Amendment and for instituting this litigation.

16. Plaintiffs also allege that the implementation of the dual syrup system and termination of cooperative advertising and merchandising programs with the unamenders breaches the Company's duty under paragraph 1 of the Consent Decrees to exercise its best efforts to promote Coca-Cola:

> It being recognized that the primary obligation of all parties hereto, as well as other individuals and Bottling Companies who employ the name Coca-Cola, in their corporate or trade name, is to promote the sale of Coca-Cola....

17. In support of their position, plaintiffs allege that the Company's prior course of performance included a policy of actively aiding the bottlers in becoming low cost producers. As proof of the policy, plaintiffs point to various statements by Company officials to the effect that it is in the interest of the Company and the bottling network that the bottlers' costs remain low. *E.g.*, Tr. 4796–97 (Dyson); Tr. 2335–36 (Wallace); Tr. 4972–73 (Keough); Tr. 7741, 7744 (Mellett); Tr. 8117 (Wallace); Tr. 9012 (Blanchard); Tr. 5106–08 (Evans); Tr. 2386–87 (Burns); *see generally*, Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 352–357 at 87–90 (Dkt. 897).

18. As previously stated, plaintiffs in addition assert that their unamended contracts entitle them to receive concentrate in lieu of syrup. They also request that the Court provide declaratory and injunctive relief by "interpreting" their unamended contracts to provide for the use of sweeteners other than sugar and for the pass through to them of any savings derived from the use of cheaper substitute sweeteners.

19. The Company contends that plaintiffs are estopped from asserting that the

provision to them of sucrose-sweetened syrup violates their unamended contracts because of plaintiffs' prior assertions that they were entitled to and preferred to receive syrup sweetened 100% with sucrose.

20. The Company also asserts that since late 1987 plaintiffs have received exactly the syrup for which they contracted, that is, syrup sweetened with 5.32 pounds of sugar per gallon. The Company contends that the modifier "standard" refers to the strength or quality of the syrup.

21. In addition, the Company contends that, in the aftermath of Judge Schwartz' decisions in *Coke III* and *Coke IV*, it was faced with a number of alternative courses of action. The Company contends that its election to provide plaintiffs the option of receiving only sucrose-sweetened syrup, amending their contracts, or agreeing to continue to receive HFCS-sweetened syrup at a sugar-based price and waiving damages was a business decision. The Company asserts it had legitimate business reasons for its action, including its desire to limit its exposure to damages under Count I, to remove plaintiffs' incentive for further litigation, to preserve its litigation posture, and to treat fairly the amended bottlers. The Company asserts that any harm incurred by plaintiffs is a result of their own choice to receive sucrose-sweetened syrup over the alternatives offered by the Company.

### C. Plaintiffs' Expressed Preference for Syrup Sweetened with 100% Sucrose

22. Paragraph 10 of the Consent Decrees states that the syrup to be provided the bottlers by the Company will be "high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

23. From the filing of the original complaint in this action in 1981 until the filing of the motion for preliminary injunction, plaintiffs uniformly expressed a preference for receiving syrup sweetened with 100% sucrose. The following are examples of statements made by various plaintiffs during the first six and one-half years of this litigation.

24. In paragraph 45 of the original complaint (Dkt. 1), plaintiffs alleged:

> The ... Unamended Bottlers have notified The Coca–Cola Company that the substitution of HFCS–55 for part of the sugar in the formula for the manufacture of Coca–Cola Bottlers' Syrup, without the consent of the individual contracting bottlers, constitutes violations of both the 1921 [Consent Decrees] and of their first-line bottlers' contracts, *and has demanded that The Coca–Cola Company supply the ... Unamended Bottlers Coca–Cola Bottlers' Syrup containing with not less than the 5.32 pounds of granulated sugar required in paragraph 10 of the [Consent Decrees], and not syrup made with HFCS 55*, or, alternatively, that The Coca–Cola Company refund and pass on to the Unamended Bottlers the savings achieved by The Coca–Cola Company from the substitution of HFCS 55 for 50% of the sugar in the syrup.

(emphasis added).

25. In 1980, shortly after the Company announced its plan to sweeten the syrup with a blend of sucrose and HFCS–55, lead plaintiff William B. Schmidt, the Elizabethtown bottler, and other plaintiffs wrote to the Company expressing a preference for sucrose-sweetened syrup. Tr. at 1547 (W. Schmidt). Schmidt testified in a deposition taken in September 1981 that he would be satisfied if the Company provided him with bottle syrup sweetened with 100% sucrose. Tr. at 1564 (W. Schmidt). He reiterated in June 1987 that he would have been satisfied in February 1981 (when the complaint was filed) if the Company had agreed to provide him with sucrose-sweetened syrup after he wrote the Company in March 1980. Tr. at 1547 & 1549–50 (W. Schmidt).

26. In a letter dated March 18, 1982, from lead plaintiff William B. Schmidt to J.A. Blanchard, Vice President, Coca–Cola USA, Schmidt stated: "We [the plaintiffs] prefer to receive 100 percent sucrose Coca–Cola syrup...." DX745.

27. In a letter dated August 16, 1986, from William B. Schmidt to the other bottlers, Schmidt stated that the unamended bottlers' contention in the litigation as of the bench trial in *Coke III* was "that Paragraph 10 of the 1921 Consent Decrees required The Coca-Cola Company to use sugar in the manufacture of Bottlers Syrup...." DX748 at 2. In the same letter, Schmidt interpreted Judge Schwartz' ruling in *Coke III* as meaning "at the absolute minimum, that the Unamended Bottlers are entitled to an injunction prohibiting The Coca-Cola Company from supplying them with Coca-Cola syrup containing HFCS-55 in the future." DX748 at 3.

28. Oliver Hutaff, the Wilmington, North Carolina bottler, contended in a 1981 deposition that the Company was obligated to provide sucrose-sweetened syrup. Tr. 2766-68 (Hutaff).

29. In a June 1987 deposition, the Plymouth bottler testified: "I believe that the Coca-Cola Company is supposed to supply all the bottlers by the terms of their unamended contracts syrup sweetened with sucrose." Tr. at 2965-66 (Mayo).

30. In a March 24, 1987 deposition, the Laredo bottler contended that syrups sweetened with sucrose were Coca-Cola Bottlers' Syrup under his unamended contract, but the same syrups sweetened with HFCS-55 did not comply with the terms of his contract. Tr. at 4267-72 (Payne).

31. As late as a December 1987 deposition, the Jamestown bottler testified:

QUESTION: Do you have an opinion or a contention as to what you believe standard Coca-Cola bottlers' syrup is?

ANSWER: Without the mutual revision of our contract—of our franchise contract, my definition of standard bottlers' Coca-Cola syrup would be what the contract defines it to be.

QUESTION: And what is that?

ANSWER: Coca-Cola bottlers' syrup manufactured with no less than 5.32 pounds of standard granulated sugar per gallon.

Tr. at 3861 (Bernabucci).

32. Plaintiffs now argue that the litigation was always about the price of the syrup and not its ingredients.

33. Plaintiffs argue their legal position has always been that the Company could provide them with syrup sweetened with HFCS so long as it obtained their consent and passed through to them any resulting savings in product cost. For example, the prayer for relief in the original complaint requested:

(a) That the Court enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 determining that:

(1) The Coca-Cola Company is obligated under the terms of paragraph 10 of the 1921 Final Decrees entered by the United States District Court for the District of Delaware and under the terms of the first-line bottlers' contracts to supply the plaintiff and members of the class of Unamended Bottlers "high grade standard Bottlers Coca-Cola Syrup that shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

(2) The substitution by The Coca-Cola Company of HFCS 55 for the sugar formerly used to manufacture Coca-Cola bottlers' Syrup sold to plaintiff and members of the plaintiff class, *without their consent*, constitutes a material breach of (A) the 1921 Final Decrees, and (B) the plaintiff's and each class member's first-line bottler's contract.

(b) That the court enter a preliminary and a permanent injunction restraining and enjoining The Coca-Cola Company from violating the provisions of paragraph 10 of the 1921 Final Decrees, and the first-line bottlers' contracts of the plaintiff and members of the plaintiff class, by failing or refusing to supply plaintiff and members of the class their requirements of "high grade standard Coca-Cola Bottlers Syrup that shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup," *so long as (1) The Coca-Cola Company continues to charge the plaintiff and other Unamended Bottlers for syrup based on*

*the list price of sugar, and (2) refuses to pass on to the plaintiff and the Unamended Bottlers the full amount of any savings achieved by The Coca–Cola Company from the use of a sugar substitute, including but not limited to HFCS 55.*

(emphasis added).

34. Further, in *Coke III,* Judge Schwartz reiterated his understanding of plaintiffs' legal position as follows:

Plaintiffs assert the term "sugar" as used in the Decrees means refined granulated sugar, i.e., sucrose. They contend that HFCS–55 is not "sugar" as that term is used in the 1921 Consent Decrees and that the Company is violating Paragraph 10 of those Decrees by using HFCS–55 in Coca–Cola Bottlers Syrup *without their consent.*

*Coke III* at 1390 (emphasis added).

35. Judge Schwartz stated in the related *diet Coke* litigation: "The Court finds it difficult to believe that the plaintiffs would have filed the Coke lawsuit if the Company had passed through the savings from using HFCS to unamended bottlers as well as amenders." *diet Coke V* at 16.

36. Nevertheless, statements by various plaintiffs, including those quoted above, demonstrate unequivocally that, while plaintiffs were willing to settle for a pass through of the HFCS savings, their position was that the contract required and they preferred to receive syrup sweetened with 100% sucrose. *Coke V* at 917 ("The unamended bottlers' original complaint in this action signalled their clear objection to the use of HFCS–55 as a substitute for sugar.... While plaintiffs may file an amended and supplemental complaint which omits any claim to receive sucrose syrup, they cannot now assert they willingly accepted HFCS–55 syrup and never truly objected to the Company's action.").

D. *The Meaning of the Modifier "Standard" as it Describes Bottlers Coca–Cola Syrup for Purposes of the Unamended Bottle Contracts*

37. Under paragraph FIRST of the unamended bottling contracts, the parent bottlers were obligated to supply each actual bottler with "sufficient syrup for bottling purposes to meet the requirements" of that bottler's territory. The unamended contracts do not define the term "syrup for bottling purposes."

38. As stated under Count I, the actual bottlers contracted to receive the same syrup the parent bottlers received from the Company, and paragraph FIRST of the unamended contracts incorporates the description of the syrup in paragraph 10 of the Consent Decrees. *See supra* Count I ¶¶ 16 & 62.

39. Paragraph 10 of the Consent Decrees describes the syrup the Company was required to supply the parent bottlers. It states that the syrup provided to the parent bottlers by the Company would be "high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty-two one-hundredths (5.32 pounds) of sugar to each gallon of syrup." Paragraph 10 contains the only description of syrup for bottling purposes in either the Consent Decrees or the bottle contracts.

40. The phrase "standard Bottlers Coca–Cola Syrup" cannot be read in isolation, but instead must be interpreted in the context of paragraph 10 and of the Consent Decrees as a whole. Paragraph 10's description of Bottlers Coca–Cola Syrup contains three modifying terms: "standard"; "high grade"; and "shall contain not less than five and thirty-two one-hundredths (5.32 pounds) of sugar to each gallon of syrup." The modifiers "high grade" and "shall contain ..." describe the strength and quality of the syrup. Thus, it seems likely that the modifier "standard" also describes strength and quality.

41. The parties' usage of the term "standard" in writings contemporaneous with the Consent Decrees indicates that the term refers to quality and not to uniformity. *E.g.,* PX287 ("[D]uring these three months last year you supplied our bottlers with syrup made out of invert sugar, and the quality of Coca–Cola was not up to the *standard*") (emphasis added); PX1 at 1501 ("During the 1921 litigation an attorney for

the Company wrote to a Parent bottler, 'it is absolutely necessary to keep our product up to a certain *standard*' ") (emphasis added).

42. The parties also used the term "standard" in Paragraph 7 of the Consent Decrees (the pricing provision) to modify "granulated sugar." In that context "standard" means a *type* or *grade* of sugar rather than uniformity. *See also Coke III* at 1413 n. 31.

43. Events prior to the entry of the Consent Decrees in 1921 indicate that the parties were concerned about maintaining the quality of the syrup. Prior to the entry of the Consent Decrees, the Company had on occasion decreased the strength of the sweetener in the syrup. Between 1907 and 1921, the Company reduced the quantity of sugar in a gallon of Coca–Cola Bottler's Syrup from 6.3 pounds before World War I, PX766 at AZ0690, to 5.97 pounds during 1916–1918, PX220, and to 5.32 pounds by the time of the 1920 litigation. In 1899, an ounce of syrup would produce nine ounces of Coca–Cola; by 1916, an ounce of syrup would produce only six and one-half ounces of Coca–Cola. *Coke III* at 1402 n. 14. Therefore, the reduction in the quantity of sweetener in a gallon syrup reduced the strength of the syrup and had the effect of increasing the price of the syrup paid by the actual bottlers, who could produce fewer six and one-half ounce bottles of Coca–Cola from a gallon of syrup.

44. Course of performance evidence also indicates that "standard" describes syrup quality and not uniformity. There have been and continue to be lapses in uniformity of sweetener even when all bottlers were theoretically receiving the same syrup. For instance, prior to the entry of the Consent Decrees, the parent bottlers began adding a "simple syrup" to the syrup received from the Company in order to eliminate the difference in taste between the bottled product and the fountain product. Admitted Facts, IV.A. ¶ 13 at 164. The parties have stipulated that it is probable that this simple syrup was not uniform. Admitted Facts, III.C. ¶ 118 at 67; III.D., ¶ 283 at 152; IV.A. ¶ 15 at 164.

45. During the Company's conversion from sugar to HFCS in the syrup which was at that time supplied all bottlers, including plaintiffs, various bottlers received syrup sweetened with different combinations of sucrose and HFCS. Tr. at 8255–56 (Cunningham).

46. There is no uniform sweetening system even among the bottlers who signed the 1978 Amendment. Approximately 90% of all bottlers purchase concentrate rather than syrup. Tr. at 7672 (Mellett). Concentrate contains no sweetener, and the amended bottlers who use concentrate are authorized by the Company to use any of five sweetener combinations:

| | | |
|---|---|---|
| 0% HFCS | – | 100% Sucrose |
| 25% HFCS | – | 75% Sucrose |
| 50% HFCS | – | 50% Sucrose |
| 75% HFCS | – | 25% Sucrose |
| 100% HFCS | – | 0% Sucrose |

Tr. at 7674 (Mellett); Tr. at 8253; 8340 (Cunningham); DX1157; DX1209.

47. The syrup sold in Hawaii continues to be sweetened with 100% sucrose. Some of the syrup sold during certain religious holidays is kosher and sweetened with 100% sucrose. Tr. 8256–58 (Cunningham).

48. Moreover, the amended bottlers operate under a contract different from plaintiffs' unamended contracts. The amenders' contract expressly permits the Company to provide syrup sweetened with ingredients, such as HFCS–55, which are not included in the term "sugar" as that term has been defined for purposes of the Consent Decrees.

49. At the time the Company and the parent bottlers entered into the Consent Decrees, the Thomas bottlers operated under two-year bottling contracts, whereas the contracts of the Whitehead–Lupton bottlers were perpetual. Admitted Facts III.D. ¶ 279 at 151; III.A. ¶ 100 at 51; *Coke VI* at 90. Consequently, the parties were aware at the time the Consent Decrees were entered into that the actual bottlers could and did operate under different bottling contracts. No provision in the Con-

sent Decrees mandates that the actual bottlers' contracts be uniform. There is no clause in plaintiffs' unamended contracts which prohibits the Company from entering into different contracts with other bottlers outside plaintiffs' exclusive bottling territories. It seems reasonable, therefore, to infer that the parties to the 1921 Consent Decrees and the unamended contracts did not intend to prohibit the Company from supplying a different syrup to different bottlers under a different contract, so long as the syrup provided was of standard, high grade quality.

50. "[H]igh grade standard Bottlers Coca–Cola Syrup" therefore describes a syrup of a specific quality and strength. There is no evidence in the record that the 100% sucrose-sweetened syrup currently being received by plaintiffs is of a lesser quality than the "high grade standard Bottlers Coca–Cola Syrup [which] contain[s] not less than five and thirty-two one-hundredths (5.32 pounds) of sugar to each gallon of syrup" for which their contracts provide.

E. *The Parties to the Consent Decrees Intended That Sugar be Used as the Exclusive Sweetening Ingredient in the Syrup.*

51. Prior to the imposition of sugar quotas and price controls in 1917, cane sugar was the primary sweetener used in soft drinks. Admitted Facts III.C. ¶ 122 at 68. Sucrose, especially sucrose from cane, was the preferred sweetener in the soft drink bottling industry. Admitted Facts III.C. ¶ 123 at 68.

52. The parties to the Consent Decrees were familiar with the use of cheaper substitute sweeteners and variations in sweetener strength. The fact that they could, but did not, provide in the Consent Decrees and the unamended contracts for the use of sweeteners other than sugar indicates that they did not intend that the syrup be sweetened with an ingredient other than sugar.

53. Prior to the entry of the Consent Decrees, the Company had on occasion decreased the strength of the sweetener in the syrup. Between 1907 and 1921, the Company reduced the quantity of sugar in a gallon of Coca–Cola Bottler's Syrup from 6.3 pounds before World War I, PX766 at AZ0609, to 5.97 pounds during 1916–1918, PX220, and to 5.32 pounds by the time of the 1920 litigation. In 1899, an ounce of syrup would produce nine ounces of Coca–Cola; by 1916, an ounce of syrup would produce only six and one-half ounces of Coca–Cola. *Coke III* at 1402 n. 14. Therefore, the reduction in the quantity of sweetener in a gallon syrup reduced the strength of the syrup and had the effect of increasing the price of the syrup paid by the actual bottlers, who could produce fewer six and one-half ounce bottles of Coca–Cola from a gallon of syrup.

54. During 1918, the Company used a number of cheaper sweeteners as substitutes for cane sugar in Coca–Cola bottlers' syrup. The Company used corn syrup, glucose, beet sugar, and invert sugar as substitutes for cane sugar in Coca–Cola Bottler's Syrup. Admitted Facts III.A. ¶ 52 at 32–33. Substitute sweeteners used by the Company during the World War I period proved unsatisfactory. PX189; PX287; PX708.

55. The parties' familiarity with substitute sweeteners at the time of the 1920 litigation is further evidenced by the distribution by the USDA of a pamphlet entitled "Formulas for Sugar Saving Sirups." PX152. Copies of this pamphlet as published by USDA were widely publicized and reprinted by the Georgia Department of Agriculture, PX144; PX232, in trade journals directed at bottlers, including the *National Bottlers' Gazette*, PX172; PX208, and *The American Bottler*, PX147, as well as by suppliers to the soft drink industry, PX190.

56. Many Coca–Cola bottlers purchased concentrates from other manufacturers to bottle beverages other than Coca–Cola, such as ginger ale or various fruit-flavored drinks. Admitted Facts, III.C. ¶ 125 at 69. These bottlers would add sweetener to the concentrate. Many Coca–Cola bottlers who faced a curtailment of the bottling of ginger ale and fruit-flavored drinks from concentrates as a result of sugar shortages

due to World War I, Admitted Facts, III.A. ¶ 48 at 31, requested copies of "Formulas for Sugar Saving Sirups" directly from the USDA. *E.g.,* PX179; PX182–184; PX186; PX188; PX195; PX197–200; PX210; PX213–218; PX220; PX223–224; PX226; PX234; PX243; PX247–248; PX254; PX256; PX265. These bottlers included the Birmingham Coca–Cola Bottling Company, whose President was Chairman of the Special Committee of the Coca–Cola Bottlers' Association and an intervenor in the 1920 litigation. PX185; PX198.

57. In 1922, one Coca–Cola bottler wrote that he was familiar with the USDA's "Formula for Sugar Saving Sirups" and that, in his opinion, substitute sweeteners were inadequate replacements for sugar. PX708; Admitted Facts III.A. ¶ 131 at 70–71.

58. Although the parties to the Consent Decrees were familiar with substitute sweeteners, the only description of syrup for bottling purposes states that the syrup "shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup." Although the parties could have provided for the use of a substitute sweetener, there is no mention of or provision for the use of a sweetener other than sugar.

59. The parties' familiarity with substitute sweeteners in 1921 and their dissatisfaction with the effect of substitute sweeteners on the quality of the syrup, combined with their failure to provide for the use of sweeteners other than sugar in the Consent Decrees and unamended bottle contracts, is evidence that the parties intended that 5.32 pounds of sugar be used as the exclusive sweetener for Bottlers Coca–Cola Syrup.

60. The pricing provisions of the Consent Decrees and the unamended contracts also provide evidence that 5.32 pounds of sugar was the only sweetener intended by the parties. As previously stated, the pricing mechanism in the Consent Decrees and unamended contracts is inextricably linked to the description of "Bottlers Coca–Cola Syrup" in paragraph 10 of the Consent Decrees, including the description that "Bottlers Coca–Cola Syrup" "shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup." *See supra* Count I at ¶ 97.

61. The base price of $1.175 per gallon paid by the parent bottlers under paragraph 5 of the Consent Decrees was calculated on the cost of 5.32 pounds of sugar per gallon. PX1 (R. 1605–06); PX557 ("[T]he future price shall be on a sliding scale of the price of sugar alone figured upon the basis of 5.32 pounds of standard granulated sugar to the gallon of syrup....").

62. The pricing mechanism provides for a base price of one dollar and thirty cents ($1.30) per gallon plus an extra six cents (6¢) per gallon for every one cent (1¢) increase in the price of sugar over seven cents (7¢) per pound. The requirement in paragraph 10 that the syrup contain not less than 5.32 pounds of sugar per gallon served a price-protecting function by ensuring the Company could not evade the pricing provisions of the Consent Decrees by reducing the amount of sugar used or using cheaper substitute sweeteners. *See Coke III* at 1402.

*F. There has been no Mutual Agreement to Amend the Consent Decrees or Unamended Contracts to Provide for the Use of a Sweetener Other Than Sugar.*

63. The Company's unilateral substitution of HFCS–55 for sugar in the syrup may be construed as an offer on the part of the Company to amend the Consent Decrees and/or the unamended contracts to provide for the use of HFCS–55 instead of sugar as the sweetening ingredient in the syrup. This offer may be construed as an offer to substitute HFCS–55 for sugar as an ingredient while continuing to price the syrup according to the sugar-based pricing mechanism of paragraphs 6 and 7 of the Consent Decrees. The plaintiffs did not accept the Company's offer.

64. Almost from the instant in which the Company first announced its intention to substitute HFCS for sugar in the syrup in 1980 until the filing of the motion for preliminary injunction in 1987, plaintiffs

have objected to the Company's course of action. Plaintiffs have both expressed a preference for receiving syrup sweetened with 100% sucrose and insisted that if the Company provided them with HFCS-sweetened syrup that it should not charge them a sugar-based price. *See supra.*

65. The plaintiffs' request to receive HFCS-sweetened syrup on the pricing terms of their own choosing is not comparable to their prior acquiescence to the use of beet sugar in the syrup and therefore did not result in amendment of the unamended contracts to the extent they incorporate paragraph 10 of the Consent Decrees.

66. In 1947, after quality problems with beet sugar were solved, the Company began to use beet sugar in the syrup sold to the bottlers. The Company subsequently purchased one-third of its sugar requirements from beet processors. The price differential between beet and cane sugar was eliminated in 1967. The bottlers knew of the Company's use of beet sugar for many years and continued to purchase syrup sweetened with beet sugar without objection. Their failure to object resulted in a waiver of their right to object to the use of beet sugar as outside their contracts. *See Coke III* at 1403.

67. The implied consent to beet sugar, however, did not leave the Company free to use any sweetener in the syrup without the consent of the bottlers. *Id.* These bottlers have clearly withheld their consent to the substitution HFCS-55 for sugar as the sweetening ingredient in the Bottlers Syrup absent a corresponding substitution of the price of HFCS-55 for the price of sugar in the pricing mechanism.

68. The position taken by plaintiffs—that they should receive the pass through of any of the savings resulting from the use in the syrup of HFCS-55 instead of sugar—may be construed as a counteroffer to amend the Consent Decrees and unamended contracts to provide for the use of different sweeteners at a syrup price based upon the price of the sweetener actually used. Throughout its defense of this lawsuit, the Company has rejected plaintiffs' counteroffer.

*G. The Interdependent Bottling Network and the Company's Institution of Quality Control Procedures*

69. Since its adoption of the 6½ ounce Root Bottle as the standard Coca–Cola bottle in 1916, the Company has authorized over twenty package sizes for finished Coca–Cola. Tr. 5045–46 (Casey).

70. Since 1980, the number of non-diet products offered by the Company in the market has increased from one to four (New Coke, Coke Classic, Cherry Coke, caffeine-free Coke).

71. This proliferation of products and packages has increased the bottlers' costs. Tr. 2057 (Wilson); Tr. 7825 (Mellett). The cost burdens fall especially on bottlers with smaller territories who cannot economically bottle syrup in the entire range of package sizes. Tr. 2499 (Hutaff).

72. One way in which the Company and the bottlers have addressed the increased costs associated with increased packaging has been by entering into Agency Processing Agreements, which allow the bottlers to have Coca–Cola products processed for them at manufacturing facilities located outside the bottler's exclusive territory. Admitted Facts, III.C. ¶ 191 at 86.

73. The parties to Agency Processing Agreements are the Company and the actual bottlers. Each Agency Processing Agreement expires by its own terms one year from the date on which it is entered and is terminable by either party without cause upon sixty days' notice. Admitted Facts, III.C. ¶ 192 at 86. In other words, the Company, if it chose, could terminate plaintiffs' Agency Processing Agreements and require bottlers to bottle the syrup themselves within their exclusive territories, on sixty days' notice. The Company could also choose not to renew plaintiffs' Agency Processing Agreements when they expire each year.

74. Plaintiffs first began entering into Agency Processing Agreements as early as 1965. Admitted Facts, III.C. ¶ 193 at 87.

75. In addition to enabling smaller bottlers to offer a wider range of packaged product, the Agency Processing Agreements presented larger bottlers an opportunity to achieve economies of scale and lower their per unit costs by packaging product for other bottlers. For example, the Elizabethtown bottler installed the fourth privately owned can line in the country in 1963 to produce for itself and neighboring bottlers. Tr. 760–69; 798–99 (Schmidt). The bottlers also relied on the Agency Processing Agreements to acquire packaged product for their territories whenever exigent circumstances, such as fire, caused a temporary shortfall in production. *E.g.*, Tr. 3714–17 (Trombley).

76. In addition, Agency Processing Agreements enabled the bottlers to cooperate with each other and to build centralized production facilities ("co-ops") which achieve economies of scale by producing packaged product for a number of bottlers. *E.g.*, Tr. 2052 (Wilson) (Gulf States); Tr. 1891–92 (Williams) (Gulf States); Tr. 2524 (Hutaff) (South Atlantic Canners ("SAC")); Tr. 2893–95 (Mayo) (SAC); Tr. 3437–38 (Christian) (Mid–Atlantic Canners Assoc. ("MACA")); Tr. 4284–85 (Hanlon) (Great Lakes Canning; MACA).

77. Prior to December 1, 1987, amended and unamended bottlers received identical syrup and unamended bottlers could process for amended bottlers and vice-versa without changing their operational procedures or maintaining dual inventories. Tr. 795–96 (W. Schmidt); Tr. 7808–09 (Mellett); Tr. 8292–93 (Cunningham).

78. By 1987, approximately 21% of the entire non-diet beverage volume was processed under Agency Processing Agreements, and over 33% of plaintiffs' products were packaged by agency processors. *Coke V* at 911; Tr. 890–91 (W. Schmidt).

79. On November 5, 1987, Richard L. Burns, the Manager for Contractual Affairs of Coca–Cola USA, notified the bottlers who held term processing appointments (*i.e.*, the bottlers who packaged syrup for other bottlers under Agency Processing Agreements) that the Company would begin providing the unamended bottlers with syrup sweetened exclusively with sucrose. Burns also notified the holders of term processing appointments who processed for both amended and unamended bottlers that the Company's Beverage Quality Assurance Department would develop and forward procedures for segregating HFCS-sweetened syrup from sucrose-sweetened syrup. The notice indicated that the Company would monitor implementation of the quality control procedures and that unauthorized deviations could result in revocation of their term processing appointments. PX1432.

80. The quality control procedures were forwarded to the bottlers on November 9, 1987. The procedures were directed primarily at bottlers who would be packaging both HFCS-sweetened syrup and sucrose-sweetened syrup and required these bottlers to:

(1) place orders for sucrose-sweetened syrup at least five days in advance;

(2) thoroughly rinse the syrup storage system (hose, pumps, lines and tanks) before unloading sucrose-sweetened syrup into a tank which previously contained HFCS-sweetened syrup (no rinse is required, however when HFCS-sweetened syrup is placed into tanks formerly containing sucrose-sweetened syrup);

(3) thoroughly rinse the system's syrup lines, proportioning, cooling, carbonating, beverage lines and filler to remove all traces of HFCS–55 syrup when packaging sucrose-sweetened syrup after using the same equipment to package HFCS-sweetened syrup (but not vice versa);

(4) keep finished products sweetened with HFCS and sucrose separate and designated by type; and

(5) maintain records of syrup batch codes, date of product, shipping date, package date, code and identity of recipient bottler.

*See* PX1436 & 1437. The Company asserts these procedures were developed to ensure that the sucrose-sweetened syrup supplied to plaintiffs did not contain traces of HFCS–55.

81. Plaintiffs label the Company's decision to supply them with only syrup sweet-

ened exclusively with sucrose combined with the institution of quality control procedures the creation of a "dual syrup system."

82. It was the unamended bottlers who first suggested that the Company create a dual syrup system. In October of 1980, several unamenders, including the Wilmington and Elizabethtown bottlers who are plaintiffs in this case, met with Company officials. Another of the unamended bottlers, Asa Day, Jr., suggested implementing a dual syrup system whereby the unamenders would continue to receive syrup sweetened with sucrose. Tr. 1512–13 (W. Schmidt); Tr. 2633–35 (Hutaff); PX2724.

83. As previously noted, in the early 1980's, plaintiffs objected to the use of HFCS–55 and requested that they receive syrup sweetened exclusively with sucrose. *See supra.* Several bottlers admitted that the plaintiffs' initial demands for sucrose-sweetened syrup after the Company first announced the conversion to HFCS–55 would have resulted in the very dual system of which plaintiffs now complain. *E.g.,* Tr. 1508 (W. Schmidt).

84. The Company asserts it was faced with a number of alternative courses of action following Judge Schwartz' decisions in *Coke III* and *Coke IV.* It could continue to supply plaintiffs with HFCS-sweetened syrup and charge a sugar price. Alternatively, it could pass through the savings from use of HFCS to plaintiffs. It also had the option of acceding to plaintiffs' original requests by supplying them with syrup sweetened with sucrose, thus creating a dual syrup system. Tr. at 7598 (Mellett); Tr. at 8005–06 (Wallace). The Company elected to provide plaintiffs the option of receiving only sucrose-sweetened syrup, signing the Amendments or agreeing to receive HFCS-sweetened syrup at a sugar based price. *See* Sucrose Letter, *supra.*

85. The Company gave a number of reasons for the decision, including Company officials' judgment that continuing to supply plaintiffs with HFCS-sweetened syrup without passing through the savings might be construed as a violation of Judge

Schwartz' decisions in *Coke III* and *Coke IV,* the Company's desire to limit its exposure to damages under Count I, and its desire to remove plaintiffs' incentive for further litigation. Tr. 7599 (Mellett); Tr. 8005–06, 8060, 8227 (Wallace). The Court finds the Company had legitimate, non-pretextual business reasons for its course of action.

86. The Company's witnesses also testified to a concern for the amended bottlers' perception that, by receiving a pass through, plaintiffs would obtain one of the benefits of the 1978 Amendment without undertaking any of its obligations. *E.g.,* Tr. 7599, 7601, 7851 (Mellett); Tr. at 8005–06, 8061 (Wallace).

87. The Court notes that providing plaintiffs with HFCS-sweetened syrup and passing through the savings would be contrary to the Company's position in this case and in the *diet Coke* litigation.

88. The quality control procedures essentially consist of a single thorough water rinse of the packaging equipment. Tr. 1759–65 (W. Schmidt).

89. The single rinse procedure is no different than the procedure utilized between packaging runs of any two different syrups, such as Coca–Cola and caffeine-free Coke or Coca–Cola and Sprite. *Id.*

90. If the Company truly intended to "punish" the plaintiffs, it could easily have devised significantly more onerous procedures. For instance, the Company could have required its three-step procedure, which involves a rinse, a cleaner and another rinse, *see* Tr. 8271 (Cunningham), or its five-step rinse procedure for cleaning the equipment between runs of a "non-pungent" product, such as Sprite, and a "pungent" product such as root beer. *Id.; see also* Tr. 1752, 1771 (W. Schmidt). The Company also could have required a rinse between runs of sucrose-sweetened syrup and HFCS-sweetened syrup.

91. Those bottlers that process both syrups could avoid performing the quality control procedures altogether by processing the sucrose-sweetened syrup in the

first packaging runs of the day. Tr. 1756 (W. Schmidt).

92. The Company's asserted reason for the quality control procedures was to ensure the accuracy of the sweetener profiles it conducts as part of its product quality monitoring program.

93. As part of its regular quality control monitoring procedures, the Company conducts a "sweetener profile" on random samples of product. After inversion begins, traces of HFCS–55 in a sucrose-sweetened product could throw off a determination of 100% purity in the sweetener profile. Tr. 8334–35 (Cunningham). The inversion process begins soon after packaging and could occur rapidly. Tr. 8341–42 (Cunningham). The accuracy of the sweetener profile declines rapidly as inversion occurs. Tr. 8342 (Cunningham).

94. The Court finds the Company had a legitimate, nonpretextual reason for instituting quality control procedures to ensure that the syrup sweetened with sucrose did not contain trace elements of HFCS–55.

95. Despite the Company's institution of the Sucrose Letter policy and concomitant quality control procedures, the plaintiffs remain low cost producers. Even without the HFCS pass through, plaintiffs have consistently paid a lower syrup price than the amended bottlers. Tr. at 1975–76 (Williams); Tr. at 9296–97 (Dorman); DX647; DX649. Moreover, plaintiffs' syrup costs are significantly lower than the syrup price paid by their main competitors, the Pepsico bottlers. Tr. at 7646–47 (Mellett); Tr. at 9296–97 (Dorman).

96. The Company's duty to promote Coca–Cola flows not only to plaintiffs, however, but to the entire bottling network. In their testimony, the Company's officials repeatedly stated their concern that the amended bottlers—which comprise 97% of the bottling system—be treated fairly. The duty to promote Coca–Cola is system-wide and entails more than a duty to see that the unamended bottlers achieve the lowest production costs possible. For instance, the duty would not require the Company to forego ordinary quality control measures, even though elimination of such procedures would lower the bottlers' costs.

### H. The Unamended Contracts Do Not Entitle Plaintiffs To Receive Concentrate

97. The Consent Decrees and plaintiffs' unamended contracts provide solely for syrup and make no mention of concentrate.

98. The terms "syrup" and "concentrate" have different meaning within the soft drink industry and are not used interchangeably. DX1266 (Maly) at 7. "Concentrate" is a product which contains flavoring ingredients, but no sweetener and almost no water. Tr. at 1303–04 (W. Schmidt). "Syrup" as that term is used in the Consent Decrees and unamended contracts is a product which contains a sweetener and is used in the manufacture of soft drinks.

99. The 1978 Amendment gave amended bottlers the option to purchase concentrate for Coca–Cola if and when the Company decided to offer it for sale. PX880. More than 90% of the amended bottlers currently receive concentrate under a separate contract (the "concentrate amendment"). Tr. 7672 (Mellett) DX1157.

100. In 1921, other soft drink manufacturers sold concentrate rather than syrup. Admitted Facts, III.C. ¶¶ 120–21.

101. Many of the Coca–Cola bottlers in 1921 received concentrate to produce and sell ginger ale and fruit flavored drinks. Admitted Facts, III.C. ¶ 125 at 69.

102. The Court finds that the parties to the 1921 Consent Decrees and bottle contracts were aware of the possibility of using concentrate. Consequently, the use of concentrate in the manufacture and sale of soft drinks is not a situation wherein developing technology has created a product never contemplated by the contracting parties.

103. The sugar-based pricing mechanism of the Consent Decrees and unamended contracts fails to provide guidance for the pricing of concentrate—a product containing no sugar or sweetener of any kind—under the unamended contracts.

104. The parties' knowledge of concentrate in 1921 is evidence that their failure to provide for the use of concentrate in the Consent Decrees and unamended contracts was intentional.

105. A decree by this Court entitling plaintiffs to receive concentrate under their unamended contracts would be nothing more than the addition of a provision to the Consent Decrees and unamended contracts to which neither party assented in 1921.

CONCLUSIONS OF LAW

106. Under Count II, plaintiffs allege the Company breached its obligation to supply their requirements of "standard high grade Coca–Cola Bottlers Syrup" by providing them with only sucrose-sweetened syrups. They seek injunctive relief compelling the Company to supply them with syrup sweetened with HFCS–55 and monetary damages. Plaintiffs also seek punitive damages, alleging that the Company's acts in supplying them with sucrose-sweetened syrup and instituting certain quality control procedures breached the Company's duty to promote Coca–Cola under paragraph 1 of the Consent Decrees and its implied duty of good faith and fair dealing under the unamended contracts. They also seek an order entitling them to receive concentrate in lieu of syrup and interpreting the unamended contracts to provide for the use of sweeteners other than sugar and a pass through of the resultant savings. Before addressing the merits of plaintiffs' claims under Count II, the Court must first consider defendant's assertion that plaintiffs are judicially estopped from asserting that the syrup to which they are entitled under the unamended contracts can be sweetened with anything but 100% sucrose.

A. *Plaintiffs are not judicially estopped from asserting that their unamended contracts entitle them to receive syrup sweetened with HFCS–55.*

107. Defendant argues that plaintiffs should be judicially estopped from pursuing their Count II claims because of their repeated assertions in connection with

their claims under Count I of this litigation that their bottle contracts entitle them to syrup sweetened with 100% sucrose and the decision of Judge Schwartz in *Coke III* resulting from those assertions. *See Scarano v. Central R. Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir.1953) ("A plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position may not be heard later in the same court to contradict himself in an effort to establish against the same adversary a second claim inconsistent with his earlier contention."); *see also Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595 (6th Cir.1982); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166–69 (4th Cir.1982).

108. In support of its argument, the Company points to numerous instances wherein various plaintiffs asserted that their contracts entitled them to sucrose-sweetened syrup. *See supra.* Contrary to the Company's contention, however, plaintiffs did not unequivocally assert under Count I that their contracts entitle them to syrup sweetened with sucrose *and only* sucrose. Rather, plaintiffs asserted that the Company was required to obtain their consent prior to changing the sweetener. This is evidenced by plaintiffs' prayer for relief in their original complaint, in which they requested that the Court enjoin the Company from providing them with anything other than sucrose-sweetened syrup *so long as* the Company refused to pass through savings from the use of a sugar substitute. *See also diet Coke V* at 116 ("The Court finds it difficult to believe that the plaintiffs would have filed the Coke lawsuit if the Company had passed through the savings from using HFCS to unamended bottlers as well as amenders.").

109. Plaintiffs' claims under Count II do not contradict their position under Count I and during the *Coke III* trial because the plaintiffs have not unequivocally asserted a right to receive only syrup sweetened with sucrose. Therefore, the Court concludes that plaintiffs are therefore not judicially estopped from asserting under Count II that their contracts entitle them to syrup sweetened with HFCS–55. *See Edwards,*

690 F.2d at 598 ("The doctrine of judicial estoppel applies to a party who has successfully and *unequivocally* asserted a position in a prior proceeding....") (emphasis added); *see also Coke V* at 923 (plaintiffs are not judicially estopped from supplementing the complaint to request syrup sweetened with HFCS–55).

## B. The Company Has Not Breached the Unamended Contracts by Providing Plaintiffs with Syrups Sweetened with 100% Sucrose.

110. Under paragraph FIRST of the bottling contracts, the parent bottlers were obligated to supply "sufficient syrup for bottling purposes to meet the requirements" of each actual bottler in its territory. Paragraph 10 of the Consent Decrees in turn provided that the syrup supplied to the parent bottlers by the Company would be "high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup."

111. The actual bottlers contracted to receive the same syrup that the parent bottlers were to receive from the Company pursuant to the Consent Decrees. Thus, paragraph FIRST of the unamended contracts incorporates the description of the syrup to which the parent bottlers were entitled pursuant to paragraph 10 of the Consent Decrees.

112. The language of the Consent Decrees should be construed as it is written, with the assumption that each party compromised part of its purpose to achieve the overall agreement. *See United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971).

113. Similarly, "[j]udicial construction of a contract requires a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties." 4 *Williston on Contracts* § 600A at 287 (quoting *Hunt v. Triplex Safety Glass Co.*, 60 F.2d 92, 94 (6th Cir.1932)).

114. Plaintiffs have failed to prove by a preponderance of the evidence that the term "standard" as it is used in paragraph 10's description of "Bottlers Coca–Cola Syrup" means "uniform."

115. Based upon the plain language of the Consent Decrees, the parties' contemporaneous usage, the knowledge and experience of the parties at the time they entered into the Consent Decrees, and the historic lapses in syrup uniformity within the Coca–Cola bottling system, the Court concludes that the term "standard" as used in paragraph 10 of the Consent Decrees describes the strength or quality of "Bottlers Coca–Cola Syrup." Use of the modifier "standard" does not mandate that the syrup received by all Coca–Cola bottlers, regardless of the contract under which they operate, be uniform.

116. The Court concludes that "high grade standard Bottlers Coca–Cola Syrup" therefore describes a syrup of a specific quality and strength. There is no evidence in the record that the 100% sucrose-sweetened syrup currently supplied to plaintiffs is of a lesser quality than the "high grade standard Bottlers Coca–Cola Syrup [which] contain[s] not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup" for which the unamended contracts provide.

117. The Court also concludes that use of 5.32 pounds of sugar per gallon is a definitional characteristic of the syrup required by the unamended contracts and Consent Decrees according to the bargain struck by the parties in 1921. The language of the Consent Decrees and the unamended contracts taken as a whole, together with the parties' knowledge of and experience with substitute sweeteners prior to entry of the Consent Decrees in 1921, indicate that sugar was the only sweetener intended to be used in the syrup supplied pursuant to the unamended contracts. Absent a mutual agreement to amend the Consent Decrees or unamended contracts, the syrup supplied by the Company to the plaintiffs pursuant to the unamended contracts must contain 5.32 pounds of granulated sugar from cane or beet per gallon.

118. Although both parties have offered to amend the unamended contracts as they

incorporate paragraph 10 of the Consent Decrees, neither party has manifested assent to the terms of the other's offer. Consequently, the Court concludes that there has been no mutual agreement to amend the unamended contracts to provide for use in the syrup of any sweetener other than 5.32 pounds of granulated sugar from cane or beet per gallon, and that sugar remains a defining characteristic of the syrup supplied to plaintiffs by the Company pursuant to the unamended contracts.

119. The amended bottlers operate under a contract, different from plaintiffs' unamended contract, which permits the Company to provide syrup sweetened with sweeteners, such as HFCS–55, which are not "sugars" as that term is used in the Consent Decrees. The fact that the Company provides a syrup sweetened with HFCS–55 to the amenders, whose contract provides for use of such a sweetener, has no bearing on the Court's interpretation of plaintiffs' rights under a different contract.

*C. The Court Will Neither Rewrite the Consent Decrees and Unamended Contracts Nor Construe Them in Such a Way as to Add Terms Which Were Not Mutually Assented to by the Original Contracting Parties.*

120. The Court will not rewrite the Consent Decrees and the unamended contracts for the parties. It is not the Court's function to change the obligations of the parties under Consent Decrees and contracts which they saw fit to enter into. 4 *Williston on Contracts* § 610A at 513. In applying the principles of contract interpretation, the Court "must guard against inadvertently reforming a contract 'under the guise of construction' by 'looking too intently for means of bringing about some ultimate good, thwarting an apparent wrong, or preventing hardship....'" *Coke III* at 1397; *Coke 1920* at 805.

121. The Court will not construe the unamended contracts to include terms not assented to by the parties. *E.g., Levy v. Levy,* 130 Wis.2d 523, 388 N.W.2d 170, 174–75 (1986) ("In the guise of construing a

contract, courts cannot insert what has been omitted or rewrite a contract made by the parties"); *E.E.E., Inc. v. Hanson,* 318 N.W.2d 101, 104 (N.D.1982) ("Normally, parties to a contract are allowed to write the terms of the contract themselves. A court may be called upon to interpret a contract written by the parties thereto but the court's authority to interpret a contract does not give a court the authority to modify it") (citation omitted); *Glantz Contracting Co. v. General Electric Co.,* 379 So.2d 912, 916 (Miss.1980) ("Courts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence") (quoting *Citizens National Bank of Meridian v. Glascock, Inc.,* 243 So.2d 67, 70 (Miss. 1971)); *Stull v. Hicks,* 59 Ill.App.3d 665, 16 Ill.Dec. 874, 876, 375 N.E.2d 981, 983 (1978) ("We are mindful of the fundamental principle that a court may not make a new contract for the parties or rewrite their contract under the guise of construction").

122. Absent illegality, mistake, fraud, duress or unconscionability, it is not within the Court's power to revise, modify, alter, extend, or remake the parties' contract to include terms not agreed upon by the parties. *Texas Co. v. Todd,* 19 Cal.App.2d 174, 64 P.2d 1180 (1937); *Low v. Davidson Manufacturing Co.,* 113 F.2d 364 (7th Cir. 1940); *Glantz Contracting Co. v. General Elec. Co.,* 379 So.2d 912 (Miss.1980); *Stull v. Hicks,* 59 Ill.App.3d 665, 16 Ill.Dec. 874, 375 N.E.2d 981 (1978); *St. Joseph Data Service, Inc. v. Thomas Jefferson Life Ins. Co. of America,* 73 Ill.App.3d 935, 30 Ill. Dec. 575, 393 N.E.2d 611 (1979).

123. The Court will not reform the contracts in the absence of a mutual mistake of integration, *Restatement (Second) of Contracts* § 155 & comment a, unilateral mistake induced by fraudulent misrepresentation, *id.* § 166, or impossibility of performance, H. Hunter, *Modern Law of Contracts: Breach and Remedies* ¶ 12.03 & 12.04[2], [3] (1986). *See generally Restatement (Second) of Contracts* § 155 comment b ("If, however, the parties make a written agreement that they would not otherwise have made because of a mistake other than one as to expression, the court

will not reform a writing to reflect the agreement that it thinks they would have made.").

124. The Court has previously concluded that the use of 5.32 pounds of granulated sugar from cane or beet in each gallon of syrup is a definitional characteristic of the syrup to be supplied to plaintiffs by the Company pursuant to the unamended contracts. Plaintiffs have presented no evidence of illegality, mistake, fraud, duress, impossibility, or unconscionability in the negotiation of the unamended contracts in 1921. At most, plaintiffs have shown only that technology may have rendered portions of the unamended contracts obsolete. The Court concludes that this showing is insufficient to induce the Court to modify the unamended contracts. If the world in which plaintiffs and the Company do business has changed in the past 70 years, it is up to the contracting parties and not this Court to modify their contracts accordingly.

*D. By Supplying Plaintiffs With Syrup Sweetened With 100% Sucrose, The Company Has Not Breached Its Implicit Duty of Good Faith and Fair Dealing.*

■ 125. In addition to their request for specific performance, the plaintiffs seek damages under Count II from the Company for its alleged breach of the duty of good faith and fair dealing. They invoke section 205 of the *Restatement (Second) of Contracts*, which states: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

126. Plaintiffs Cleveland and Sacramento have contracts governed by the Uniform Commercial Code, which automatically attaches a duty of good faith to their contracts. *See* Cal.U.Comm.Code § 1203 (Deering 1991); Ohio Rev.Code Ann. § 1301.09 (Baldwin 1991). Of the remaining relevant jurisdictions, many have recognized either explicitly or implicitly a general obligation of good faith performance implied in contracts at common law. *Ligon v. Parr,* 471 S.W.2d 1 (Ky.1971) (Kentucky) (court may impose a duty of good faith and fair dealing to prevent one party from impairing the ability of the other party to benefit from the contract); *Weyerhaeuser Co. v. Godwin Bldg. Supply Co.,* 40 N.C.App. 743, 746, 253 S.E.2d 625, 627–28 (1979) (North Carolina) (recognizing duty of good faith and fair dealing); *Western Natural Gas Co. v. Cities Serv. Gas Co.,* 507 P.2d 1236, 1241 (Okla.), *cert. denied and app. dismd.,* 409 U.S. 1052, 93 S.Ct. 559, 34 L.Ed.2d 506 (1972) (same); *Beaugureau v. Beaugureau,* 11 Ariz.App. 234, 236, 463 P.2d 540, 542 (1970) (Arizona) (same); *In re Estate of Chayka,* 47 Wis.2d 102, 108, 176 N.W.2d 561, 564 (1970) (Wisconsin) (same); *Faust & Forden, Inc. v. Greenbaum,* 421 S.W.2d 809 (Mo.App.1967) (Missouri) (same); *see also Atlantic Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736 (1978) (Pennsylvania) (implicitly recognizing the duty); *Ireland v. Charlesworth,* 98 N.W.2d 224 (N.D.1959) (North Dakota) (same). Two federal courts applying state law have found that the courts of Virginia and Arkansas would imply a duty of good faith performance of contracts in common law. *Tymshare, Inc. v. Covell,* 727 F.2d 1145 (D.C.Cir.1984) (Virginia); *Howard P. Foley Co. v. J.L. Williams & Co.,* 622 F.2d 402, 406–407 (8th Cir.1980) (Arkansas).

■ 127. The Texas Supreme Court refused to find a general duty of good faith and fair dealing in contracts at common law in *English v. Fischer,* 660 S.W.2d 521, 522 (Tex.1983). The Texas courts subsequently found that there may be an implied duty of good faith when a "special relationship" exists between the contracting parties, such as when an element of trust is necessary to accomplish the goals of the contract or when there is unequal bargaining power. *Arnold v. National County Mutual Fire Ins. Co.,* 725 S.W.2d 165 (Tex. 1987), *modified on other grounds, Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826 (Tex.1990); *City of San Antonio v. Forgy,* 769 S.W.2d 293 (Tex.App.1989). The Texas courts have held that no "special relationship" exists in ordinary commercial contractual relationships, such as the supplier-distributor relationship. *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477

(Tex.App.1989) (no special relationship between beer manufacturer and bottler). The plaintiffs in this case, "despite their long and mutually profitable relationship with the Company, are far from reposing in it complete trust and confidence...." *Coke VI* at 73–74. Although the Company may have greater economic strength and concomitantly greater bargaining power than the bottlers, the disparity does not rise to the type of "special relationship" contemplated by the Texas courts. This Court finds that the Texas courts would not imply the general duty of good faith and fair dealing in the contract between the Company and its bottlers. Consequently, plaintiff Laredo has no claim against the Company under Texas law for breach of the implied duty of good faith and fair dealing.

128. An action for breach of the implied duty of good faith and fair dealing has been perceived both as a cause of action in contracts and in torts. The Court finds that any claim plaintiffs may have for breach of the implied duty of good faith and fair dealing arises solely from their contractual relationship with the Company.

■ 129. Courts and commentators have not articulated any particular standard for defining when there has been a breach of the duty of good faith and fair dealing. Frequently the line between a legitimate, but hard-nosed business decision and an action taken in bad faith is ambiguous and difficult to determine. It is clear, however, that when there is an implied duty of good faith performance, a breach of that duty should be analyzed like a breach of any other contractual duty. That is, "[b]ad faith performance should be a breach of contract only if in important respects it is like a breach of contract by failing to perform as expressly promised." Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369, 373–74 (1980).

130. The duty of good faith and fair dealing apparently has two elements: "good faith" and some sort of "dealing." That is, in order to breach the implied duty, a party must engage in a dealing, i.e., take some kind of action, and the party must have taken that action in bad faith. Plaintiffs allege both elements. They allege the Company took an action—supplying them with syrup sweetened with 100% sugar instead of HFCS–55,[8] and they allege the Company was acting in bad faith.

■ 131. Obviously, the implied duty of good faith and fair dealing may be breached when a party acting in bad faith fails to perform its express obligations under the contract, such as when an insurer intentionally fails to honor a policy claim. The

---

**8.** To the extent the plaintiffs rely on the Sucrose Letter of March 16, 1987 as a "dealing" in breach of the duty of good faith and fair dealing, the action of the Company in issuing that letter is, for purposes of this claim, a part of its larger action of supplying plaintiffs with sucrose-sweetened syrup. Plaintiffs cite §§ 175 and 176 of the *Restatement (Second) of Contracts* in support of their position that the Sucrose Letter constituted an independent breach of good faith and fair dealing. Section 175 addresses the issue of when a contract is voidable because assent was manifested under duress. Plaintiffs argue that the Sucrose Letter in combination with the Company's announcement of its intention to withdraw the 1978 and 1983 Amendments constituted an improper threat. If plaintiffs had entered into new contracts with the Company as a result of these actions, § 175 might be applicable. However, plaintiffs refused to sign the 1978 or 1983 Amendments, and they have not entered into any new contracts with the Company as a result of the Sucrose Letter. They certainly have not

manifested assent as to any action taken by the Company which bears on the issues of this litigation. Consequently, plaintiffs' reference to § 175 is irrelevant to their claims under Count II.

Similarly, § 176 addresses when a threat is improper for purposes of making a showing of duress. Subsection 176(d) states that a threat is improper if it is a breach of the implied duty of good faith and fair dealing. While the Sucrose Letter might well be considered a threat, reference to § 176(d) for purposes of plaintiffs' good faith and fair dealing claim is meaningless, since the subsection does not offer any standard for determining the ultimate issue of whether a threat constitutes a breach of the implied duty.

Finally, plaintiffs have not alleged any harm caused to them by the Sucrose Letter beyond the fact that it induced many of their fellow bottlers to sign the 1978 and 1983 Amendments. Their alleged harms arise from the actual carrying out of the threat contained in the Sucrose Letter and from the institution of the quality control procedures.

implied duty may also be breached even though both parties act within their contractual rights. For example, an employer's attempt to reduce his salesperson's compensation through the exercise of his contractually conferred powers to adjust the salesperson's commission quota and to terminate employees at will would be a breach of the employer's duty of good faith performance. *See Tymshare, Inc. v. Covell,* 727 F.2d at 1154–55. Likewise, an insurer's failure to exercise its power to authorize medical treatment until after the insurance contract's cut-off date for payment for treatment would breach the insurer's duty of good faith performance. *See Gallimore v. Daniels Construction Co.,* 78 N.C.App. 747, 338 S.E.2d 317 (1986).

132. On the other hand, a party exercising its contractual rights does not breach the implied duty of good faith and fair dealing merely because the exercise of its rights disadvantages the other party to the contract:

> It seems reasonably clear from the decided cases that a lending institution does not violate a separate duty of good faith by adhering to its agreement with the borrower or by enforcing its legal and contractual rights as a creditor. The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender generally is not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons. A lending institution also is not required to delay attempts to recover from a guarantor after the principal debtor has defaulted.

*Creeger Brick and Building Supply Inc. v. Mid-State Bank and Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 154 (1989).

133. In supplying plaintiffs with sucrose-sweetened syrup, the Company was not only acting within its contractual rights, it was in fact performing an express obligation of plaintiffs' unamended contracts. This is not a situation in which the Company did something that the contracts *permitted;* rather, the Company was obligated by the express terms of the contracts to supply plaintiffs with syrup containing 5.32 pounds of sugar. The question for the Court thus becomes whether the Company's performance of an express contractual obligation can give rise to a breach of its implied duty of good faith and fair dealing under its contracts. Phrased differently, so long as the Company is performing in conformity with the express terms of the contracts, can its hope that its performance will harm the plaintiffs, without more, be a breach of its duty of good faith performance?

134. The *Restatement (Second) of Contracts* appears to recognize the possibility that the implied duty may be breached by performance in bad faith. The types of potentially actionable bad faith listed by the *Restatement,* while not exhaustive, are illustrative: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Restatement (Second) of Contracts* § 205 comment d. Plaintiffs allege that the Company's action in supplying them only with syrup sweetened with sucrose evaded the spirit of their bargain and interfered with their ability to perform their obligations under the contract.

135. Plaintiffs allege that by supplying them with sucrose-sweetened syrup the Company breached its contractual duty to promote Coca–Cola. *See* Consent Decrees, paragraph 1 ("It being recognized that the primary obligation of all parties hereto ... is to promote the sale of Coca–Cola...."). Plaintiffs argue that the Company's action has made it difficult for them to participate in the interdependent bottling network. They also argue that by selling them sucrose-sweetened syrup at a sucrose-based price, the Company prevents them from

being lowest-cost producers. Plaintiffs' arguments suffer from two fatal flaws.

136. First, plaintiffs' arguments ignore the fact that the Company is contractually obligated under plaintiffs' contracts to supply sucrose-sweetened syrup. As has been stated previously in this Opinion, the parent bottlers in 1921 were dissatisfied with substitute sweeteners and intended that the syrup be sweetened only with sugar. Implicit in the plaintiffs' contracts is the assumption that use of syrup sweetened only with sucrose would best promote Coca-Cola. If that assumption is no longer applicable, the parties and not the Court must modify their contracts accordingly. *See Restatement (Second) of Contracts* § 155 comment b ("If, however, the parties make a written agreement that they would not otherwise have made because of a mistake other than one as to expression, the court will not reform a writing to reflect the agreement that it thinks they would have made.").

137. Second, plaintiffs' arguments ignore the fact that—even paying the sucrose-based syrup price—plaintiffs pay the lowest syrup price of any soft drink bottler. Plaintiffs receive a high quality syrup at a competitive price. The Company's action has not impaired to any actionable degree plaintiffs' ability to perform their obligations under the contracts to "properly and vigorously push the sale of bottled Coca–Cola." *See* Bottle Contracts, paragraph SIXTH.

138. Plaintiffs' good faith and fair dealing claim insofar as it concerns the provision of sucrose-sweetened syrup is really a way of trying to convince the Court indirectly to modify their contracts to entitle them to syrup sweetened with HFCS–55. The Court will not do indirectly what it declined to do directly. Although the obligation of good faith and fair dealing may be used to imply contract terms when a contract is ambiguous, it cannot alter an express term of the contract. *See, e.g., April Enterprises, Inc. v. KTTV,* 147 Cal. App.3d 805, 195 Cal.Rptr. 421, 425 (1983) ("The traditional rule ... is to the effect a covenant of fair dealing will not be implied

to vary the terms of an unambiguous contract"); *Balfour, Guthrie & Co. v. Gourmet Farms,* 108 Cal.App.3d 181, 166 Cal. Rptr. 422, 427 (1980) ("Nevertheless, the duty to act in good faith does not alter the specific obligations of the parties under the contract.").

*E. The Company's Institution of Quality Control Procedures Did Not Violate Its Obligation of Good Faith and Fair Dealing.*

139. Plaintiffs' claim that the Company's institution of quality control rinsing procedures violated its implied obligation of good faith and fair dealing presents a slightly different question. While they do not contest that the unamended contracts permit the Company to require the bottlers to follow reasonable quality control procedures, plaintiffs argue that the procedures instituted by the Company in connection with its decision to supply them with syrup sweetened only with sucrose violated the implied duty of good faith and fair dealing because the procedures were so unduly burdensome as to disrupt plaintiffs' ability to carry out their businesses.

140. The Court concludes that the Company's election to give plaintiffs the option of receiving sucrose-sweetened syrup, amending their contracts, or continuing to receive HFCS-sweetened syrup and waiving future damages was a legitimate business decision. The Company gave a number of reasons for the decision, including the judgment of Company officials that continuing to supply plaintiffs with HFCS-sweetened syrup without passing through the savings might be construed as a violation of Judge Schwartz' rulings in *Coke III* and *Coke IV,* the Company's desire to limit its damages under Count I, its desire to remove plaintiffs' incentive for further litigation, and its concern about reaction of the amended bottlers. The Court concludes the Company had legitimate, nonpretextual business reasons for its course of action.

141. The Court concludes the Company's decision to implement quality control procedures for processors that handle syr-

ups sweetened with sucrose and HFCS–55 was a legitimate business decision. Company officials testified that some sort of rinsing procedure was necessary in order for the Company's quality control analysts to be certain that plaintiffs were receiving syrup sweetened only with sucrose in accordance with their unamended contracts. The Court finds this was a legitimate business purpose.

142. Plaintiffs have failed to prove by a preponderance of the evidence that the Company instituted the quality control procedures for the sole purpose of disrupting plaintiffs' businesses. To the contrary, the evidence shows that the Company could have imposed significantly more onerous procedures if its sole intent had been to make things more difficult for plaintiffs. *See supra.*

143. Because the Company had a legitimate business purpose and imposed relatively less burdensome procedures, the Court concludes the Company's institution of quality control procedures did not constitute a breach of its implied duty of good faith and fair dealing.

144. The Court concludes that the actions taken by the Company in response to Judge Schwartz' rulings in *Coke III* and *Coke IV*, seen in the context of the entire bottling system, did not breach the Company's duty pursuant to paragraph 1 of the Consent Decrees to promote the product Coca–Cola.

### F. *Plaintiffs Are Not Entitled To Receive Concentrate Under Their Unamended Contracts.*

145. The Court concludes that the evidence that the parties in 1921 were familiar with the use of concentrate in the manufacture of soft drinks, their failure to provide for the use of concentrate in the Consent Decrees and unamended contracts, and their use of a sugar-based pricing mechanism of the Consent Decrees and unamended contracts, which takes no account of products which contain no sugar nor any sweetener whatsoever, demonstrate that plaintiffs are not entitled to receive concen-

trate under their unamended contracts as written.

146. The Court will not interpret the unamended contracts and Consent Decrees to include terms which were not assented to by the parties. Although the use of concentrate might well benefit both sides of this litigation, it is up to the parties and not the Court to alter their contractual relationship to provide for the use of a product not covered by their current contracts.

### COUNT III

### FINDINGS OF FACT

#### A. *Introduction and Contentions.*

1. Paragraph 6 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts fix the price of a gallon of syrup at $1.30. The syrup price increases from the $1.30 base amount at a rate of six cents (6¢) for every one cent (1¢) increase in the price of sugar over seven cents (7¢) per pound. Paragraph 7 of the Consent Decrees and paragraph FOURTH(d) of the unamended contracts set forth the method for calculating the price of sugar for purposes of the sliding scale pricing mechanism of paragraph 6:

the price of sugar is to be determined quarterly, January, April, July and October in each year by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

2. In *Coke III*, Judge Schwartz defined "market price" of standard granulated sugar as that term is used in paragraph 7 as:

an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, al-

lowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances or rebates.

*Coke III* at 1418.

3. In Count III, plaintiffs allege that, since 1969, the Company has overcharged them for syrup because the sugar price used by the Company in its syrup price calculations has been higher than the "market price" as defined by Judge Schwartz. Plaintiffs allege that prior to 1969, the Company undertook an independent investigation each quarter to inquire of the ten largest refiners their market price of sugar for the first seven days of the quarter. Plaintiffs contend that in 1969 the Company abruptly ceased this practice and began to rely exclusively on "list" prices, that is, prices found in the refiners' published price lists, in brokers' reports, and in trade publications such as the *Daily Sugar Trade Journal* published by Willett & Gray (referred to hereinafter as "Willett & Gray") until it ceased publication in 1979. Plaintiffs contend that market price, as defined by Judge Schwartz, is a different price than list price; that since 1969, the market price of the ten largest refiners has consistently been lower than the list price used by the Company in its syrup price calculations; and that the Company's use of list prices has resulted in plaintiffs' being overcharged for syrup in each quarter since 1969.

4. The Company contends that plaintiffs waived or are estopped from raising their claims with regard to market price. The Company primarily bases its estoppel argument on the fact that many of the plaintiffs purchase sugar for use in bottling products other than Coca–Cola. The Company asserts that plaintiffs, as participants in the refined sugar market, could have discovered that the Company used list prices to calculate the syrup price simply by comparing the prices they themselves paid with the market price of sugar disclosed by the Company as part of its syrup price notice to the bottlers. Because plain-

tiffs could have discovered its use of list price to calculate the syrup price at an earlier date, the Company urges that the plaintiffs' failure to object to the use of list prices sooner constitutes a waiver of their right to do so or estops them from doing so.

5. The Company further contends that (1) list price is the only price which conforms to Judge Schwartz' definition of market price and (2) that there has been no abrupt change in practice because the Company has always relied primarily on the list prices published in Willett & Gray and other trade journals, along with the refiners' price lists, when calculating plaintiffs' syrup price.

### B. The Language of the Contract and Usage in the Trade

6. The fact that the Consent Decrees and the bottling contracts use the term "market price" instead of "list price" means very little in light of the confusion surrounding pricing terminology in the refined sugar industry.

7. There appears to be no consensus among members of the refined sugar trade as to the meaning of the term "market price." *See* Tr. at 7066 (Nagle) (people within the refined sugar industry could disagree on the meaning of the term "effective market price"); Tr. at 7410 (Fuchs) (market price is a "vague" term which "could mean anything" depending upon the person using it); Tr. at 8503 (Ruffolo) (the term market price "means many things to many different people"). Consequently, there is no consensus that the term "market price" means an "effective selling price" as opposed to "list price."

8. Moreover, there seems to be no standard usage in the sugar industry regarding any of the sugar pricing terms which frequently appear in the evidence for Count III. For instance, William Nelson of the Great Western Sugar Company and Godchaux–Henderson referred to "market price" as actual selling prices rather than prices made available upon inquiry prior to sale, which he termed "daily competitive

price." Tr. at 6170–171; 6415–416; 6499–500 (Nelson). Robert Nagle, who was employed by both Amstar Corporation and C & H Sugar, defined both "market price" and "effective selling price" as prices that are generally available. Tr. at 6763 (Nagle). Nagle also stated that the terms "market price," "effective market price," "effective selling price," and "going price" could be used interchangeably, depending upon the context. Tr. at 7022–23 (Nagle). Spencer Fuchs, a sugar broker, equated the terms "selling price" and "competitive price." Tr. at 7340 (Fuchs). He stated, however, that "market price" was not the same thing as "effective selling price" and that "market price" was a vague term that could mean anything depending upon the person using it. Tr. at 7410–411 (Fuchs). In fact, Fuchs expressed disagreement with the definition of "market price" set forth by Judge Schwartz. Tr. at 7407 (Fuchs).

*C. The Prices Published in Willett & Gray and Other Sugar Price Publications, Including Price Lists, Satisfy the Court's Definition of Market Price.*

9. The parties to the 1921 Consent Decrees and the unamended bottling contracts had two objectives when they devised the pricing scheme for the syrup. First, they wanted to ensure that the actual bottlers would receive syrup at a competitive price. Second, they sought a price that was mutually verifiable. *See Coke III* at 1407.

10. At the time they entered into the 1921 Consent Decrees and derivative unamended bottling contracts, the bottlers greatly distrusted the Company in light of their experiences with the Company's insistence upon recouping at their expense its losses from unwise sugar purchases during pendency of the litigation and the Company's refusal to allow them to inspect its books in order to verify its cost of sugar. *See supra; see also Coke III* at 1408.

11. The unamended contracts of the Thomas Company bottlers contains the following language in paragraph FOURTH(d):

[B]ut the ten refineries whose prices are to be used in obtaining the average price as herein stated and the fixing of that market price shall be as determined by the party of the first part [Thomas Company] and The Coca–Cola Company.

Plaintiffs describe the obligation of the Thomas Company under this contract provision as that of "Policing the [Coca–Cola] Company's Performance" under the pricing provisions. Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 237 (Dkt. 897). The Thomas Company expressed its understanding of its obligation in an April 24, 1947 letter to the Company: "It would appear from [paragraph FOURTH(d)] that Thomas has an obligation to its bottlers to know something about the selection of the refineries whose quotations are being used and that it also has an obligation in the fixing of the market price together with The Coca–Cola Company." PX809. In fact, the now-infamous Hodgson Memorandum, *see infra,* resulted from the efforts of the Thomas Company to satisfy its obligation.

12. The fact that the Thomas Company had a "policing" role in the determination of market price indicates that the market price calculated by the Company was intended to be a price which could be verified by the Thomas Company.

13. Plaintiffs argue that the only "verifiability" intended by the parties in 1920 was that the price be "verifiable in the sense that it was not subject to one party's manipulation or control." Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 1164 at 294. Plaintiffs argue that their version of "market price" meets this definition because the price at which sugar refiners sell to industrial users is not subject to the Company's control.

14. Plaintiffs' argument regarding the type of "verifiability" desired by the parties in 1921 is unpersuasive.

15. Plaintiffs' citations to Judge Schwartz' comments in *Coke III* do not support their position. Judge Schwartz recounted that, in response to the Company's representations under the June 10 order that its prices were increased, the bottlers

"in disbelief, demanded verification of the Company's figures." *Coke III* at 1395. Plaintiffs also cite to Judge Schwartz' statement that the parent bottlers were unable to reconcile their audit figures with the Company's figures. *Id.* at 1395; Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 1164 at 294. Finally, plaintiffs quote Judge Schwartz' comment that "Also apparent ... is the bottlers' concern with verifying the Company's cost figures." *Coke III* at 1408; Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 1164 at 294. Judge Schwartz' comments do not support plaintiffs' assertion that in 1920 the bottlers only wanted to assure themselves that the basis for their syrup price was beyond the Company's control. If anything, Judge Schwartz' statements indicate that the bottlers wanted to be able to ascertain *for themselves* the accuracy of the Company's figures. Not only is this interpretation in line with Judge Schwartz' comments and the evidence before the Court, but it also makes the most sense in light of the Thomas Company's policing role.

16. Plaintiffs assert that the Company's acquisition of the Thomas Company conferred upon the Company the Thomas Company's price policing role. According to plaintiffs, this in turn created in the Company a fiduciary duty to plaintiffs with respect to calculation of the syrup price. Such an interpretation, however, would nullify the contracting parties' intent in 1920 and 1921 that the syrup price be verifiable. This may be demonstrated by analogy to the effect of the dissolution of the Thomas Company upon the parent bottlers' right to consent to a change in sweetener.

17. The plaintiffs have argued successfully both before Judge Schwartz and during this trial that the dissolution of the Thomas Company did not relieve the Company of its duty to use 5.32 pounds of sugar per gallon of syrup but rather conferred upon the plaintiffs the parent bottlers' right to consent to any change in the sweetener. Phrased differently, plaintiffs' assertion, which has been accepted by the Court, is that it would be nonsensical to confer upon the Company the parent bot-

tlers' right to consent to a change in sweetener because this would leave the Company free to evade the spirit and letter of the contract. Likewise, it would be nonsensical, upon the dissolution of the parent bottlers, to assign to the Company the Thomas Company's price policing role because such an assignment would leave the Company free to evade the provisions of the Consent Decrees and unamended contracts.

18. Dissolution of the parent bottlers did not suddenly impose a fiduciary duty upon the Company. The Company and the unamended bottlers continue to be arms-length bargaining partners. *See Coke VI* at 73. During the negotiations regarding the 1978 Amendment, for example, the bottlers demonstrated that they are very far from reposing in the Company their blind trust when it comes to matters which affect their bottom lines. *See, e.g.,* DX498 (letter dated 5/9/78 from Bill Schmidt to Luke Smith, President of the Coca–Cola Company expressing disagreement over Company's proposals); DX499 (letter dated 5/14/78 from Schmidt to bottlers outlining concerns about proposed amendment); DX535 (letter dated 9/4/78 from Schmidt to bottlers discussing his concerns after "seriously studying the Amendment").

19. In light of the foregoing, the Court finds that the intent of the pricing provisions of the Consent Decrees and unamended contracts continues to be to provide a syrup price which is both competitive and mutually verifiable.

20. The list price is a price that may be easily verified by both the bottlers and the Company. List price is the only price which the refiners will verify in writing. *See, e.g.,* Tr. at 7000 (Nagle). In addition, every trade, government, and broker publication which publishes sugar prices publishes the refiners' list prices. Tr. at 7000 (Nagle); Tr. 7384–89 (Fuchs); Tr. 8500–501 (Ruffolo). Moreover, the majority of refiners testified that in response to an inquiry seeking their "market price" as defined by Judge Schwartz, they would give their list price. Tr. 8640–41 (Hanna); Tr. 8809 & 8857 (Tindall); *see also* Tr. 8504 (Ruffolo) (broker would expect refiners to give list

price in response to court's definition); PX2832 at 375–76 (deposition of R. Satola of Amstar Corp.); PX2837 at 176 (deposition of C. Richard Donnelly of Savana Foods & Industries, Inc.); PX2844 at 151–53 (deposition of R. Conlin of Supreme Sugar, Inc.); *but see* PX2839 at 376–80 (deposition of E. Motyka of Colonial Sugar, Inc.).

21. Beginning October 1, 1987, the Company, in response to Judge Schwartz' opinion in *Coke III*, began soliciting pricing information from the refiners by sending to the refiners requests for pricing information which incorporated the language of Judge Schwartz' market price definition. *E.g.*, DX985 at P007403–P007417; DX988 at P004133. The refiners generally responded with their list prices. *E.g.*, PX2832 at 373 (deposition of R. Satola of Amstar Corp.); DX985 at P007472 (Imperial Sugar; October, 1987); DX985 at P007473 (Savannah Sugar; October, 1987); DX985 at P007474 (Everglades Sugar; October, 1987); DX985 at P007475 (Colonial Sugar; October, 1987); PX985 at P007476 (Amstar; October, 1987); DX985 at P007477 (Supreme Sugar Co.; October, 1987). Refined Sugars, Inc. replied to the Company's inquiry by stating that it was uncertain as to what exactly the Company was requesting and assumed the Company desired its list price. DX985 at P007419.[9]

22. The Company's use of list prices as the basis for calculating the bottlers' syrup price has yielded a syrup price which enables the bottlers to compete effectively. Plaintiffs remain low cost producers, consistently paying a lower syrup price than the amended bottlers and the Pepsico bottlers. Tr. at 1975–75 (Williams); Tr. at 9296–97 (Dorman); Tr. at 7646–47 (Mellett); DX647; DX649.

23. In light of the foregoing, the list price is a price which both yields a competitive syrup price and is mutually verifiable. Consequently, the list price is a price which satisfies the intent of the Consent Decrees and the unamended contracts.

*D. Plaintiffs Have Not Proven By a Preponderance of the Evidence That There Exists an "Effective Selling Price" Lower than the List Prices Which is Made Known to Large Industrial Users Upon Inquiry Prior to Sale.*

24. Plaintiffs allege that there are three prices for sugar: the "list" price published in the refiners' price lists and in trade journals, such as Willett & Gray; an "effective selling price," which is lower than list price and available to large industrial users upon inquiry prior to sale; and individually negotiated prices. They contend that the "effective selling price" is the only price which fits Judge Schwartz' definition of market price.

25. Plaintiffs have proven by a preponderance of the evidence that there has existed at times a substantial amount of selling at off-list prices in the sugar industry. *See, e.g.*, Tr. at 6170–171 (Nelson) (majority of Godchaux–Henderson sales occur at lower than list); Tr. at 6703 & 6725 (Nagle) (in 1971, Amstar sold a majority of its sugar off-list); Tr. at 6855 (Nagle) (Amstar sells

---

**9.** Plaintiffs argue that the refiners responded to the Company's market price inquiries with their list prices because they "knew, or at the very least suspected based on the Company's prior inquiries for list price, that the Company wanted list price information." Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 1339 at 337 (Dkt. 897). Nevertheless, the fact that the refiners sent their list prices in response to Judge Schwartz' market price definition is entitled to substantial evidentiary weight, especially when considered with the refiners' testimony that they would quote list price in response to a pricing inquiry phrased in terms of Judge Schwartz' definition.

Plaintiffs also argue that the portions of the refiners' testimony favorable to the Company's position should be disregarded. Plaintiffs urge that the refiners' testimony is influenced by bias or, at the very least, by a desire to curry favor with the Company in light of the Company's substantial sugar purchases. The bias of the refiners is questionable, however, in light of the fact the Company's decision to use HFCS in its syrups has drastically reduced its sugar needs. At least one bottler testified that the switch by the Company to HFCS adversely affected the cane sugar industry. Tr. at 9072–73 (Harder). Moreover, at least one of the refiners who testified favorably with regard to the Company's position has retired and therefore would not be influenced by any desire to procure the Company's sugar business. Tr. at 8781 (Tindall).

the overwhelming majority of its sugar below list and very little at list); Tr. at 7294 (off-list pricing began in the early 1960's; by the late 1960's most sales occurred at off-list prices); Tr. at 8483 & 8532 (Ruffolo) (amount of sugar sold off-list depends upon the market cycle); Tr. at 8611 (Ruffolo) (since 1966, there have been periods where most sugar is sold off-list); Tr. at 8633 (Hanna) (majority of Imperial Sugar's sales occur off list at a range of prices).

26. Plaintiffs have *not* proven by a preponderance of the evidence, however, that list price is a wholly fictitious price. Instead, witnesses described the level of off-list pricing as the "the majority" of sales, Tr. at 6170–171 (Nelson); Tr. at 6703 & 6725 (Nagle); Tr. at 8233 (Hanna), or "overwhelming majority," Tr. at 6855 (Nagle). By definition, if a majority of sales occur off-list, then some significant portion of sales occurs at list price.

27. The evidence shows that in the relevant time period there were always at least some sales at list price. Tr. at 7384 (Fuchs) (there has always been some sugar sold to some industrial users at list); Tr. at 7390–91 (Fuchs) (there are some accounts that buy at list, few as they may be); Tr. at 8483 (Ruffolo) (at all times McKeany–Flavell has brokered some sales of sugar to industrial customers at list price); Tr. at 8611 (Ruffolo) (since 1966, there have been some periods where most sugar sold off-list and other periods where most sugar sold at list price); Tr. at 8632 (Hanna) (at all times Imperial has sold some sugar at list price, although the percentage has decreased in the last ten years).

28. Moreover, there have been periods of time during the 1970's and early 1980's in which the majority of sugar sold was sold at list price. For instance, Robert Nagle, one of plaintiffs' witnesses, testified that Amstar lowered its list price and attempted to sell only at list in the fourth quarter of 1972. Tr. at 6898 (Nagle). Nagle testified that from early 1974 through the first quarter of 1975, list price was a "meaningful" price. Tr. at 7186 (Nagle). He also testified that from 1975–1977 there was a mixture of list and off-list selling. Tr. at 7189–190 (Nagle). In 1979, C & H Sugar experienced a "mixed bag"—selling a fair amount of sugar both at list and under list. Tr. at 6954 (Nagle). In 1980, C & H Sugar sold a majority or close to a majority of its sugar at list price. Tr. at 6956 (Nagle).

29. Spencer Fuchs, another witness for plaintiffs, testified that in 1972 Amstar introduced a "bonus plan" to encourage its brokers to sell sugar at list price. Fuchs testified that prior to the introduction of the bonus plan, 30% of Fuchs' sales volume to industrial customers was sold at list. After the bonus plan went into effect, the figure went as high as 90%. Tr. 7358–359 (Fuchs).

30. Judge Schwartz' definition of market price states that "market price" is a price made available upon inquiry prior to sale—*not* an actual sales price. The plaintiffs have not proven by a preponderance of the evidence that there exists a verifiable price or range of prices, other than list price, which are available upon inquiry prior to sale. Phrased differently, plaintiffs have been unable to prove by a preponderance of the evidence any method for determining the "effective selling price" for the first seven days of any given quarter other than by averaging retrospectively the prices at which sales occurred during that period. An average sales price calculated after the fact is simply not the same thing as a price made available upon inquiry prior to sale.[10]

31. Plaintiffs' witnesses describe the existence of an effective selling price vaguely, as something which is "known" in the market. *E.g.,* Tr. at 7391 (Fuchs); Tr. at 6806 (Nagle) ("known and available" in the market); *see also* Tr. at 7034 (Nagle) ("Again these things vary with market conditions. I think we know what we are talking about....").

---

**10.** The Court notes that this discussion is not intended to have any bearing on the sufficiency of plaintiffs' damages evidence. Rather, in this section, the Court is interpreting contract language which was intended to govern the parties' conduct prospectively.

32. The determination of the "effective selling price" on a given day in a given territory is complicated by the fact that such an "effective selling price" may change in the course of a day within a given territory. *E.g.,* Tr. at 6380–81 (Nelson) (Godchaux–Henderson daily competitive price could vary from territory to territory and change in the course of a day within a given territory); Tr. at 7040 (Nagle) (typically, given "normal" competitive conditions, there could be some variations in prices in a particular market territory).

33. In fact, several witnesses acknowledged that persons knowledgeable about the sugar industry and market could disagree as to the "market" or "effective selling" price of sugar on a given day. *E.g.,* Tr. at 6716 (Nagle) (there could be "differences of opinion" as to the effective selling price in various competitive areas or territories on a given day because "everybody has their own source of information"); Tr. at 6718 (Nagle) ("[T]here can be differences in what people perceive to be the effective selling price"); Tr. at 8503 (Ruffolo) (it is possible for two persons knowledgeable about the sugar industry to disagree about the market price of sugar on a given day).

34. One of plaintiffs' witnesses acknowledged that he would occasionally have "differences of opinion" with Coca-Cola Company officials regarding the "market price" of sugar:

> There were sometimes situations where it was necessary for the [the Company and C & H Sugar or Spreckles Sugar] to determine what the market price—what they both agreed the price was in the market that should be treated as the market price.

> And obviously, there would be discussion among the parties in terms of what they believed the market price was based on their information in the market.

Tr. at 6981 (Nagle); *see also* Tr. at 6974 (Nagle) ("Well, sometimes we would have a different view on what we thought [the market price] was in a particular market.").

35. Plaintiffs point to the business records of various refiners as sources of a "market" price other than list price available to industrial users on inquiry prior to sale.

36. One of the types of business records on which plaintiffs focus is the "Black Book" entries kept by C & H Sugar Co. The Black Book is an internal C & H memorandum of conversations on behalf of C & H with some of its customers regarding sugar sales.

37. Plaintiffs assert that the prices recorded in the Black Book reflect the "market price" of sugar, as defined in *Coke III,* at the time of each entry. The Black Book entries, however, are not reflective of the price of sugar generally available to industrial users upon inquiry. Edward F. Harder, who for many years was the person primarily responsible for maintaining the Black Book, testified regarding these records. Although Harder had originally been retained by plaintiffs, he was called to testify in this trial by the Company. Tr. 6750–52.

38. Harder characterized the entries in the Black Book as exceptional sales—not sales made in the ordinary course of business. Tr. 9046 (Harder).

39. For example, in the years prior to 1980, C & H made approximately 150 to 300 sales of sugar *per day.* However, there are only two or three Black Book entries *per week* during the 1970's. Tr. 9073 (Harder). According to Harder, the sales prices of sugar in the Black Book entries reflect only the selling prices to the particular customers listed. Tr. 9155 (Harder).

40. Generally, the Black Book entries reflected prices discussed only with "major" customers willing to make substantial tonnage commitments. Harder noted that these were the types of customers who usually negotiated individual discounts. Tr. 9058–59 (Harder).

41. Many of the Black Book entries offered by plaintiffs concern discussions between C & H and the Coca-Cola Company regarding implementation of "market less-X" contracts. Under these contracts, the Company purchased sugar at price defined

as a "market price" minus an allowance. C & H and the Company would agree on a "market price" for whatever days the Company drew down a shipment of sugar.

42. The testimony concerning the "market less-X" contracts indicates that the "market price" used in the contracts was generally either the list price, Tr. 9079 (Harder), or the result of negotiations between the Company and C & H. Tr. 9077, 9079–84 (Harder).

43. Harder stated that the "market price" used in the "market less-X" contracts was not a price at which C & H would offer to sell to all customers in the relevant geographical area, Tr. 9084 (Harder), nor was it a price which met Judge Schwartz' definition, Tr. 9048 (Harder).

44. Furthermore, the Court has previously ruled that, when determining the market price of sugar, the Company has never taken into account its own negotiating experience and has no duty to do so. *Coke III* at 1418. In fact, plaintiffs themselves have conceded: "Under the Consent Decrees and the bottlers' contracts, the Company is allowed to increase its profit without increasing the bottlers' syrup price by beating the index, *i.e.*, purchasing the sweetener used in the syrup at less than the market price." Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 843 at 203.

45. Plaintiffs also point to the business records of the Godchaux–Henderson refiner. Plaintiffs offer the testimony of William Nelson, a former Godchaux–Henderson employee, as evidence of a "daily competitive price" below Godchaux–Henderson's list price which was offered to the market. The Court finds Mr. Nelson's testimony as to the existence of a daily price below Godchaux–Henderson's list price unpersuasive. For example, the Court notes that despite Mr. Nelson's insistence that the "daily competitive price" was telexed *daily* to brokers, the exhibit prepared by plaintiffs with the aid of Mr. Nelson allegedly demonstrating the market price for Godchaux–Henderson for the first seven days of every quarter from 1976–1983 contains only six telexed prices out of a possible seventy-odd entries. Tr. 6416 (Nelson).

46. The Court also finds unpersuasive the evidence of "competitive price" records kept by employees of the Fuchs sugar broker. Spencer Fuchs, one of plaintiffs' witnesses, conceded that the price records kept by three of his employees occasionally revealed discrepancies among the prices reported by the three employees because "[t]here were price changes during the course of a day, or [the three employees] might have talked to ... different people [at the refinery]...." Tr. at 7335 (Fuchs).

47. Not only have plaintiffs failed to prove by a preponderance of the evidence the existence of a sugar price lower than list price generally available to industrial users upon inquiry prior to sale, they have also failed to show how such a price could be determined in future quarters.

48. Plaintiffs allege that the Company "knew" or "should have known" the effective selling price for every quarter because its officials were highly knowledgeable concerning pricing in the sugar market. *E.g.*, Tr. at 6716–17 (Nagle) ("The Company's sources of information very often might be better than [Amstar's] because they were buying from every cane refiner, every beet processor, in essence every seller in the marketplace. So ... they had a multiplicity of sources of information from the direct sellers as well as their relationship with all the general brokers in the industry who sought to service the Coca–Cola account."). Plaintiffs detail various ways that Company officials can and do receive information regarding selling prices of sugar. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶¶ 1140–54 at 286–91 (Dkt. 897). However, the fact that Company officials might have access to information regarding transaction prices does not by itself demonstrate the existence of a method for determining under the unamended contracts a verifiable price upon inquiry prior to sale other than the refiners' list prices. The Court notes, for example, that the record is devoid of evidence of the Company's ability *in 1921* to obtain

sugar price information other than its own costs and the list price.

49. Plaintiffs' witness William Nelson stated that he would have quoted Godchaux–Henderson's "daily competitive price" to the Elizabethtown plaintiff if asked for it. Tr. 6389–90 (Nelson). Yet there is no evidence on this record that Elizabethtown or any other plaintiff, in any quarter following the filing of this lawsuit, ever attempted to obtain Godchaux–Henderson's daily competitive price.

50. Nelson also stated that he did not make any inquiries of refiners at the request of plaintiffs to determine the price other than list price that was available upon inquiry prior to sale.

51. In preparing damages contentions for plaintiffs, Nelson utilized "reasonable prices." Tr. 6436–37; 6526 (Nelson). He does not say how he came to choose which prices were "reasonable" in any given quarter, much less how a "reasonable" price could be determined in future quarters.

52. Even for those quarters after the filing of this lawsuit, the prices used by Nelson in preparing plaintiffs' damages contentions with regard to Godchaux–Henderson's "market price" were not necessarily the prices appearing on the refiner's "daily" telexes. In explaining why he used a price of $24.79 for January 5, 1982, Nelson stated: "That was an effective price that day.... That doesn't necessarily identify it as a daily competitive price. I determined that it was a price that was reasonable." Tr. 6526 (Nelson).

E. *The Company's Reliance on Willett & Gray and Its Use of List Price is not an Abrupt Change in Practice from its Course of Conduct Prior to 1969.*

53. In *Coke III* and again in *Coke IV*, Judge Schwartz found that the Company conducted an investigation into market price prior to 1969 and that its decision to rely on Willett & Gray constituted an abrupt change in practice. However, in his Pretrial Conference Order (Dkt. 849) in Oc-

tober 1988, Judge Schwartz allowed defendant to relitigate this finding at trial:

1. Defendant can offer evidence on the issue of whether there was in 1969 an "abrupt change" as discussed by the Court in its Opinion of August 8, 1986 [*Coke III*]....

2. Defendant can introduce evidence concerning its course of conduct both before and after 1969....

54. The Court finds that, prior to 1969, the Company did not undertake an independent investigation each and every quarter to inquire of the ten largest refiners the price of sugar on the first seven days of the quarter. Rather, the Company relied primarily on the list prices reported in Willett & Gray and other published price lists, making inquiries of the refiners *only* when Willett & Gray did not list prices for the first seven days of the quarter or when the Company noticed a discrepancy between the prices listed in Willett & Gray and those in other price lists. The following evidence supports this finding.

55. As early as 1924, the parent bottlers were aware that the Company used the prices listed in Willett & Gray to calculate the price of bottlers' syrup. In 1924, the price of sugar rose above 7 cents per pound for the first time since the Consent Decrees were entered. On January 2, 1924, Willett & Gray reported: "The easier raw conditions and the light demand for refined caused somewhat lower prices in refined sugar, Federal and Arbuckle quoting 8.70c, and *although the other refiners have thus far not changed their list price from 8.90c, there are some accepting business at 8.80c.*" DX195 (emphasis added). On the following day, Willett & Gray reported: "Refined continues unchanged, Federal and Arbuckle quoting 8.70c *with the other refiners' list at 8.90c, although most of the latter are selling at 8.80c.*" *Id.* (emphasis added).

56. On January 11, 1924, John Sibley, an attorney for the bottlers, wrote to Harold Hirsch, attorney for the Company, inquiring:

It has been called to my attention by some of the local bottlers that sugar is

being quoted at the Refineries generally at about 10 points higher than business is actually being accepted.

I would be glad if you would look into this and advise me if you do not think that this should be taken into consideration in fixing the price of syrup during the next quarter, if my information is correct.

DX199.

57. Hirsch responded on January 12, 1924:

I have your letter of the eleventh in re quoted prices from the refineries.

Mr. Howard Candler has this question of price up with Mr. Rainwater at the present time for the quarter commencing January 1, 1924. I have not carefully reviewed the contract, but it just occurs to me that the suggestion possibly involves a change of the contract, and if that be so then our clients should take the matter up.

DX200.

58. The record contains no further correspondence on this subject in 1924, and there is no evidence that the syrup price was recalculated. In the quarters which followed, the Company continued to use the prices from Willett & Gray. Except for the correspondence quoted above, the bottlers registered no objection.

59. Consequently, as early as 1924—only three years after entry of the Consent Decrees—the bottlers were aware that the Company was using the prices listed in Willett & Gray even when the listed prices were higher than the prices at which sugar was actually being sold. The acquiescence of the bottlers and of their representatives who negotiated the Consent Decrees is evidence that the Consent Decrees contemplated use of published list prices to calculate the price of sugar even when the refiners were accepting business at prices lower than published list price.

60. As early as 1928, the Company relied primarily on the prices listed in publications such as Willett & Gray to calculate the price of bottlers syrup with the knowledge and consent of the parent bottlers. In 1927, the refiners formed a trade associ-

ation called The Sugar Institute, and changed their method of publishing their list prices to the publication of three separate prices—a 30–day price guaranteed against decline; a 30–day price without guarantee; and a 7–day shipment contract. Horace Garner, an assistant purchasing agent for the Company informed Hirsch (attorney for the Company) of this change on October 9, 1928, and recommended:

We have used in the years past the published list price for shipment in thirty days, whether guaranteed against decline or not. Such guarantee was given only as trade conditions warranted it and was withdrawn from time to time.

We have a well set precedent in using thirty days' contract price; we could not buy and take out in seven days sufficient sugar to make the bottlers syrup for a quarter; the uncertainty of the refiners continuing the seven day guaranteed price—all lead to me to believe that we should use the thirty day contract price.

PX748.

61. On October 10, 1928, Hirsch wrote to Frank Spurlock and John Sibley, attorneys for the Thomas and Whitehead–Lupton parent bottlers, informing them of the change. After quoting paragraph 7 of the Consent Decrees, Hirsch stated:

Since the formation of what is known as the Sugar Institute, these prices *are published in the list* in a different way from the manner in which they were heretofore published. *The list price now publishes the following:*

[explaining the new pricing]

To make myself a little clearer, prior to the forming of the Sugar Institute only one price was published.

Would you be good enough to give consideration to *the present method of publishing the prices* as it relates to [paragraph 7] from the contract of [our] ... respective clients. It occurs to me that possibly we could jointly advise our respective clients ... after we have conferred with each other as to our interpretation, considering the new situation.

DX226 (emphasis added). Hirsch was apparently suggesting the Consent Decrees and contracts might be amended to reflect the new published pricing scheme.

62. Charles Rainwater, writing for Sibley of the Whitehead–Lupton Company, informed Hirsch:

> As sugar is now below seven cents per pound, we [the Whitehead–Lupton parent bottler] are willing to adopt the suggestion outlined in your letter of October 31st; that is, in determining the price of sugar quarterly you can take either *quotation,* notifying us which *quotation* has been adopted. If, however, the price of sugar reaches seven cents per pound or over under either *quotation,* then the question as to the *quotation* which should be adopted under the terms of the contract shall be determined without prejudice to any of the parties.

PX754 (emphasis added). It is apparent that Rainwater's use of the term "quotation" refers to the list prices published by The Sugar Institute.

63. Spurlock similarly responded for the Thomas Company:

> The plan as suggested in the letter of The Coca–Cola Bottling Company [the Rainwater letter above] meets with the approval of Coca–Cola Bottling Company as it can not be seen under present circumstances that there is any reason for changing that paragraph in the permanent contract fixing the manner of determining from time to time the price of sugar.

PX755.

64. Neither Rainwater nor Spurlock quarreled with the use of a published price or suggested direct inquiries to the refineries. This exchange clearly demonstrates that the Company was relying on published prices with the knowledge *and consent* of the parent bottlers as early as 1928.

65. The very fact that all parties in 1928 agreed to the use of the prices published by the Sugar Institute supports the contention they intended to use list prices to calculate the syrup price. The Sugar Institute condemned as discriminatory pricing (unless openly practiced and uniformly employed)

"[v]ariations from the *open and publicly announced prices and terms,* including ... [s]pecial allowances by way of discounts...." PX745 at HR0153–HR0154 (emphasis added).

66. Except for a brief period from 1924–1925, the price of sugar remained at or below seven cents per pound until 1947. On June 3, 1947, E.J. Forio an executive with the Company wrote DeSales Harrison, President of the Thomas Company, a letter outlining the procedure for determining the ten largest refineries and their quotations for sugar. He stated:

> For quotations, reliance is placed upon Willett & Gray, Inc., which has been for many years the universally recognized standard statistical service on sugar. In instances in which the publication dates of Willett & Gray do not conveniently coincide with the dates referred to in our contract, we obtain the necessary quotations directly from the refineries.

PX811. Forio's letter plainly states that the Company contacted the refineries to obtain sugar prices only when the publication dates of Willett & Gray did not coincide with the first seven days of the quarter.

67. Not only did the bottlers acquiesce in the procedure outlined in the Forio letter, they insisted that it be followed. On May 27, 1947, DeSales Harrison of the Thomas Company sent a letter to The Coca–Cola Company requesting that the Company advise the Thomas Company in the event it used any sugar quotations other than that quoted by the refineries as listed in Willett & Gray. Two subsequent letters, dated July 12, 1948 and October 15, 1957, from the Thomas Company to The Coca–Cola Company refer to and reaffirm the desire of the Thomas Company that The Coca–Cola Company continue to rely on the prices listed in Willett & Gray:

> We again refer to our letter of May 27, 1947, in which we asked that we be advised *should The Coca–Cola Company consider using any base for sugar quotations other than that quoted by the refineries as listed in the Willett and Gray Statistical Trade Journal.* In this

way we will have the opportunity of discussing this matter thoroughly with you before any [price] notice is sent to us. We hope that you will not find it necessary to so advise us,.... [11]

PX826 (dated 10/15/57); *see also* PX996 at CX0227 (dated 7/12/48).

68. Plaintiffs primarily base their argument that the Company abruptly changed its procedure for obtaining the market price of sugar on a memorandum by C.W. Hodgson, a Vice–President with the Company, dated August 20, 1956. The memorandum, which for purposes of this litigation has become known as the "Hodgson Memorandum," memorialized a telephone conversation between Hodgson and De-Sales Harrison, President of the Thomas Company. The Hodgson Memorandum was circulated to and initialed by numerous Company officials, some of whom testified in this litigation, and outlined the Company's procedure for determining the price of sugar upon which calculation of the price of bottlers syrup was based. Because of the importance placed upon it by the parties, the contents of the Hodgson Memorandum bear quoting in full:

Following conversation in Mr. Forio's office regarding DeSales Harrison's letter to me dated July 20, 1956 having to do with the quotation of sugar prices as quoted by Willett & Gray Statistical Trade Journal, I called Mr. Harrison and made the following points:

1. With reference to Dee's letter of July 20, 1956 in which he raised the question on sugar quotations as given by Willett and Gray, that I had thoroughly investigated the matter with the Purchasing Department, with Mr. Oehlert and Mr. Forio as well as digging back into the files.

2. That as mentioned in Forio's letter of June 3, 1947, it was not always possible to follow the list prices given by Willett and Gray because of the fact the publication dates of Willett and Gray do not coincide with dates referred to in our contract.

3. That at times a refinery will sell below its own list price and that quoted by Willett and Gray. Under such circumstances the Purchasing Department has been using the lower price.

4. That I was convinced that where there was a possibility of two interpretations that the Thomas Company and the Bottler had in every instance benefitted.

5. That perhaps had it not been for the reorganizational changes, the matter would never have been brought up perhaps the best thing to do would be for the Company notification to continue to refer to the two quotations, paper and cloth, and for Dee to continue to write the same letter that he has in the past.

6. I advised him that since the entire matter had arisen due to Mr. Hunter's wish to be able to explain the method to Bottlers, that I thought that we were exactly where we were back in 1947 and that no basic change had been made in the understanding but merely changes in ownership of refineries and the occasional variance as mentioned heretofore in connection with the impossibility of hueing to the line 100% with Willett and Gray.

7. Dee asked if I wished to formalize the matter and I told him that I did not think it was necessary and he agreed.

8. Dee agreed with the foregoing and the file is closed as far as I am concerned.

PX825; DX307.

69. Plaintiffs point to paragraphs 3 and 4 of the Hodgson Memorandum as evidence that the Company conducted its own independent investigation into the price of sugar for the first seven days of each and every quarter. However, paragraph 3 should not be read in isolation out of the context of the remainder of the memorandum. In paragraph 2, Hodgson refers to the letter of June 3, 1947 from S.J. Forio to DeSales Harrison, in which Forio informed

---

**11.** The remainder of the paragraph refers to the Company's position regarding the use of price quotations for sugar sold in cotton, as opposed to paper, bags. *See, e.g.,* DX283; DX284; DX852; DX864.

Harrison that the Company relied primarily on the prices published in Willett & Gray. PX811; *see supra.* Neither paragraphs 3 and 4 nor the Hodgson Memorandum taken as a whole purports to overrule or to contradict the policy set forth in Forio's June 3, 1947 letter. Moreover, in paragraph 6 Hodgson appears to reaffirm the procedure outlined in the June 3, 1947 letter when he states: "I thought that we were exactly where we were back in 1947 and that no basic change had been made in the understanding...."

70. The testimony of Company officials who participated in calculating the price of bottlers' syrup confirms that in 1956 the Company relied primarily on the contents of Willett & Gray to determine the price of sugar for purposes of calculating syrup price. Their testimony also sheds light on the meaning of paragraph 3 and 4 of the Hodgson Memorandum. According to the testimony adduced at trial, the Company received, in addition to Willett & Gray, published sugar price quotations from brokers and published price lists from the refiners themselves. When discrepancies arose between the prices published in Willett & Gray and those contained in the brokers' reports and the refiners' price lists, the Company would contact the refiners for clarification. If, under these circumstances, the Company's inquiries resulted in a price lower than that published in Willett & Gray, the Company used the lower price in its syrup price calculations.

71. The deposition of John Mount, Assistant to the Director of Purchasing and later a Senior Buyer for the Company, who had responsibility for the day-to-day operations of the Sugar Section of the Purchasing Department until 1967–68, was read into the record. Mount gave the following testimony concerning the procedures for obtaining the price of sugar for purposes of calculating syrup price:

Q: What was your responsibility for that process [collection of information to be used to calculate syrup price] beginning at the earliest stage in which you had any role in it?

A: To obtain price information from price lists, from telegrams, from circulars, from what was then known as the bible of the industry, Willett and Gray and to summarize that information for the review of my superiors.

Tr. 5979 (Mount).

72. When asked whether he received particular instructions regarding the collection of sugar price data, Mount responded:

All that my memory serves me is that the first line of reference is Willett and Gray....

[There were no other instructions] that I recall, other than what I previously stated, to check other documentation to look to see if Willett and Gray was accurate in what they were reporting....

[The "other documentation" consulted included] Brokers' letters, such as Lamborn's letter, Lamborn at that time being the largest refined sugar broker in the country, I believe. The Dyergram from B.W. Dyer & Company....

....

[and] price lists as we may have received from various refiners ... and any changes in such price lists as may have been received in the form of a telegram or letter of advice.

Tr. 5980–81 (Mount).

73. Mount's initials appear on the Hodgson Memorandum, indicating that he reviewed the memorandum in 1956. *See* Tr. at 6088 (Mount). Mount explained paragraph 3 of the Hodgson Memorandum as referring to situations "[w]here there were deviations from price, announced to the trade and the purchasers which may not have been picked up and quoted in Willett & Gray. Such deviations as announced by the refiners would be used in determining the price. Those deviations were usually in the form of a telegram or wire." Tr. at 6098–99 (Mount).

74. The deposition of Donald Leslie was also read into the record. Leslie was an assistant purchasing agent with the Company in 1946. In 1957 he became Assistant Director of Purchasing, and he was Director of Purchasing from 1960–69. He testified the following with regard to the

procedure used to determine the price of sugar for purposes of calculating syrup price:

Q: For purposes of computing average market price of sugar to be used in pricing bottlers syrup, was it the procedure of the Purchasing Department ... to look not only to Willett and Gray but to Lamborn as well as presumably the refiners own published price lists?

A: Correct.

Q: And if there were not differences between those three sources, then the price shown by those three sources would be used?

A: Correct.

Q: If there were differences, then ... Mr. Mount would make a phone call to a refinery?

A: Asking for clarification of those two quotes, two separate quotes.

Tr. 5879–80 (Leslie).

75. Leslie's initials appear on the Hodgson Memorandum. He testified that the memorandum was true and accurate when he received it. Tr. 5905 (Leslie).

76. Joe Power was a senior statistician in the Purchasing Department at the time the Hodgson Memorandum was written. He was the person within the Purchasing Department primarily responsible for actually collecting the data from which the price of sugar was determined. Tr. 5878 (Leslie). Power testified at trial and described the procedure for collecting the price of sugar as follows:

Q: Mr. Power, could you please describe for us the method that you used for collecting price quotations from cane sugar refiners for use in the bottler syrup price calculations beginning in [1954]?

A: Our primary source was always Willett and Gray. We always tried to have copies of everyone's price lists and price announcements so we could refer to those.

We always followed up by reading our publications. But they were merely supplemental. Willett and Gray was the primary reference.

Q: Now, in 1954, what was the primary source of price quotations that you used in the bottlers' syrup price calculations?

A: Willett and Gray.

Tr. 9462.

77. Power further testified:

Q: As part of your duties in the Purchasing Department, did you compare the prices that appeared in Willett and Gray and the price announcement that you received from the refiners?

A: Yes I did.

Q: Did the prices that appear in Willett and Gray always coincide exactly with the price announcements that you received from the refineries?

A: In the vast majority of the time they coincided exactly. When they didn't we would investigate to clear up any discrepancies.

Q: What would you do when you discovered a difference between the price announcements that you received from the refiners and the price that appeared in Willett and Gray?

A: The normal procedure would be to call the refiner to see if perhaps we had not received a price list or a price announcement.

Q: On those occasions where there was a difference in the prices that were reported in Willett and Gray and the prices that appeared on one of the refiner's price lists, which of those prices would you use in the bottlers' syrup calculation?

A: If the refiner said his price list was his correct price list, then we used that.

Q: Were there occasions when Willett and Gray did not report the specific quotations for a refiner?

A: That has happened, yes.

Q: What would you do on those occasions?

A: We normally would go to the refiner to get the quotations.

Tr. at 9468–69 (Power).

78. As an example, Power testified that in the third quarter of 1956, J. Ahrens & Company (Supreme) for the first time became one of the ten largest refiners. Con-

sequently, the Company required a sugar price from that particular refiner for the first time. Because it had never before needed that refiner's sugar price, the Company did not have its price list, and it became necessary to telephone the refiner to get a price. Tr. 9475 (Power). *See also* DX859 at P004290 (intra-Company memorandum on sugar price for third quarter of 1956, citing telephone conversation with the refiner as a source of the price information).

79. Power's initials appear on the Hodgson Memorandum. He testified that the memorandum accurately described the method used for collecting prices from the refineries. As to paragraph 3, Power stated that the Company would have used a price lower than that published in Willett & Gray in the syrup price calculation when there was "an announced allowance that was available to everyone. There could be an instance where the refiner had put out an announcement, saying we are reducing our price or we are increasing our price, effective on a given date, and [the Company] might have the announcement in hand, not the price list.... Anything that would openly, to the trade, change [the refiner's] price quotation, would cause us to use the new price quotation." Tr. 9570–71.

80. The testimony of Company officials that they primarily relied on the information published in Willett & Gray when calculating the price of bottler syrup during the mid–1950's is supported by certain intra-Company memoranda entered into the record. In a memorandum dated October 8, 1954, Homer Thompson informed Forio that the average market price of refined cane sugar for the first seven days of the fourth quarter of 1954 was 8.47¢ per pound in paper bags and 8.7078¢ in cotton bags. The memorandum listed the following under the heading "SOURCES":

Willett & Gray's Daily Sugar Trade Journals for 10/1–4–5–6–7; *supplemented by the following:*

(a) C & H's price list for industrial grade sugar on Pacific Coast.

(b) Lamborn's Sugar Market Reports for Sept. 28, 1954 & Oct. 5, 1954.

(c) Imperial's wire of Sept. 15, 1954.

(d) Letter form American dated Sept. [unreadable], 1954, concerning price ... New Orleans (Gulf) area.

(e) Keiser & Co., Inc.'s Sugar Market Review for period Sept. 30, 1954 to October 6, 1954.

DX852 at P004261 (emphasis added).

81. A similar memorandum, dated July 9, 1956—only one month prior to the Hodgson Memorandum—from Thompson to Hodgson giving the price for the first seven days of the third quarter of 1956 listed its sources as:

Willett & Gray's daily Sugar Trade Journals for 7/2–3–5–6 *supplemented by the following:*

(a) C & H's price list for industrial grade sugar on Pacific Coast.

(b) Keiser & Co.'s Sugar Market Review for period June 28 to July 5.

(c) Willett & Gray's Weekly Sugar Trade Journal dated 7/5/56.

(d) Lamborn's Sugar Market Report for 7/3/56.

(e) Letter from American Sugar Refining Co. dated 4/24/56 concerning price in New Orleans.

(f) Telephone conversation on 7/6/56 with Mr. Charles A. Levy, Vice President, J. Aron & Co. (Supreme)—see notes attached.

DX859 at P004290 (emphasis added).

82. The Court finds that the Hodgson Memorandum does not support plaintiffs' assertion that the Company prior to 1969 conducted its own independent investigation into the price of sugar for the first seven days of each quarter. Rather, the Hodgson Memorandum is entirely consistent with the Company's procedure as described in the June 3, 1947 Forio letter. That is, the Court finds that the Hodgson Memorandum describes a procedure wherein the Company, when calculating the price of bottlers syrup pursuant to paragraphs 6 and 7 of the Consent Decrees and paragraph FOURTH of the unamended contracts, primarily relied upon the sugar prices published in Willett & Gray, supplemented by brokers' reports, such as Lamborn, and refiner's price lists. When Wil-

lett & Gray failed to publish prices for the first seven days of a quarter, or when a particular refiner's price as published in Willett & Gray differed from that listed in a broker's report or in the refiner's own price list, the Company contacted the refiner directly to resolve the discrepancy. When the price given by the refiner in response to the Company's inquiry was lower than that published in Willett & Gray, the Company used the lower figure when calculating the syrup price.

83. This point is further buttressed by the fact that one of the Thomas Company's letters emphasizing its desire that the Company continue its procedure, as set forth in the Forio letter, of relying upon the prices quoted in Willett & Gray was written *after* the date of the Hodgson Memorandum and the telephone conversation between Hodgson and the Thomas Company official that the Memorandum memorialized. *See* PX826 and *supra.*

84. The Company's procedure remained essentially unchanged both before and after 1969, until Willett & Gray ceased publishing in 1979. *See* Tr. 9477 (Power) (primary source of sugar price information in January 1975 was still Willett & Gray); Tr. 9733–36 (Konzal) (no change in procedure from 1965–80). Thus, the Company's primary reliance on the prices published in Willett & Gray after 1969 does not constitute an abrupt deviation from its prior course of performance.

CONCLUSIONS OF LAW

85. The Court first addresses the Company's assertion that plaintiffs waived or are estopped from raising their claims with regard to market price. The concepts of waiver and estoppel, while sometimes used interchangeably, are distinguishable. "[A] waiver is a voluntary and intentional abandonment or relinquishment of a known right, whereas an equitable estoppel may arise though there was no intention on the part of the party to relinquish or change any existing right." 28 Am.Jur.2d *Estoppel and Waiver* § 30 at 633–34. The Company bears the burden of showing waiver or estoppel.

86. Waiver includes an element of intent. The Company has not shown a waiver because it has not shown that plaintiffs voluntarily and intentionally relinquished their asserted right to use of a price other than list price in the calculation of the syrup price. At most, the Company has shown that plaintiffs were negligent in failing to object to its use of the list price of sugar in its syrup price calculations.

87. The elements of equitable estoppel include a showing that the other party relied on the actions or omissions of the estopped party to his detriment. There has been no showing by the Company that it in any way changed its position as a result of plaintiffs' failure to object sooner to its use of list prices. *Matter of B.J. Thomas, Inc.,* 45 B.R. 91, 95–96 (Bankr. M.D.Fla.1984) (mere delay in enforcing one's rights does not create estoppel so long as the other party is not prejudiced). If anything, the Company has argued the exact opposite—that it has not changed its position with regard to the use of list prices to calculate the syrup price since the inception of the unamended contracts in 1921.

88. The Company has also failed to demonstrate that it has somehow been misled or prejudiced by plaintiffs' failure to act sooner. Under the facts of this case, the Company's argument that it has been prejudiced because required to defend an older claim is insufficient to sustain its assertion of waiver or estoppel. Having concluded that the plaintiffs did not waive and are not estopped from asserting that the Company's use of list prices to calculate the syrup price breached their contracts, the Court turns to the merits of plaintiffs' assertion.

89. The Court must give effect to the mutual intention of the parties at the time the Consent Decrees and unamended contracts were executed. In so doing, the Court concludes that the pricing provisions of the Consent Decrees and unamended contracts were intended to operate prospectively and to govern the parties' future conduct.

90. The Court concludes that the term "market price" as it is used in the

Consent Decrees and unamended contracts is ambiguous and that the use of "market price" as opposed to "list price" in the Consent Decrees and unamended contracts does not evidence the intention of the contracting parties in 1921 that the Company calculate the syrup price using a price, such as negotiated selling prices, other than list price.

91. The Court further concludes that the parties in 1920 and 1921 intended the pricing provisions to yield a syrup price which would be both competitive and verifiable.

92. The Court concludes that plaintiffs have not proven by a preponderance of the evidence that list price is a wholly fictitious price. At all times relevant to this litigation at least some sugar was sold to industrial users at list price.

93. The Court concludes the "list price," *i.e.*, the price published in the refiners' price lists and the trade publications, satisfies the terms and intent of the Consent Decrees and unamended contracts because it yields a syrup price which is competitive and verifiable.

94. The Court also concludes that the list price satisfies the definition of "market price," as that term is used in the pricing provisions of the Consent Decrees and unamended contracts, set out by Judge Schwartz in *Coke III* because the list price is a price available to industrial users upon inquiry prior to sale.

95. The Court concludes that plaintiffs have not proven by a preponderance of the evidence that there exists a price other than list price which satisfies both the intent of the pricing provisions and Judge Schwartz' definition of "market price."

96. More importantly, beyond allegations that the Company knows or should know of such a price, plaintiffs have offered no evidence as to any method for prospectively determining a price lower than list price which is available to industrial users upon inquiry prior to sale. Judge

Schwartz' definition of "market price," which plaintiffs chose to abide by when they declined the Court's offer to reconsider the rulings of *Coke III*,[12] calls for a price available upon inquiry prior to sale. Plaintiffs have offered no procedure for determining such a price in future quarters.

97. The Court concludes that the Company's reliance on the prices listed in Willett & Gray and other trade publications is not the result of an abrupt change in practice in 1969. Rather, the Court concludes that, as early as 1924, the Company, with the knowledge of the parent bottlers, relied upon prices listed in the trade journals. This course of performance close in time to the drafting of the Consent Decrees and unamended contracts is evidence that the contracting parties found acceptable the use of list prices in determining the price of syrup.

98. The plaintiffs have proven no more than that around 1969 the cane sugar refiners began to change the way they priced sugar for large industrial users. If in fact there has been a material change in the pricing practices of the cane refiners, it is up to the parties and not the Court to adjust their contractual relations to reflect such a change.

99. The Court concludes that the Company's reliance on list prices to calculate the syrup price does not constitute a breach of the pricing provisions of the unamended contracts, and plaintiffs, therefore, are not entitled to damages.

---

12. *See* Transcript of Conference Before Hon. Joseph J. Farnan, Jr. (Oct. 31, 1989) (Dkt. 882).